# 13-0422-cv(L), 13-0445-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

THE NEW YORK TIMES COMPANY, CHARLIE SAVAGE, SCOTT SHANE, AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION FOUNDATION,

*Plaintiffs-Appellants,*

— v. —

UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DEPARTMENT OF DEFENSE, CENTRAL INTELLIGENCE AGENCY,

*Defendants-Appellees.*

—————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL LIBERTIES UNION FOUNDATION

JAMEEL JAFFER
HINA SHAMSI
BRETT MAX KAUFMAN
THE AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 17th Floor
New York, New York 10004
(212) 607-3300

JOSHUA COLANGELO-BRYAN
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, New York 10019
(212) 415-9200

   – and –

ERIC RUZICKA
COLIN WICKER
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
(612) 340-2959

*Attorneys for Plaintiffs-Appellants American Civil Liberties Union
and American Civil Liberties Union Foundation*

## CORPORATE DISCLOSURE STATEMENT

As required by Rule 26.1, Appellants state that the American Civil Liberties Union and the American Civil Liberties Union Foundation are affiliated non-profit membership corporations. Accordingly, they have no stock and no parent corporations, nor does any corporation own more than 10% of their stock.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ..................................................................i

TABLE OF AUTHORITIES ....................................................................v

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE..................................................................3

STATEMENT OF FACTS & PROCEDURAL HISTORY ......................5

I.     The Targeted-Killing Program ....................................................5

II.    Plaintiffs' FOIA Request & the Agencies' Responses...................6

       A.     DOJ..................................................................................7

       B.     DOD ................................................................................8

       C.     CIA ..................................................................................9

III.   The Government's Disclosures About the Program......................10

       A.     The government has acknowledged that the United States
              carries out targeted killings, including against American
              citizens............................................................................11

       B.     The government has acknowledged the CIA's involvement in
              the targeted-killing program..............................................13

       C.     The government has disclosed that it carried out the killing of
              Anwar al-Aulaqi and has described its reasons...................17

       D.     The government has outlined the purported legal justification
              for the targeted killing of U.S. citizens and referred to and
              discussed the OLC memoranda that set out that justification............20

       E.     The government has acknowledged the existence of OLC
              memoranda that constitute the targeted-killing program's
              governing law ..................................................................24

IV.    The District Court's Opinion....................................................25

       A.     "No Number No List" Responses ......................................26

B.    Identified Documents Withheld by the Agencies ...............................27

    1.    The OLC–DOD Memo ..................................................27

    2.    The Unclassified Memos ...........................................28

STANDARD OF REVIEW ...........................................................29

SUMMARY OF THE ARGUMENT ...........................................30

ARGUMENT ...............................................................................32

I.    FOIA Requires the Court to Scrutinize Closely the Government's Argument that National Security Requires Records to Be Withheld from the Public ...........................................................32

II.    The Agencies' "No Number No List" Responses to the ACLU's FOIA Request Are Unlawful .......................................................34

    A.    A "no number no list" response to a FOIA request is a novel judicial accommodation that is justified only in the most unusual circumstances .........................................................35

    B.    The agencies' "no number no list" responses are unlawful because the government has already disclosed the information that it purports to protect .....................................................37

    CIA .................................................................................38

    DOD ...............................................................................39

    DOJ ................................................................................40

    C.    The agencies' "no number no list" responses cannot be justified under Exemptions 1 and 3 ..........................................40

III.    The Agencies' Withholding of the OLC–DOD Memo and the Unclassified Memos (and Any Other Responsive OLC Memoranda) is Unlawful ....................................................................50

    A.    The agencies have waived their right to withhold responsive legal memoranda under Exemptions 1 and 5 .......................51

    B.    The legal memoranda are not protected by Exemptions 1 and 3 ........55

    1.    Legal reasoning cannot be withheld under Exemptions 1 or 3 .......................................................55

2.      Targeted killing is not a "source or method" of
        intelligence or a statutory "function" of the CIA......................59

IV.    The DOJ's OIP Did Not Conduct an Adequate Search................................60

CONCLUSION ..................................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
   488 F.3d 178 (3d Cir. 2007) .........................................................................45

*Am. Civil Liberties Union v. CIA*,
   No. 11-5320, — F.3d —, 2013 WL 1003688
   (D.C. Cir. Mar. 15, 2013) ....................................................................*passim*

*Am. Civil Liberties Union v. Dep't of Def.*,
   389 F. Supp. 2d 547 (S.D.N.Y. 2005) ....................................................42, 49

*Am. Civil Liberties Union v. Dep't of Def.*,
   543 F.3d 59 (2d Cir. 2008), *vacated on other grounds and
   remanded*, 130 S. Ct. 777 (2009)..................................................................32

*Am. Civil Liberties Union v. Dep't of Justice*,
   681 F.3d 61 (2d Cir. 2012) ...........................................................................43

*Am. Civil Liberties Union v. Office of the Dir. of Nat'l Intelligence*,
   2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011) .............................................57

*Boggs v. United States*,
   987 F. Supp. 11 (D.D.C. 1997)......................................................................35

*Brennan Ctr. for Justice at N.Y. Univ. Law Sch. of Law v.
   Dep't of Justice, Cv.*,
   697 F.3d 184 (2d Cir. 2012) .........................................................................54

*Campbell v. U.S. Dep't of Justice*,
   164 F.3d 20 (D.C. Cir. 1998).........................................................................60

*CIA v. Sims*,
   471 U.S. 159 (1985).......................................................................... 33-34, 59

*Ctr. for Int'l Envtl. Law v. Office of the U.S. Trade Representative*,
   505 F. Supp. 2d 150 (D.D.C. 2007)...............................................................57

*Delaney Migdail & Young, Chartered v. IRS*,
   826 F.2d 124 (D.C. Cir. 1987)................................................................45, 47

*Dep't of the Air Force v. Rose*,
   425 U.S. 352 (1976).......................................................................................49

v

*EPA v. Mink*,
  410 U.S. 73 (1973)........................................................................44

*Gallant v. NLRB*,
  26 F.3d 168 (D.C. Cir. 1994).........................................................35

*Goldberg v. U.S. Dep't of State*,
  818 F.2d 71 (D.C. Cir. 1987).........................................................34

*Halpern v. FBI*,
  181 F.3d 279 (2d Cir. 1999) ....................................................29, 56

*Hoch v. CIA*,
  No. 88-5422, 1990 WL 102740 (D.C. Cir. July 20, 1990)............38

*Hope v. Pelzer*,
  536 U.S. 730 (2002).....................................................................10

*Hopkins v. Dep't of Housing and Urban Dev.*,
  929 F.2d 81 (2d Cir. 1991) ...........................................................59

*John Doe Corp. v. John Doe Agency*,
  850 F.2d 105 (2d Cir. 1988), *rev'd on other grounds*,
  493 U.S. 146 (1989)......................................................................48

*Larson v. Dep't of State*,
  565 F.3d 857 (D.C. Cir. 2009).......................................................56

*Mead Data Cent., Inc. v. Dep't of Air Force*,
  566 F.2d 242 (D.C. Cir. 1977)..................................................45, 46

*Military Audit Project v. Casey*,
  656 F.2d 724 (D.C. Cir. 1981).......................................................57

*Milner v. Dep't of Navy*,
  131 S. Ct. 1259 (2011)...................................................................32

*N.Y. Times Co. v. Dep't of Justice*,
  872 F. Supp. 2d 309 (2012) .....................................................57, 58

*N.Y. Times Co. v. U.S. Dep't of Justice*,
  Nos. 11 Civ. 9336 & 12 Civ. 794, 2013 WL 238928
  (S.D.N.Y. Jan. 22, 2013) ................................................................3

*N.Y. Times Co. v. U.S. Dep't of Justice*,
  Nos. 11 Civ. 9336 & 12 Civ. 794, 2013 WL 50209
  (S.D.N.Y. Jan. 3, 2013) ............................................................. 3-4

*Nat'l Ass'n of Home Builders v. Norton*,
    309 F.3d 26 (D.C. Cir. 2002).......................................................32

*Nat'l Council of La Raza v. Dep't of Justice*,
    411 F.3d 350 (2d Cir. 2005) .......................................................54

*Navasky v. CIA*,
    499 F. Supp. 269 (S.D.N.Y. 1980) ..............................................43

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978).....................................................................32

*NLRB v. Sears, Roebuck, & Co.*,
    421 U.S. 132 (1975)...............................................................51, 58

*Oglesby v. U.S. Dep't of Army*,
    79 F.3d 1172 (D.C. Cir. 1996)......................................................48

*Phillippi v. CIA*,
    546 F.2d 1009 (D.C. Cir. 1976)..................................7, 35, 42, 60

*Pub. Citizen, Inc. v. Office of Mgmt. & Budget*,
    598 F.3d 865 (D.C. Cir. 2010).....................................................58

*Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*,
    533 F.3d 810 (D.C. Cir. 2008).................................................32, 53

*Roth v. U.S. Dep't of Justice*,
    642 F.3d 1161 (D.C. Cir. 2011)...................................................35

*U.S. Dep't of State v. Ray*,
    502 U.S. 164 (1991).....................................................................32

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973)..............................................*passim*

*Weissman v. CIA*,
    565 F.2d 692 (D.C. Cir. 1977).....................................................42

*Wilner v. Nat'l Sec. Agency*,
    592 F.3d 60 (2d Cir. 2009) ...................................................*passim*

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007).....................................................37

**Statutes & Other Authorities:**

U.S. Const. amend. IV ......................................................................21

U.S. Const. amend. V ..................................................................................21

5 U.S.C. § 552 .................................................................................*passim*

5 U.S.C. §§ 701–706 .....................................................................................1

18 U.S.C. § 1119(b) ....................................................................................21

18 U.S.C. § 2441 ........................................................................................21

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

50 U.S.C. § 403-1 ...............................................................................27, 42

50 U.S.C. § 403g ................................................................................27, 42

50 U.S.C. § 413b .........................................................................................38

Fed. R. App. P. 4(a)(1)(B) ............................................................................1

Fed. R. Evid. 201(d) ...................................................................................10

Executive Order on Classified National Security Information,
No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009)............................26, 41, 55, 56

H.R. Rep. No. 276(II) (1984), *reprinted in* 1984 U.S.C.C.A.N. 3778 ..................43

S. Rep. No. 93-1200 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267 .....................33

Republican Policy Committee Statement on Freedom of Information
Legislation, S. 1160, 112 Cong. Rec. 13020 (1966), *reprinted in*
Subcomm. on Admin. Practice, S. Comm. on the Judiciary, 93rd
Cong., Freedom of Information Act Source Book: Legislative
Materials, Cases, Articles, at 59 (1974) ........................................................33

Statement of Rep. Donald Rumsfeld, 112 Cong. Rec. 13031 (1966),
*reprinted in* Subcomm. on Admin. Practice, S. Comm. on the
Judiciary, 93rd Cong., Freedom of Information Act Source Book:
Legislative Materials, Cases, Articles, at 70 (1974)......................................33

Statement of Sen. Edward Kennedy, 120 Cong. Rec. 9314 (1974) .....................34

Statement of Sen. Edmund Muskie, 120 Cong. Rec. 9334 (1974)........................34

Karen A. Winchester & James W. Zirkle, *Freedom of Information and the
CIA Information Act*, 21 U. Rich. L. Rev. 231 (1987) .................................43

## JURISDICTIONAL STATEMENT

The American Civil Liberties Union and the American Civil Liberties Union Foundation (together, the "ACLU") brought claims under the Freedom of Information Act. The District Court had subject matter and personal jurisdiction pursuant to 5 U.S.C. §§ 552(a)(4)(B), (a)(6)(E)(iii), 28 U.S.C. § 1331, and 5 U.S.C. §§ 701–706. The District Court granted summary judgment to the Defendant–Appellee government agencies, and judgment was entered on January 24, 2013. The ACLU filed its Notice of Appeal on February 1, 2013, which was timely under Rule 4(a)(1)(B) of the Federal Rules of Appellate Procedure. This Court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

1. Whether the defendant–appellee agencies can lawfully provide "no number no list" responses to plaintiffs' Freedom of Information Act ("FOIA") request for information about the targeted-killing program when the President and senior government officials have voluntarily disclosed information about the program's scope, effectiveness, operation in individual instances, and purported legal basis.

2. Whether the defendant–appellee agencies can lawfully provide "no number no list" responses when the provision of a *Vaughn* declaration enumerating and describing responsive documents would disclose no information protected by Exemptions 1 and 3.

3. Whether the Departments of Justice and Defense have waived their right to withhold a memorandum from the Office of Legal Counsel to the Department of Defense (the "OLC–DOD Memo") by voluntarily disclosing its substance.

4. Whether the Departments of Justice and Defense have waived their right to withhold the OLC–DOD Memo by adopting its reasoning.

5. Whether, irrespective of waiver or adoption, the Departments of Justice and Defense properly withheld the OLC–DOD Memo pursuant to FOIA Exemptions 1 and 5.

6. Whether the Department of Defense has waived its ability to withhold the unclassified memoranda listed on its *Vaughn* index (the "Unclassified Memos") pursuant to FOIA Exemption 5.

7. Whether the Department of Justice's Office of Information Policy conducted an adequate search for responsive records.

## STATEMENT OF THE CASE

This litigation concerns a Freedom of Information Act request (the "Request") filed by the ACLU for records relating to the government's targeted-killing program and to its killing, in the fall of 2011, of three United States citizens—Anwar al-Aulaqi, Samir Khan, and Abdulrahman al-Aulaqi. The Request seeks records concerning the purported legal basis for the program, the process by which the government adds U.S. citizens to so-called "kill lists," and the government's legal and factual basis for the killing of those three U.S. citizens. Plaintiffs filed the Request on October 19, 2011, with the Central Intelligence Agency ("CIA"), the Department of Defense ("DOD"), and the Department of Justice ("DOJ")—including DOJ's Office of Information Policy ("OIP") and Office of Legal Counsel ("OLC"). After exhausting administrative appeals, the ACLU filed suit in the Southern District of New York on February 1, 2012. The case was consolidated with a related suit filed by The New York Times Company.

After various modifications by the defendant agencies of their original responses to the ACLU's Request, the parties filed cross-motions for summary judgment. In two opinions dated January 3, 2013, and January 22, 2013, U.S. District Judge Colleen McMahon granted the government's motion and denied the ACLU's motion. *See N.Y. Times Co. v. U.S. Dep't of Justice*, Nos. 11 Civ. 9336 & 12 Civ. 794, 2013 WL 238928 (S.D.N.Y. Jan. 22, 2013) (SPA1–68); *N.Y. Times*

*Co. v. U.S. Dep't of Justice*, Nos. 11 Civ. 9336 & 12 Civ. 794, 2013 WL 50209 (S.D.N.Y. Jan. 3, 2013) (SPA69–71). The ACLU timely appealed on February 1, 2013; the New York Times Company also appealed. This Court consolidated the appeals on March 19, 2013.

## STATEMENT OF FACTS & PROCEDURAL HISTORY

### I.     The Targeted-Killing Program

Over the last twelve years, the CIA and JSOC have used drones to carry out targeted killings in at least half a dozen countries. Some of these killings have been carried out in Iraq and Afghanistan; many others have been carried out in places far removed from areas of armed conflict. *See* JA166. The frequency of drone strikes has increased dramatically in recent years, and public interest in the government's targeted-killing program has increased concomitantly. *See generally id.*; *see also generally* Scott Shane & Thom Shanker, *Yemen Strike Reflects U.S. Shift to Drones in Terror Fight*, N.Y. Times, Oct. 1, 2011, http://nyti.ms/qd0L4Q (cited at JA255–256). Many commentators, including some in public office, have raised concerns about civilian casualties, the program's legal basis, the process by which individuals are added to so-called "kill lists," and the wisdom of permitting Executive Branch officials to deprive individuals of their lives without ever presenting evidence to any court. *See* JA837–843. Within the United States, public concern and debate about the program grew substantially after the CIA and JSOC killed three U.S. citizens in Yemen in the fall of 2011. On September 30, 2011, the CIA and JSOC killed Anwar al-Aulaqi, who had been added to the agencies' "kill lists" months earlier, and Samir Khan, who was traveling with him. JA249–251. Two weeks later, the CIA and JSOC killed Abdulrahman al-Aulaqi, Anwar al-

Aulaqi's sixteen-year-old son, in what anonymous CIA officials told the media was "an outrageous mistake." JA842.

While the government does not release casualty statistics, The Bureau of Investigative Journalism, a London-based group that tracks American drone strikes, estimates that the CIA and JSOC may have killed more than 4,000 people in Pakistan, Yemen, and Somalia alone, including approximately 1,000 civilian bystanders.[1]

## II.   Plaintiffs' FOIA Request & the Agencies' Responses

To help the public better assess the wisdom and lawfulness of the targeted-killing program the ACLU filed the Request under the Freedom of Information Act ("FOIA") on October 19, 2011, with the CIA, DOD, and DOJ, including its components OIP and OLC. It sought records concerning the purported legal basis for the program, the process by which the government adds U.S. citizens to so-called "kill lists," and the government's legal and factual basis for the killing of Anwar al-Aulaqi, Samir Khan, and Abdulrahman al-Aulaqi. *See* JA248–259.

DOD did not provide any substantive response to the Request. *See* JA373. OLC and the CIA issued so-called "Glomar" responses, refusing to confirm or

---

[1] *See Covert War on Terror: The Datasets*, Bureau of Investigative Journalism, http://www.thebureauinvestigates.com/category/projects/drone-data/ (last visited Apr. 12, 2013); *see also* Scott Neuman, *Sen. Graham Says 4,700 Killed in U.S. Drone Strikes*, NPR News, Feb. 21, 2013, http://n.pr/157whqC.

deny the existence of responsive records. *See generally Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976). JA263–264, 318. After exhausting administrative appeals, the ACLU filed suit on February 1, 2012. The Southern District of New York consolidated the case with a related action filed by The New York Times Company. *See* JA036–048, JA024–035.

In connection with the parties' cross-motions for summary judgment, the defendant agencies modified their original FOIA responses after "senior executive branch officials . . . publicly addressed significant legal and policy issues pertaining to U.S. counterterrorism operations and the potential use of lethal force by the U.S. government against senior operational leaders of al-Qa'ida or associate[d] forces who have U.S. citizenship." SPA7 (quotation marks omitted). The agencies' amended responses to the Request were as follows:

A.    DOJ

After searching its own files, OLC provided a *Vaughn* index listing sixty non-classified responsive records, each described as an e-mail concerning "the use of lethal force in a foreign country against U.S. citizens in certain circumstances," withholding them in their entirety under FOIA Exemption 5. JA290–291, JA324–333; *see generally Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). OLC stated that it was also withholding classified records, but that FOIA Exemptions 1 and 3 excused it from having to disclose the number of these documents or supply a

description of them. (OLC termed this a "no number no list" response, as did the other agencies.) OLC did acknowledge the existence of one classified record, an "OLC opinion related to DOD operations" (the "OLC–DOD Memo"), which it withheld in its entirety under Exemptions 1 and 3. JA291–292; *see* SPA9.

OIP's search yielded one set of talking points related to "hypothetical questions" about the death of Anwar al-Aulaqi, a record it released. OIP also issued a *Vaughn* index listing four unclassified records withheld under Exemptions 3 and 5. JA412–413, JA442–443, JA447–450, JA453–454. And it withheld additional classified documents through a "no number no list" response pursuant to Exemptions 1 and 3. JA412.

At issue in this case are (a) DOJ's "no number no list" responses, (b) its withholding of the OLC–DOD Memo, and (c) the adequacy of OIP's search.

B.   DOD

DOD released a speech by DOD General Counsel Jeh Johnson at Yale Law School on February 22, 2012, and it provided a *Vaughn* index listing ten unclassified records withheld under FOIA Exemption 5. JA337–338. Seven of those records consisted of e-mail chains regarding drafts of speeches given by Mr. Holder and Mr. Johnson, JA338–339; one was a presentation about international legal principles made by Mr. Johnson, JA339; and DOD described the two others as "unclassified memoranda from the Legal Counsel to the Chairman of the Joint

Chiefs of Staff to the White House's National Security Council Legal Advisor addressing the legal basis for conducting military operations against U.S. citizens in general" (the "Unclassified Memos"). *Id.*; SPA54.

DOD also indicated that it had located responsive documents that were classified. One of these was the OLC–DOD memo, which the agency withheld under FOIA Exemptions 1 and 5. *See* JA339. As to the remainder, DOD issued a "no number no list" response. JA342.

At issue in this case are (a) DOD's "no number no list" response, (b) its withholding of the OLC–DOD Memo, and (c) its withholding of the Unclassified Memos.

C.     CIA

The CIA withdrew its initial "Glomar" response and replaced it with a "no number no list" response. In doing so, the CIA acknowledged its "general interest in" two categories of records: those relating to "the legal basis . . . upon which U.S. citizens can be subjected to targeted killing," and those relating to "the process by which U.S. citizens can be designated for targeted killing." JA215–216 (alteration in original). The agency also released the publicly available texts of the speeches given by Mr. Holder and Mr. Brennan. *See* JA216. The CIA issued a "no number no list" based on FOIA Exemptions 1 and 3 as to any other responsive documents in its possession. JA217. It did not provide a *Vaughn* index.

At issue in this case is the CIA's "no number no list" response.

## III.    The Government's Disclosures About the Program[2]

Senior government officials made a series of on-the-record disclosures about the targeted-killing program before Plaintiffs filed the Request—indeed, it was these disclosures that led Plaintiffs to file the Request in the first place. Since that time, government officials—including the President and some of his closest advisors—have made additional disclosures. Through these disclosures, they have defended the program's legality, effectiveness, and necessity, and have dismissed concerns about civilian casualties. They have described the CIA's role in the program. They have acknowledged that the U.S. government carried out the strike that killed Anwar al-Aulaqi, and they have outlined the government's reasons for having done so. The government's disclosures about the program have been selective and self-serving, and they leave the public record about the targeted-killing program incomplete in crucial respects. Nonetheless, the disclosures have

---

[2] Most of the government statements cited below were part of the record before the district court. A few were made after July 2012, when briefing before the district court was completed, and most of these were made after January 2013, when the district court entered judgment. Unless they were submitted to the court through post-briefing letters, the sources of such statements are not included in the Joint Appendix. However, this Court may take judicial notice of newspaper articles and other publications in which such statements appear. *See* Fed. R. Evid. 201(d); *see also Hope v. Pelzer*, 536 U.S. 730, 737 n.7 (2002); *Am. Civil Liberties Union v. CIA* ("*Drones FOIA*"), No. 11-5320, — F.3d —, 2013 WL 1003688, at *6 n.10 (D.C. Cir. Mar. 15, 2013).

been sufficiently substantial, detailed, and consistent that they fundamentally
undermine the arguments that the government makes in this litigation.

A.    The government has acknowledged that the United States carries out
targeted killings, including against American citizens.

The President and other senior officials have acknowledged that the
government carries out targeted killings of suspected terrorists. An early official
acknowledgment came in May 2009 at the Pacific Council on International Policy,
where, in response to a question about "remote drone strikes" in Pakistan, then–
CIA Director Leon Panetta called such strikes "the only game in town in terms of
confronting and trying to disrupt the al-Qaeda leadership." JA544. Roughly one
year later, then–Legal Adviser to the Department of State Harold Koh assured a
meeting of the American Society of International Law that "U.S. targeting
practices—including lethal operations conducted with the use of unmanned aerial
vehicles"—"comply with all applicable law." JA124. On two occasions in 2012,
the President acknowledged and discussed the targeted-killing program—first
describing it during an online forum as "a targeted, focused effort at people who
are on a list of active terrorists who are trying to go in and harm Americans, hit
American facilities, American bases, and so on," JA516; and more recently calling
it a "tool" used against al-Qaeda in a CNN interview. JA828. In February 2013,
Press Secretary Jay Carney stated that "[w]e have acknowledged, the United
States, that sometimes we use remotely piloted aircraft to conduct targeted strikes

against specific al Qaeda terrorists in order to prevent attacks on the United States and to save American lives." White House, Press Briefing by Press Secretary Jay Carney (Feb. 5, 2013), http://1.usa.gov/UvbFaS ("Carney Briefing").

Senior officials have also acknowledged that U.S. citizens are and have been among the program's targets. In an April 30, 2012 speech at the Woodrow Wilson International Center for Scholars, John O. Brennan—then the President's chief counterterrorism advisor, and since March 2013 the CIA Director—confirmed that "the United States Government conducts targeted strikes against specific al-Qaida terrorists, sometimes using remotely piloted aircraft, often referred to publicly as drones." JA095. He then disclosed that "[w]hen [the target] is a U.S. citizen, we ask ourselves additional questions" and "engage in additional review." JA102–103. Various government officials, including the President, have acknowledged that the United States was responsible for the targeted killing of Anwar al-Aulaqi. *See infra* FACTS § III(C).

The leaders of the congressional committees that oversee the intelligence community have also made clear that U.S. citizens have been among the program's targets. In her opening statement during Mr. Brennan's confirmation hearing to be CIA Director, Sen. Dianne Feinstein—Chairman of the Senate Select Committee on Intelligence ("SSCI")—discussed the "disclosure . . . of a 16-page unclassified White Paper on the government's legal analysis of the use of targeted force against

—12—

a United States citizen[] who was a senior operational leader of al-Qa'ida." *Open Hearing on the Nomination of John O. Brennan to be Director of the Central Intelligence Agency Before the S. Select Comm. on Intelligence* at 5:18–20, 113th Cong. (Feb. 7, 2013), http://1.usa.gov/15fr1Sx ("Brennan Hearing Tr."). And both Sen. Feinstein and Rep. Mike Rogers, the Chairman of the House Select Committee on Intelligence ("HSCI"), have discussed the CIA's role in the targeted killing of Mr. al-Aulaqi. *See infra* FACTS § III(C).

B. The government has acknowledged the CIA's involvement in the targeted-killing program.

As the D.C. Circuit recently remarked of the CIA, "it strains credulity to suggest that an agency charged with gathering intelligence affecting the national security does not have an 'intelligence interest' in drone strikes . . . ." *Am. Civil Liberties Union v. CIA* ("*Drones FOIA*"), No. 11-5320, — F.3d —, 2013 WL 1003688, at *5 (D.C. Cir. Mar. 15, 2013). "But," as that court continued, "there is more." *Id.*

On multiple occasions, then–CIA Director Leon Panetta acknowledged that the CIA carries out targeted killings; he also discussed the CIA's role in specific strikes. In a June 2010 interview with ABC News, Mr. Panetta discussed a drone strike in Pakistan that had reportedly killed al Qaeda's third-most-important leader:

> [T]he more we continue to disrupt Al Qaida's operations, and we are engaged in the most aggressive operations *in the history of the CIA* in that part of the world, and the result is that we are disrupting their

leadership. . . . We just took down number three in their leadership a
few weeks ago.

JA628 (emphasis added). After his 2009 speech before the Pacific Council, Mr.

Panetta responded to a question about "remote drone strikes": "[T]hese operations

have been very effective because they have been very precise in terms of the

targeting and it involved a minimum of collateral damage." JA544. In March 2010,

discussing a drone strike on Hussein al-Yemeni, a suspected "top al Qaeda

trainer," Mr. Panetta remarked to the *Wall Street Journal* that "[a]nytime we get a

high value target that is in the top leadership of al Qaeda, it seriously disrupts their

operations." JA622.

Mr. Panetta continued to discuss the CIA's operational involvement in the

targeted-killing program after he became Secretary of Defense.[3] In a speech at the

U.S. Navy's 6th Fleet Headquarters in Naples, Italy, Mr. Panetta said: "Having

moved from the CIA to the Pentagon, obviously I have a hell of a lot more

weapons available to me in this job than I had at the CIA, although Predators aren't

bad." JA577. Later that same day, Panetta noted that a recent military operation in

---

[3] Mr. Panetta's term as CIA Director stretched from February 13, 2009, to June 30,
2011. He then served in the same administration as Secretary of Defense from July
1, 2011, to February 27, 2013.

Libya had involved "the use of Predators, which is something I was very familiar with in my past job." *Id.*[4]

Mr. Panetta is not the only senior official to have discussed the CIA's operational role in the targeted-killing program. In an October 2012 interview with the *Washington Post*, Mr. Brennan discussed his "efforts to curtail the CIA's primary responsibility for targeted killings" and "described a future in which the CIA is eased out of the clandestine-killing business." JA837, 843. More recently, Ross Newland, who was a senior CIA official when the targeted-killing program was first developed, told the *New York Times* (in the newspaper's paraphrase) that "the agency had grown too comfortable with remote-control killing," "drones ha[d] turned the C.I.A. into the villain in countries like Pakistan," and (in his own words) the CIA's program was "just not an intelligence mission."[5]

Leaders of the congressional committees that oversee the CIA have similarly acknowledged the agency's ongoing operational role. In an interview with CBS, HSCI Chairman Rogers revealed: "Monthly, I have my committee go to the CIA to review [drone strikes]. I as chairman review every single air strike that we use in

---

[4] In a February 2011 interview with *Newsweek*, the CIA's former General Counsel, John Rizzo, also discussed the CIA's use of Predator drones to carry out targeted killings: "The Predator is the weapon of choice, but it could also be someone putting a bullet in your head." Tara Mckelvey, *Inside the Killing Machine*, Newsweek, (Feb. 13, 2011), http://thebea.st/rfU2eG.

[5] Mark Mazzetti, *A Secret Deal on Drones, Sealed in Blood*, N.Y. Times, Apr. 6, 2013, http://nyti.ms/10FLtIB.

the war on terror, both from the civilian and the military side when it comes to
terrorist strikes." Transcript, *Face the Nation*, CBS News (Feb. 10, 2013),
http://cbsn.ws/ZgBg9R ("Rogers CBS Tr."). In February 2013, Sen. Feinstein
publicized her committee's "robust and ongoing oversight of counterterrorism
targeted killings," which included "35 monthly, in-depth oversight meetings with
government officials to review strike records (including video footage) and
question every aspect of the program." Press Release, Sen. Dianne Feinstein,
Chairman, U.S. Sen. Select Comm. on Intelligence, Feinstein Statement on
Intelligence Committee Oversight of Targeted Killings (Feb. 13, 2013),
http://1.usa.gov/14UCBBr ("Feinstein Press Release"). In a more recent radio
interview, Sen. Feinstein addressed a proposal to shift responsibility for targeted-
killing strikes from the CIA to JSOC by favorably comparing the CIA's drone-
strike record to the military's with regard to civilian casualties:

> Here's my concern: We [i.e. the members of the SSCI] watch the
> intelligence aspect of the drone program, those [i.e. drones] that are
> used by the Intelligence Agency, very carefully. Literally, dozens of
> inspections following the intelligence, watching the Agency exercise
> patience and discretion specifically to prevent collateral damage. The
> military program has not done that nearly as well. I think that's a fact,
> I think we even hit our own base once. So, that causes me concern.

*Senator Dianne Feinstein on Drones, Assault Weapons Ban*, The Takeaway (Mar.
20, 2013), http://bit.ly/147GbKB ("Feinstein Takeaway Interview").

And equally telling, when the SSCI considered Mr. Brennan's CIA Director nomination, the members spent a substantial portion of the hearing discussing targeted killing, including the future "role" of Mr. Brennan "as CIA director in [the] approval process" for targeted killings. *See, e.g.,* Brennan Hearing Tr. at 31:13–15 (question of Sen. Feinstein).

      C.     <u>The government has disclosed that it carried out the killing of Anwar al-Aulaqi and has described its reasons</u>.

The President and other senior administration officials have acknowledged the United States' responsibility for the killing of Anwar al-Aulaqi on September 30, 2011. SPA11. That day, DOD's *Armed Forces Press Service* published a story on the DOD website announcing "[a] U.S. air strike that killed Yemeni-based terrorist Anwar al-Awlaki early this morning is a testament to the close cooperation between the United States and Yemen, Defense Secretary Leon E. Panetta said today." JA651. The story referred to remarks given by then–Secretary Panetta in response to a press question about the strike:

> Well, this has been a bad year for terrorists. You know, we—we just have seen a major blow—another major blow to al-Qaida, someone who was truly an operational arm of al-Qaida in this node of Yemen. And, you know, we had always had tremendous concern that after getting bin Laden, that *someone like Awlaki was a primary target* because of his continuing efforts to plan attacks against the United States. . . .
>
> As far as the operational elements here, I'm not going to speak to those except to say that *we've been working with the Yemenis over a long period of time to be able to target Awlaki*, and I want to

—17—

congratulate them on their efforts, their intelligence assistance, their
*operational assistance* to get this job done.

JA799 (emphases added).

President Obama echoed Mr. Panetta's remarks on national television nearly

one month later. On October 25, 2011, on *The Tonight Show With Jay Leno*, the

President said that Mr. al-Aulaqi "was probably the most important al Qaeda threat

that was out there after bin Laden was taken out, and it was important that,

working with the Yemenis, we were able to remove him from the field." JA556.

In January 2012, Mr. Panetta again discussed Mr. al-Aulaqi's killing and the

purported legal basis for it in an interview broadcast on CBS's *60 Minutes*.

Reporter Scott Pelley asked Mr. Panetta, "You killed al-Aulaqi?" Mr. Panetta

responded by nodding affirmatively. JA514. Mr. Panetta explained his

understanding of the government's legal authority to kill U.S. citizens it suspects

of terrorism, and disclosed that the use of that authority "required

a recommendation the CIA director makes . . . , but in the end when it comes to

going after someone like that, the President of the United States has to sign off."

*Id.* [6]

The leaders of the congressional committees that oversee the CIA

have also acknowledged that agency's role in Mr. al-Aulaqi's killing. At Mr.

---

[6] Portions of Mr. Pelley's interview with Mr. Panetta were broadcast as a "Web
Extra" presentation and are only available as video on the Internet. JA514.

Brennan's February 2013 confirmation hearing before the SSCI, Sen.

Feinstein asked the nominee to describe the threat that justified that killing:

> I think one of the problems is now that the drone program is so public,
> and one American citizen is killed, people don't know much about
> this one American citizen . . . . And I wonder if you [Mr. Brennan]
> could tell us a little bit about Mr. al-Awlaki and what he had been
> doing?

Brennan Hearing Tr. at 125:14–20. Similarly, Rep. Rogers disclosed that his

committee has overseen the CIA's targeted-killing strikes since "even before they

conducted that first air strike that took Awlaki." *See* Rogers CBS Tr.

Beyond acknowledging the government's responsibility for the al-Aulaqi

strike, the government has explained its reasons for carrying it out. Speaking at a

White House ceremony the day of the strike, President Obama recited a list of

terrorist activities with which the government believed Mr. al-Aulaqi to be

associated, including leading "external operations for al Qaeda in the Arabian

Peninsula," "planning and directing efforts to murder innocent Americans,"

"direct[ing] the failed attempt to blow up an airplane on Christmas Day in 2009,"

"direct[ing] the failed attempt to blow up U.S. cargo planes in 2010," and

"repeatedly call[ing] on individuals in the United States and around the globe to

kill innocent men, women and children to advance a murderous agenda." JA139.

During Mr. Panetta's press conference the same day, he cited the same allegations.

JA799.

The government has made allegations against Mr. al-Aulaqi in other contexts as well. In labeling him a Specially Designated Global Terrorist in July 2010, the Department of the Treasury alleged that Mr. al-Aulaqi played "a key role in setting the strategic direction for AQAP"; "recruited individuals to join AQAP"; "facilitated training" at AQAP camps in Yemen; and "helped focus AQAP's attention on planning attacks on U.S. interests." *See* Designation of Anwar al-Aulaqi Pursuant to Executive Order 13,224 and Global Terrorism Sanctions Regulations, 31 C.F.R. 594, 75 Fed. Reg. 43,233–34 (publicly announced July 12, 2010) ("SDGT Designation"). In a February 2012 sentencing memorandum filed in *United States v. Umar Farouk Abdulmutallab*, No. 2:10-cr-20005 (E.D. Mich. filed Dec. 26, 2009), the government alleged that Mr. al-Aulaqi had instructed and enabled the defendant, who had been convicted of plotting to bomb a Northwest Airlines jetliner on December 25, 2009, to carry out the attack. JA592.

D.    <u>The government has outlined the purported legal justification for the targeted killing of U.S. citizens and referred to and discussed the OLC memoranda that set out that justification.</u>

The government has outlined the purported legal justification for the targeted killing of U.S. citizens. On February 4, 2013, NBC News published a non-classified DOJ white paper titled, "Lawfulness of a Lethal Operation Directed against a U.S. Citizen Who Is a Senior Operational Leader of Al-Qa'ida or An Associated Force." *See* Michael Isikoff, *Justice Department Memo Reveals Legal*

*Case for Drone Strikes on Americans*, NBC News, Feb. 4, 2013, http://nbcnews.to/U1ZII3. The DOJ subsequently officially released the 16-page document—which is dated November 8, 2011—in response to a reporter's previously submitted FOIA request.[7] Jason Leopold, *Targeted Killing White Paper Leaked to NBC News Turned Over to Truthout by DOJ in Response to a Six-Month-Old FOIA Request Four Days Later*, Truthout, Feb. 16, 2013, http://bit.ly/12TT4ra.

The White Paper sets out legal arguments purporting to justify the government's killing of Americans believed to be senior leaders of al-Qaeda. *See Department of Justice White Paper* at 1–2, November 8, 2011, http://bit.ly/YKXeN8 ("White Paper"). It explains the sources of the government's claimed legal authority, *id.* at 2–5, the scope of that authority (and the limits on it), *id.*, the relevance of the Fourth and Fifth Amendments, *id.* at 5–10, the feasibility and appropriateness of judicial review, *id.* at 5–7, 10, and the import of the foreign-murder statute, *id.* at 10–15 (addressing 18 U.S.C. § 1119(b)), and the War Crimes Act, *id.* at 15–16 (addressing 18 U.S.C. § 2441)).

---

[7] Though the White Paper appears to be responsive to the ACLU's request, DOJ neither released the document nor listed it (or any draft thereof) on its *Vaughn* index. *See infra* ARGUMENT § IV. Despite releasing it to other FOIA requesters, DOJ has not released it to the ACLU.

Even before the release of the White Paper, the government had set out its legal analysis in a series of speeches by senior officials. Harold Koh, then the Department of State's Legal Adviser, addressed the program's legal basis in a March 25, 2010 address to the American Society of International Law. JA124–125 (discussing, among other things, international law of war principles). Mr. Brennan addressed the program's legal basis in a September 16, 2011 speech at Harvard Law School. JA130–131 (contending that the government's legal authority to carry out targeted killings is not "restricted solely to 'hot' battlefields like Afghanistan," and proposing that "the traditional conception of what constitutes an 'imminent' attack should be broadened in light of the modern-day capabilities, techniques, and technological innovations of terrorist organizations"). Jeh Johnson, then DOD's General Counsel, addressed the program's legal basis in a February 22, 2012 speech at Yale Law School. JA403 (contending that "belligerents who also happen to be U.S. citizens do not enjoy immunity where non-citizen belligerents are valid military objectives").[8]

---

[8] In an April 2012 speech discussing the legal regime applicable to the CIA in a "hypothetical case," then–CIA General Counsel Stephen W. Preston cited the President's authority under Article II of the Constitution, "[a] specific congressional authorization," "national self-defense" authority under Article 51 of the United Nations charter, and the international humanitarian law principles. JA573–574.

Most notably, Attorney General Eric Holder addressed the legal basis for the targeted-killing program in a March 5, 2012 speech at Northwestern University School of Law. Like the White Paper, the Attorney General's speech addressed both the source and the scope of the government's claimed authority. JA083–086. It also endeavored to distinguish targeted killings, which the Attorney General viewed as legitimate, from "assassinations," which are proscribed by Executive Order. JA085. *See infra* ARGUMENT § III(A) (discussing the speech and the White Paper in more detail).

Before the release of the White Paper, the administration treated these speeches as a comprehensive and definitive statement about the legal basis for the government's targeted-killing policy. In his April 2012 Wilson Center speech, Mr. Brennan stated that he considered Mr. Holder's speech to have "already described" the relevant "legal authorities . . . , including all relevant constitutional considerations" that apply to the targeting of U.S. citizens. JA102. The White House press secretary also argued that Mr. Holder and other senior officials had detailed the legal basis for the program. *See* Carney Briefing ("I encourage you to go back to look the speeches by the Attorney General, by John Brennan, remarks by Jeh Johnson and by Harold Koh on these matters, and I think they provide a pretty voluminous accounting of matters that are treated here with great deliberation and seriousness.").

E.    <u>The government has acknowledged the existence of OLC memoranda
that constitute the targeted-killing program's governing law</u>.

The government has acknowledged in this litigation that the OLC produced

at least one legal memorandum relating to the targeted-killing program—the OLC–

DOD Memo—but the OLC produced others as well. Earlier this year, the

administration provided four memoranda about the targeted killing of U.S. citizens

to the SSCI in connection with the nomination of John Brennan to be CIA

Director.[9] At Mr. Brennan's confirmation hearing, Mr. Brennan acknowledged that

the OLC memoranda were governing law: "The Office of Legal Counsel advice

establishes the legal boundaries within which we can operate." Brennan Hearing

Tr. at 57:14–15.[10]

The administration has made clear that the White Paper was drawn from one

or more of the OLC memoranda. Mr. Carney explicitly tied OLC opinions to the

White Paper and to Mr. Holder's speech. White House, Press Gaggle by Press

---

[9] In February 2013, Sen. Feinstein revealed that the SSCI was seeking access to
"all nine OLC opinions" on the "legal authority to strike U.S. citizens," Feinstein
Press Release, but later clarified that there were "a total of 11 OLC opinions
related to targeted killing," four of which had been released to the SSCI. Ryan
Reilly, *Seven Other Targeted Killing Memos Still Undisclosed*, Huffington Post,
Feb. 13, 2013, http://huff.to/12gSbZC.

[10] As discussed above, Sen. Feinstein's statement about the White Paper—
describing it as a "16-page unclassified White Paper on the government's legal
analysis of the use of targeted force against a United States citizen, who *was* a
senior operational leader of al-Qa'ida"—suggests that not only was the advice
operative, but that it had been relied upon when the government targeted Mr. al-
Aulaqi. Brennan Hearing Tr. at 57:14–15 (emphasis added).

—24—

Secretary Jay Carney (Feb. 7, 2013), http://1.usa.gov/TQ3MLw ("Carney Gaggle")

("[T]he President directed the Department of Justice to provide the congressional

Intelligence Committee's access to classified Office of Legal Counsel advice

related to the subject of the Department of Justice white paper that we've been

discussing these last several days."). And in testimony before the Senate Judiciary

Committee, Attorney General Holder responded to questions about the White

Paper's controversial definition of "imminence," which had first been discussed

publicly by Mr. Brennan, JA 130–31:

> I think that white paper becomes more clear if it can be read in
> conjunction with *the underlying OLC advice*. I mean in the three, the
> speech that I gave at Northwestern I talked about imminent threat and
> I said that incorporated three factors: a relevant window of
> opportunity to attack, the possible harm that missing window would
> cause. . . . I do think and without taking a position one way or another,
> it is one of the strongest reasons why the sharing of the opinions, the
> advice, the OLC advice with this committee makes sense.

*Oversight of the U.S. Department of Justice Before the S. Comm. on the Judiciary*

at 1:51:36–1:52:24, 113th Cong. (Mar. 6, 2013), http://1.usa.gov/14pKfSc

("Holder Judiciary Cmte. Testimony").

## IV.   The District Court's Opinion

In two opinions dated January 3 and January 22, 2013, the district court

granted summary judgment to the government. The court's holdings are

summarized here.

A.    "No Number No List" Responses

The court affirmed the defendant agencies' "no number no list" responses, rejecting Plaintiffs' argument that the government's many disclosures about the targeted-killing program had waived the agencies' right to make a "no number no list" response. SPA66–67. The court did not consider whether the agencies' provision of something other than a "no number no list" response, including a *Vaughn* index, would compromise information protected by a FOIA exemption.

Additionally, without specific reference to the agencies' "no number no list" responses, but perhaps with them in mind, the court addressed generally the applicability of Exemptions 1 and 3 to documents responsive to the Request.

First, it held that it "s[aw] no reason why legal analysis cannot be classified pursuant to the Executive Order on Classified National Security Information, No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009) ('E.O. 13,526'), if it pertains to matters that are themselves classified." SPA37. Addressing waiver under Exemption 1, the court rejected the Plaintiffs' arguments that government statements regarding "the factual bas[e]s" for the killings of Anwar Al-Awlaki, Samir Khan, and Abdulrahman Al-Awlaki had waived the government's right to exempt such documents from disclosure under FOIA. SPA39. It also determined that, generally, "none of [the government's] public pronouncements reveals the

necessarily detailed analysis that supports the Administration's conclusion that targeted killing . . . is lawful." SPA41.

Next, the court made general conclusions with respect to Exemption 3. The court held that targeted killing constitutes an "intelligence source or method" under the National Security Act ("NSA"), 50 U.S.C. § 403-1(i)(1), and that information about the CIA's involvement in targeted killing would constitute a CIA "function[]" under the Central Intelligence Agency Act ("CIA Act"), 50 U.S.C. § 403g. SPA45, SPA47.[11] But the court agreed with Plaintiffs' argument that legal analysis cannot be considered an "intelligence source or method" within the meaning of the NSA, or a "function[]" under the CIA Act. SPA45–47.

B.    Identified Documents Withheld by the Agencies

1.    The OLC–DOD Memo

The court held that the OLC–DOD Memo was properly withheld under Exemption 5. SPA42, SPA51, SPA59–60. It rejected Plaintiffs' argument that senior officials' public speeches about the targeted-killing program's legal basis had waived the agencies' right to withhold the document. SPA59–60. And the court found "no need" to address Plaintiffs' arguments that the withholding of the OLC–DOD Memo was impermissible because the document constituted "working

---

[11] The NSA and the CIA Act are the two withholding statutes relied upon by the government. *See infra* ARGUMENT § II(C).

law"—as the government's effective law and policy—or impermissibly classified "secret law." SPA55.

The court's general conclusions regarding Exemptions 1 and 3—that it "s[aw] no reason why legal analysis cannot be classified," SPA37, and that legal analysis cannot be considered an "intelligence source or method" within the meaning of the NSA, or a "function[]" under the CIA Act, SPA45–47—would also apply to the OLC–DOD Memo. But because the court found that the OLC–DOD Memo was properly withheld under Exemption 5, it did not adjudicate the application of Exemptions 1 and 3 to that record, and it declined to review the OLC–DOD Memo *in camera*. SPA42.

2.    The Unclassified Memos

In its supplemental opinion, the court held that the Unclassified Memos were deliberative and therefore properly withheld under Exemption 5. SPA70. The court did not address Plaintiffs' argument that the agencies had waived their right to withhold the Unclassified Memos by disclosing their substance or adopting them as policy. Nor did it address Plaintiffs' arguments based on governmental "working law" or impermissible "secret law." *See* SPA55, n.35; SPA70.[12]

---

[12] The court held that the unclassified "CAPSTONE presentation" listed on the DOD *Vaughn* index was protected by Exemption 5. SPA53. Plaintiffs no longer seek that document.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment in FOIA litigation de novo. *Halpern v. FBI*, 181 F.3d 279, 288 (2d Cir. 1999); *accord* 5 U.S.C. § 552(a)(4)(B).

## SUMMARY OF THE ARGUMENT

At the heart of this FOIA case is the fundamental question whether the government can lawfully refuse to disclose records about a targeted-killing program—and the killings of three U.S. citizens pursuant to it—that has been acknowledged and discussed by the President, the nation's senior-most military and intelligence officials, and other government officials in scores of public statements. It cannot. When government officials have publicly disclosed and discussed at length both the government's asserted legal authority to lethally target American citizens and the CIA's and Pentagon's roles in carrying out the specific killings at issue here, then the government's continuing claims of secrecy are not only legally untenable, but rationally implausible.

Because of these official acknowledgements, the government cannot properly invoke the "no number no list" response to avoid its statutory obligations. Nor can the government withhold legal analysis justifying the use of lethal force against U.S. citizens when it has publicly adopted that analysis, and the analysis constitutes the working law of the targeted-killing program.  And the government's claimed authority to withhold records under FOIA exemptions is also improper because targeted-killing is not an intelligence source or method or a "function" of the CIA for withholding purposes.

Below, the district court felt "constrained" by a "thicket of laws and precedents," SPA3, to conclude that the government had satisfied its statutory duties despite its sweeping secrecy claims. But this Court should not accept what its sister Circuit recently termed "a fiction of deniability," *Drones FOIA*, 2013 WL 1003688 at *6, that every day becomes more and more at odds with plain truths that cannot be ignored either inside or outside this Court.

**ARGUMENT**

## I.   FOIA Requires the Court to Scrutinize Closely the Government's Argument that National Security Requires Records to Be Withheld from the Public.

Congress enacted FOIA "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). By design, FOIA "create[s] a 'strong presumption in favor of disclosure.'" *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 813 (D.C. Cir. 2008) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). "Although Congress enumerated nine exemptions from the disclosure requirement, these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Id.* (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)) (quotation marks omitted); *accord Am. Civil Liberties Union v. Dep't of Def.*, 543 F.3d 59, 66 (2d Cir. 2008), *vacated on other grounds and remanded*, 130 S. Ct. 777 (2009) (mem.). The Supreme Court recently reaffirmed that the courts are to give FOIA's exemptions "a narrow compass." *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1265 (2011) (quotation marks omitted).

The courts' obligation to enforce the public's right of access to government records is especially important where, as here, the information in question concerns

—32—

the government's response to national-security threats. The Congress that enacted

FOIA in 1966 voiced particular concern about selective and misleading

government statements on national-security policies, and it gave the public access

to information so that the public could evaluate those policies, and the

government's assertions about them, for itself. *See, e.g.*, Republican Policy

Committee Statement on Freedom of Information Legislation, S. 1160, 112 Cong.

Rec. 13020 (1966) ("In this period of selective disclosures, managed news, half-

truths, and admitted distortions, the need for this legislation is abundantly clear."),

*reprinted in* Subcomm. on Admin. Practice, S. Comm. on the Judiciary, 93d Cong.,

*Freedom of Information Act Source Book: Legislative Materials, Cases, Articles*, at

59 (1974) ("*FOIA Source Book*").[13]

Eight years after enacting FOIA, Congress amended it to clarify that the

courts must independently review any government claim that national security

requires records to be withheld from the public. *See* S. Rep. No. 93-1200 (1974),

*reprinted in* 1974 U.S.C.C.A.N. 6267, 6723; *accord CIA v. Sims*, 471 U.S. 159,

---

[13] *See also* 112 Cong. Rec. 13031 (1966) (statement of Rep. Rumsfeld), *reprinted in FOIA Source Book* at 70 ("Certainly it has been the nature of Government to play down mistakes and to promote successes. . . . [This] bill will make it considerably more difficult for secrecy-minded bureaucrats to decide arbitrarily that the people should be denied access to information on the conduct of Government . . . .").

189 (1985).[14] Since then, the Judiciary has frequently emphasized that, while the Executive Branch is entitled to a degree of deference in its factual claims about the harms that might result from disclosure, courts cannot "relinquish[] their independent responsibility" to review an agency's withholdings. *Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987).

## II.    The Agencies' "No Number No List" Responses to the ACLU's FOIA Request Are Unlawful.

The defendant–appellee agencies seek to justify their "no number no list" responses on the ground that any enumeration or description of responsive records would reveal classified information about the "nature, breadth, and depth" of their interests in the subjects of the Request. JA217 (CIA); JA342 (DOD); JA192 (DOJ).[15] In accepting this argument, the district court erred.

---

[14] *See also* 120 Cong. Rec. 9314 (1974) (statement of Sen. Kennedy) ("We have seen too much secrecy in the past few years, and the American people are tired of it."); 120 Cong. Rec. 9334 (1974) (statement of Sen. Muskie) ("It should not have required the deceptions practiced on the American public under the banner of national security in the course of the Vietnam war or since to prove to us that Government classifiers must be subject to some impartial review.").

[15] OLC and OIP made "no number no list" responses at the request of the Office of the Director of National Intelligence ("ODNI"). *See* JA291 (OLC); JA441 (OIP). The ODNI's justification for the response is set out in the Declaration of John F. Hackett. JA192–193.

A.    A "no number no list" response to a FOIA request is a novel judicial accommodation that is justified only in the most unusual circumstances.

Typically, in response to a FOIA request, an agency searches for responsive records, releases those that are not exempt, and "provide[s] the court with 'a reasonable basis to evaluate the claim of privilege'" by submitting a detailed justification of any withholdings in a "*Vaughn* index." *Boggs v. United States*, 987 F. Supp. 11, 21 (D.D.C. 1997) (quoting *Gallant v. NLRB*, 26 F.3d 168, 173 (D.C. Cir. 1994)); *see Vaughn*, 484 F.2d at 826–28. In limited circumstances, however, courts have permitted the government to refuse to confirm or deny the existence of responsive records when such acknowledgment would itself implicate one of FOIA's exemptions. *See Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009); *accord Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011).

That response, known as "Glomar," is a judicial innovation. *See Phillippi*, 546 F.2d 1009. The "no number no list" response is a recent variation of Glomar. Rather than refuse to confirm or deny the existence of responsive records, an agency invoking "no number no list" refuses to enumerate or describe responsive records that it acknowledges it does possess. SPA67.

While there may be circumstances in which an agency could justify a "no number no list" response, those circumstances will be exceedingly rare.  Earlier this year, the D.C. Circuit rejected the CIA's Glomar response to another ACLU

FOIA request for information about that agency's use of drones to carry out targeted killings. *See Drones FOIA*, 2013 WL 1003688, at *8–*9. To guide the district court on remand, the circuit court discussed the circumstances in which a "no number no list" response might be justified. *Id.* at *8–*9.[16] An agency's "no number no list" response will be lawful, the court wrote, only if the agency demonstrates that enumerating or describing any responsive documents would itself disclose information protected by one of FOIA's exemptions. *Id.* at *8; *accord* SPA67.

Thus, to justify a "no number no list" response, it is not sufficient for an agency to show that identifying or describing some subset of the records it refuses to enumerate or describe would reveal information protected by a FOIA exemption. The agency must show that identifying or describing *any* of those records would implicate an exemption. If the agency cannot make that showing, FOIA requires it to identify and describe those records to the extent it can do so without implicating the exemptions. That is why the D.C. Circuit in *Drones FOIA* observed that legitimate "no number no list" responses would be "unusual" and would require "particularly persuasive" affidavits, 2013 WL 1003688, at *8:

---

[16] The court noted that the government's filings in *this* litigation "speak as if the notion of a 'no number, no list' response is well-established," but that, in fact, those filings constituted the *third* "reported instance[] of such a response." 2013 WL 1003688, at *8.

because their justification requires *the very same kind of accounting* normally associated with the *Vaughn* index. *See Vaughn*, 484 F.2d at 826 (requiring "a relatively detailed analysis in manageable segments" of documents withheld under FOIA exemptions).

B.   The agencies' "no number no list" responses are unlawful because the government has already disclosed the information that it purports to protect.

It is well settled that the government cannot withhold information that it has already officially acknowledged. *See, e.g.*, *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007).[17] Applying that rule, courts have held Glomar responses to be unlawful where the government has already acknowledged "the existence of [responsive] agency records *vel non*." *Id.* at 374; *accord Wilner*, 592 F.3d at 70; *Drones FOIA*, 2013 WL 1003688, at *2. As the district court correctly noted, a "no number no list" response will be similarly unlawful where the agency has already acknowledged the information that its response seeks to protect. *See* SPA66–67; *accord Drones FOIA*, 2013 WL 1003688, at *8.

---

[17] A FOIA requester challenging a withholding on the basis of official acknowledgment must satisfy three criteria: "First, the information requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed . . . . Third, . . . the information requested must already have been made public through an official and documented disclosure." *Wolf*, 473 F.3d at 378 (ellipses in original) (quotation marks omitted); *accord Wilner*, 592 F.3d at 70.

Here, the agencies contend that enumerating or describing any additional records would disclose the "nature, depth, or breadth" of their respective interests in the subject matter of the ACLU's FOIA request, JA334; JA217; JA192–193,[18] but the government has already disclosed the information it says its various "no number no list" responses protect.

## CIA

Senior government officials have acknowledged that:

• **the CIA has an operational role in the targeted-killing program**, *see supra* FACTS § III(B); JA628; JA544; JA622; JA577; JA837; Rogers CBS Tr.; Feinstein Press Release; Brennan Hearing Tr. at 31:13–15;[19]

---

[18] The agencies use slightly different phrasing, but their arguments are the same.

[19] The government might argue that members of Congress may not "officially acknowledge" facts about Executive Branch agencies, but that argument lacks legal support and is logically absurd.

In *Hoch v. CIA*, No. 88-5422, 1990 WL 102740 (D.C. Cir. July 20, 1990) (per curium), the D.C. Circuit specifically declined to reach the question of whether a congressional committee can officially acknowledge classified information while noting earlier precedent indicating that it could. *See id.* at *1 ("We cannot so easily disregard the disclosures by congressional committees. As [the plaintiff–appellant] notes, in *Fitzgibbon v. CIA*, the district court held that such disclosures are official because the CIA cannot have 'greater official status as an arm of the United States government than the United States Senate.' This circuit has never squarely ruled on this issue, but we need not do so to decide this case." (footnotes omitted)).

Moreover, the committees chaired by Sen. Feinstein and Rep. Rogers are *charged by statute* with overseeing covert actions taken by the CIA. *See* 50 U.S.C. § 413b. Their unequivocal public statements carry both the weight of those responsibilities and the authority of their offices. To ignore clear confirmations of

• **at least in some geographic areas, the CIA has primary responsibility for carrying out such killings**, *see supra* FACTS § III(B); JA628; JA544; JA622;

• **the CIA has in fact carried out many such killings, including the strike that killed Anwar al-Aulaqi**, *see supra* FACTS §§ III(B)–(C); JA544; JA622; JA628; JA514; Rogers CBS Tr.; **and**

• **the CIA's role in the program is ongoing**, *see supra* FACTS § III(B); JA847, JA843; Rogers CBS Tr.; Feinstein Press Release; Feinstein Takeaway Interview; Brennan Hearing Tr. at 31:13–15.

<u>DOD</u>

Senior government officials have acknowledged that:

• **the military's involvement in the targeted-killing program is active (and perhaps growing)**, *see* JA339 (acknowledging the existence of the OLC–DOD Memo); JA289 (same); *see supra* FACTS §§ III(A)–(C); JA516; Carney Briefing; JA095; JA841–843; Feinstein Takeaway Interview; JA651; JA799; **and**

• **the military played a role in the killing of Anwar al-Aulaqi**, *see supra* FACTS §§ III(C); JA651; JA799.

---

facts by congressional leaders speaking about matters within their statutory purviews in the context of an official-acknowledgment analysis would defy both law and logic. It would be especially perverse in this case, where the government repeatedly insists on the adequacy of congressional oversight of the targeted-killing program while rejecting the need to explain even parts of it to the public. *See, e.g.*, JA083–84, JA086; JA102.

<u>DOJ</u>[20]

Senior government officials have acknowledged that:

• **DOJ has established rules governing the targeted-killing program**, *see supra* FACTS § III(D)–(E); Carney Briefing; Carney Gaggle; Holder Judiciary Cmte. Testimony; Feinstein Press Release;

• **the OLC–DOD Memo is a document responsive to the Request, i.e. it relates to the targeted killing of U.S. citizens,** JA339;

• **the White Paper and statements by the Attorney General mirror, or were drawn from, OLC memoranda**, *see supra* FACTS § III(E); Carney Gaggle; Holder Judiciary Cmte. Testimony; Feinstein Press Release; **and**

• **DOJ possesses other responsive documents, including up to 11 OLC opinions**, *see supra* FACTS § III(E) & note 9; Carney Gaggle; Holder Judiciary Cmte. Testimony.

C.    <u>The agencies' "no number no list" responses cannot be justified under Exemptions 1 and 3</u>.

The agencies' "no number no list" responses would be unlawful even if the agencies had not already disclosed the "nature, depth, [and] breadth" of their

---

[20] While the CIA and DOD declarations focus on the "nature, depth, and breadth" of their respective agencies' interests, both OLC and OIP (through ODNI) assert "no number no list" responses on the basis that any information about the "volume and nature of the classified documents located by DOJ would reveal classified information about the *nature and extent* of the *U.S. Government's* classified counterterrorism activities." JA192 (emphases added).

interests in the subject matter of the Request. To justify a "no number no list" response, an agency must explain why the enumeration and description of responsive documents would necessarily disclose information protected by a FOIA exemption. The agencies have failed to do this—and it is not a close question.

The agencies justify their "no number no list" responses by reference to FOIA Exemptions 1 and 3.[21] Exemption 1 excludes from disclosure matters that are both "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Under the relevant executive order, information may be classified if: (1) it is classified by an original classification authority; (2) it is under the control of the government; (3) it "pertains to" a "[c]lassification [c]ategor[y]" defined in section 1.4 of the order; and (4) its disclosure could be reasonably expected to result in identifiable or describable damage to the national security. E.O. 13,526 §§ 1.1, 1.4. The classification categories relevant here are "intelligence activities (including covert action)" and "intelligence sources or methods," and "military plans, weapons systems, and operations." *Id.* § 1.4.

---

[21] With respect to their "no number no list" responses, the CIA and DOJ rely on both exemptions, JA217, JA192–193, and DOD relies on Exemption 1 only, JA336, JA342.

FOIA Exemption 3 applies to documents withheld pursuant to qualifying withholding statutes. *See* 5 U.S.C. § 552(b)(3). To support an Exemption 3 withholding under a qualifying statute, the government bears the burden of showing that its withholdings fall within the statute's scope. *Am. Civil Liberties Union v. Dep't of Def.*, 389 F. Supp. 2d 547, 559 (S.D.N.Y. 2005) ("*Torture Memo FOIA*"). The CIA and DOJ cite the NSA as a relevant withholding statute, and the CIA additionally cites the CIA Act. JA213–214; JA190–191.[22] The NSA prohibits the "unauthorized disclosure" of "intelligence sources and methods," 50 U.S.C. § 403-1(1), and section 6 of the CIA Act protects against disclosures that would reveal "intelligence sources and methods" or would reveal the "organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50 U.S.C. § 403g.

The phrases "intelligence sources and methods" and "functions . . . of . . . the Agency" have sometimes been given broad scope, but neither phrase affords the CIA a categorical exemption from the FOIA. *See, e.g.*, *Weissman v. CIA*, 565 F.2d 692, 694–96 (D.C. Cir. 1977) (holding that the CIA's authority to protect "intelligence sources and methods" did not extend to domestic law-enforcement functions); *Phillippi*, 546 F2d at 1015, n.14 (The reference in the CIA Act to

---

[22] Plaintiffs do not contest that the NSA and the CIA Act are withholding statutes within the meaning of Exemption 3.

"functions" does not give the CIA license "to refuse to provide any information at all about anything it does; rather, it exempts the CIA from providing information regarding its 'internal structure.'"); *Navasky v. CIA*, 499 F. Supp. 269, 274 (S.D.N.Y. 1980) (holding that the CIA's book-publishing propaganda was not an "intelligence source or method" that had been "contemplated by Congress").

Indeed, when the CIA sought a categorical exemption from the FOIA, Congress refused to supply it. *See* Karen A. Winchester & James W. Zirkle, *Freedom of Information and the CIA Information Act*, 21 U. Rich. L. Rev. 231, 256 (1987) (detailing congressional rejection of the CIA's plea to "exclude totally the CIA . . . from the requirements of FOIA"). And in 1984, when Congress enacted the CIA Information Act to streamline processing of FOIA requests by creating "a *limited exemption* from the [FOIA] for selected CIA records," it underscored the CIA's broad FOIA obligations and explained that its amendment "represent[ed] a reaffirmation by the Congress that the principles of freedom of information are applicable to the CIA." H.R. Rep. No. 276(II) (1984), *reprinted in* 1984 U.S.C.C.A.N. 3778, 3780.

The agencies have not justified their "no number no list" responses under either Exemption 1 or 3. An agency may only "invoke a FOIA exemption if its justification 'appears logical or plausible.'" *Am. Civil Liberties Union v. Dep't of Justice*, 681 F.3d 61, 69 (2d Cir. 2012) (quoting *Wilner*, 592 F.3d at 73).

—43—

Even assuming for the sake of argument that the agencies' declarations establish that there are *some* responsive documents that cannot be identified or described without disclosing information protected by Exemptions 1 or 3, the declarations do not logically or plausibly establish that this is true of *every* responsive document. Indeed, the declarations do not even *try* to establish it. But this is the agencies' burden.

Moreover, whereas the legitimacy of a Glomar response does not turn on the *nature* of the underlying documents (because the government seeks to protect whether or not it even possesses responsive records), the legitimacy of a "no number no list" response depends on the *specific information* that would be disclosed if an agency were to provide a *Vaughn* index. If an agency establishes that its identification and description of *some* records would inevitably disclose information protected by Exemptions 1 and 3, then the agency has justified the non-provision of a *Vaughn* index—for *those* records. But the agency cannot justify its failure to provide a *Vaughn* declaration for a set of records by contending that its identification and description of a *subset* of those records would disclose protected information. *See Vaughn*, 484 F.2d at 827, n.21 (quoting *EPA v. Mink*, 410 U.S. 73, 93 (1973)) (stating that an agency may "not discuss only the representative example while ignoring the bulk of the documents which may be disclosable"). But—at most—that is all the government's declarations do.

—44—

A "no number no list" response also frustrates FOIA by making a meaningful judicial evaluation of agency withholding claims less possible. The *Vaughn* index was a judicial innovation—but, consistent with FOIA, it aimed to make more information public, not less. *See Vaughn*, 484 F.2d at 823–26. The very purpose of requiring the government to meaningfully justify withholdings of information responsive to FOIA requests is to "transform a potentially ineffective, inquisitorial proceeding against an agency that controls information into a meaningful adversarial process" by giving the court a "reasonable basis to evaluate . . . claim[s] of privilege." *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 488 F.3d 178, 183 n.3 (3d Cir. 2007) (quotation marks omitted); *accord Delaney Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 128 (D.C. Cir. 1987) (requiring detailed government submissions to "overcome the applicant's natural handicap— an inability to argue intelligibly over the applicability of exemptions when he or she lacks access to the documents"). That is why, as the district court acknowledged, government submissions that merely "parrot the relevant statutory language" are "never enough to avoid disclosure under FOIA." SPA54; *accord Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977) ("[T]he burden which FOIA specifically places on the Government . . .  cannot be

satisfied by the sweeping and conclusory citation of an exemption plus submission of disputed material for in camera inspection.").[23]

The Court should be particularly skeptical of the defendant–appellee agencies' "no number no list" responses here because the agencies have already identified and described some responsive records. The CIA has acknowledged that it possesses copies of certain speeches, and the OLC has acknowledged the OLC–DOD Memo. *See supra* FACTS § II. Outside the context of this litigation, the government has acknowledged the existence of other OLC memoranda about targeted killing. *See supra* FACTS § III(D)–(E). That the agencies were able to identify and/or describe these responsive records undermines considerably their contention that a *Vaughn* declaration would inevitably disclose protected information. It also undermines their claim that the provision of a *Vaughn* declaration would reveal the "nature, breadth, and depth" of their respective interests in the subject matter of the Request. By identifying and describing *some*

---

[23] The second half of the quotation from *Mead* additionally explains, consistent with FOIA, why whatever justifications the government might have presented in its classified declarations below—and whatever conclusions the district court might have drawn from those submissions in the classified appendix to its opinion, *see* SPA3–4—should not be the lone basis for any affirmance of the district court's grant of summary judgment. *See Wilner*, 592 F.3d at 68 ("The court should attempt to create as complete a public record as is possible." (quotation marks omitted)); *Roth*, 642 F.3d at 1185 ("Reviewing documents *in camera* is no substitute for the government's obligation to provide detailed public indexes and justifications whenever possible." (quotation marks omitted)).

responsive documents, the agencies have disclosed that they have an interest in the subject of Plaintiffs' request. Even assuming that the "nature, breadth, and depth" of the agencies' respective interests in the subject matter of the Request is protected under Exemptions 1 or 3, if an agency can release *some* information without implicating an exemption, it must supply a "particularly persuasive" reason to explain why the same is not true as to *any* other information. But the agencies' declarations are devoid of any such reason, and they have failed to meet their FOIA burden.

The agencies' argument is made weaker still by the flexibility that the courts have always given to the *Vaughn* requirement. A *Vaughn* index "may take any form so long as" it "permits the court to critically evaluate the merit of [an] agency's claim of privilege." *Delaney*, 826 F.2d at 128; *accord Drones FOIA*, 2013 WL 1003688, at *8 ("[O]nce an agency acknowledges that it has some responsive documents, there are a variety of forms that subsequent filings in the district court may take."). If describing a given document in a particular way would disclose protected information, the agency can describe the document more generically. If even a generic description would disclose protected information, the agency can omit the description altogether from its public declaration and provide a description *ex parte*. Plaintiffs do not concede that the responsive records cannot be described with reasonable specificity in a public declaration. But the point is

that if a detailed public declaration would inevitably disclose protected information, the agencies have many options short of simply refusing to provide a *Vaughn* index at all, *Drones FOIA*, 2013 WL 1003688, at *8, and the FOIA requires the agencies to employ one of those options, *see Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) ("The description and explanation the agency offers should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection."). Though a *Vaughn* index "usually detail[s] the author, date, number of pages, subject matter of each contested document, and a short explanation of why the document should not be disclosed," *John Doe Corp. v. John Doe Agency*, 850 F.2d 105, 107 n.1 (2d Cir. 1988), *rev'd on other grounds*, 493 U.S. 146 (1989), the *Vaughn* requirement is flexible enough to accommodate the demands of particular litigation. *See Vaughn*, 484 F.2d at 826–27.

The consequences of the government's argument here go beyond the records at issue in this case. Because it will almost always be true that enumerating and describing records responsive to FOIA requests will reveal information about the depth or breadth of the CIA's interest in the subject of the request, the CIA could effectively do unilaterally what Congress explicitly rejected nearly thirty years ago, and exempt itself from FOIA altogether. *See supra* ARGUMENT § II(C). To shield from the public documents about *any* topic, it would simply have to seek

classification of the "nature, depth, and breadth" of its interest in that topic. The CIA's secrets would no longer include just legitimately protected programs, operations, sources, and methods. Rather, the CIA would be able to shield any document without regard to whether, by the letter and spirit of FOIA, a public demand for that record should lead to a public release. *See Torture Memo FOIA*, 389 F. Supp. 2d at 561 (identifying the "danger of Glomar" as over-classification that "frequently keep[s] secret that which the public already knows, or that which is more embarrassing than revelatory of intelligence sources or methods").

Likewise, judicial acceptance of blanket "no number no list" responses would lead to an increase of withholdings of *non-exempt* records by fundamentally diminishing the government's withholding burden under FOIA. As this case clearly demonstrates, a "no number no list" response relieves responding agencies of having to provide the court with any justification regarding the withholding of *particular* documents. And in doing so, it raises the specter of "no number no list" responses being invoked by the government to shield documents based on withholdable "nature, depth, and breadth" information even where the responding agency ordinarily would have to release the underlying documents themselves. That is manifestly not an outcome consistent with the text of or policy behind FOIA, a statute whose "dominant objective" is disclosure, *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

**III.    The Agencies' Withholding of the OLC–DOD Memo and the Unclassified Memos (and Any Other Responsive OLC Memoranda) is Unlawful.**

While each of the agencies has offered a "no number no list" response with respect to some subset of responsive records, each (except the CIA) has also provided plaintiffs with a *Vaughn* index and declaration describing other responsive records withheld under Exemptions 1, 3, and 5.[24] Plaintiffs do not contest the bulk of those withholdings. They do challenge, however, the government's withholding of legal analysis and conclusions in the OLC–DOD Memo, the Unclassified Memos, and certain OLC memoranda that the agencies have not addressed in this litigation but whose existence they have officially acknowledged in public statements.[25]

The government's withholding of these records fails for three reasons: (1) the government has officially acknowledged or adopted as policy the legal conclusions and rationale of the memoranda relating to targeted killing; (2) legal analysis is not an "intelligence source or method" and must, therefore, be segregated for release; and (3) targeted killing is not an "intelligence source or

---

[24] If any responsive records contain personal information subject to FOIA Exemption 6, *see* JA199, the government should redact that information and produce the non-exempt portions. *See* 5 U.S.C. § 552(b).

[25] There are at least eleven OLC memoranda regarding targeted killing, *see supra* FACTS § III(E), any of which—if related to U.S. citizens—would be responsive to the Request.

method" or "function" within the meaning of the government's withholding authorities.[26]

A.    The agencies have waived their right to withhold responsive legal memoranda under Exemptions 1 and 5.

The government has waived its right to withhold the OLC–DOD Memo, the Unclassified Memos, and any other responsive legal memoranda under Exemptions 1 and 5, and the district court erred in concluding otherwise.

Under both Exemptions 1 and 5, the government's "official acknowledgment" of requested information waives its ability to withhold it. *See supra* ARGUMENT § II(B). Under Exemption 5—which incorporates both the attorney–client and deliberative-process privileges, *see* 5 U.S.C. § 552(b)(5)—the "working law" doctrine constitutes an additional basis to find waiver. That doctrine requires disclosure of "all opinions and interpretations" that constitute an agency's "effective law and policy" or "working law." *NLRB v. Sears, Roebuck, & Co.*, 421 U.S. 132, 153, 161 (1975). Under either standard, the government's public acknowledgments defeat its claims of privilege with respect to legal memoranda

---

[26] The New York Times Company's brief in its related case further explains in the sections addressing Exemptions 1, 3, and 5 why legal analysis is not properly classified and release of it would cause no national-security harm, and why the government has adopted the legal analysis at issue here as "working law." The ACLU adopts the Times' additional arguments.

responsive to the Request, including those withheld pursuant to "no number no list" responses.

As the district court remarked, the government has "mount[ed] an extensive public relations campaign" in order to persuade the public of the targeted-killing program's lawfulness, SPA17, culminating in Attorney General Holder's March 2012 Northwestern speech. Mr. Holder discussed the purported sources of the government's authority to carry out targeted killings of American citizens and the conditions under which it could exercise that authority. JA085. He discussed the relevance and import of the Due Process Clause. *Id.* He addressed the laws of war and their applicability to the targeted-killing program, specifically describing the significance of the principles of necessity, distinction, proportionality, and humanity. JA086. He also distinguished targeted killings from "assassinations." JA085. As the district court observed, the Attorney General's speech "constitute[d] a sort of road map of the decision-making process that the Government goes through before deciding to 'terminate' someone 'with extreme prejudice.'" SPA39–40.

Nonetheless, the district court rejected Plaintiffs' waiver arguments as to both Exemptions 1 and 5. The court held that the public statements relating to the targeted-killing program were not of "sufficient exactitude" to waive the government's Exemption 1 privilege. SPA38, SPA40. And it rejected "waiver and

adoption" under Exemption 5 based on its determination that the Attorney General's speech (and any other statements) did not constitute an "express adoption" of the OLC–DOD Memo: "[T]here is no evidence that the Government continually relied upon and repeated in public the arguments made *specifically* in the OLC–DOD Memo." SPA60 (quotation marks omitted).

The court's Exemption 1 holding was clear error. As the above discussion shows, Mr. Holder's speech detailed almost every aspect of the relevant law. To turn the Exemption 1 waiver inquiry into one focused on whether an executive official includes footnotes in a public speech, as the district court essentially did, SPA40, is a formalistic approach that cannot be squared with FOIA's presumption in favor of disclosure. *See Pub. Citizen*, 533 F.3d at 813. Moreover, Mr. Holder's analysis tracks substantially the officially released DOJ White Paper's analysis (which itself was based on OLC opinions), and its content was cited by the White House Press Secretary as an authoritative representation of the administration's position. Mr. Holder himself referred to his speech in explaining to Congress why he agreed it should be permitted to see "the underlying OLC advice." *See supra* FACTS § III(E). The government has waived its Exemption 1 privilege as to the OLC–DOD Memo (a responsive record, and thus related to targeted killing) as well as to other responsive legal memoranda.

Likewise, the court erred in its Exemption 5 "adoption" analysis. The relevant question is not, as the district court analyzed it, whether the government's public statements evidence the "specific[]" adoption of a withheld *document*; rather, it is whether those statements demonstrate that the government has adopted the *legal reasoning* in that document as "effective law and policy." *See Brennan Ctr. for Justice at N.Y. Univ. Law Sch. of Law v. Dep't of Justice, Cv.* , 697 F.3d 184, 195 (2d Cir. 2012). The government's public statements about the legal analysis that governs its targeted-killing program leave no doubt that the withheld memoranda embody the government's "effective law and policy." This Court recently reaffirmed that "a party cannot invoke [a] relied-upon authority and then shield it from public view." *Id.* at 208. But "invoke" and "shield" is exactly what the government has done here. *See* FACTS § III(D)-(E). Considering "all the[se] relevant facts and circumstances," the district court erred in concluding that the government's "repeated references" to "assure third parties" as to the legality of its actions, *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 357 (2d Cir. 2005), as well as its other public representations, did not constitute adoption of the OLC–DOD Memo's legal reasoning (as well as that of other responsive legal memoranda). The district court's error has only been made clearer by recent events. The official release of the White Paper, statements by Press Secretary Carney and the Attorney General himself explicitly linking the White Paper to the

Northwestern speech, and Mr. Brennan's assurance that "[t]he Office of Legal Counsel advice establishes the legal boundaries within which we can operate," make the government's claim that it has not adopted the legal reasoning and conclusions of the withheld memoranda simply incredible. *See supra* FACTS §§ III(D)–(E).[27]

B.     The legal memoranda are not protected by Exemptions 1 and 3.

1.     Legal reasoning cannot be withheld under Exemptions 1 or 3.

The district court properly acknowledged that legal analysis cannot be protected under the National Security Act because "legal analysis is not an intelligence source or method." SPA45 (quotation marks omitted). Nevertheless, the court "saw no reason why legal analysis cannot be classified" under E.O. 13,526. SPA37. This was error. While legal analysis may be withheld if it is inextricably intertwined with *other* properly classified information, legal analysis cannot itself be classified. For good reason, no court has ever held otherwise.

Under the Executive Order, information can be classified only if it falls within one of eight enumerated categories of classifiable information, E.O. 13,526 § 1.4(c); if the original classification authority determines that "disclosure of the information reasonably could be expected to result in damage to the national

---

[27] The waiver of the government's Exemption 1 and 5 privileges extends to any responsive legal memoranda, even those not enumerated in response to the Request. *See supra* FACTS §§ III(D)–(E).

security," *id.* § 1.1(4); and if the authority is "able to identify or describe the damage," *id*. Here, the government contends that its legal analysis falls within section 1.4(c), *see* SPA37, which includes "intelligence activities (including covert action), intelligence sources or methods, or cryptology." The government's declarations, however, fail to explain how legal analysis can possibly fall within this category. Plainly, legal analysis is not an "activity," a "source," or a "method." The government's declarations resort simply to reciting the Executive Order's standards and asserting they have been met. But as the district court itself recognized, government assurances that "parrot the relevant statutory language" are "never enough to avoid disclosure under FOIA." SPA54; *see Halpern*, 181 F.3d at 295 (requiring "sufficiently specific explanation[s]" in agency affidavits); *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009).

In reaching its erroneous conclusion, the district court cited to language that appears at the beginning of E.O. § 1.4(c) ("Information shall not be considered for classification unless . . . it pertains to one of the following . . . ."), and reasoned that even information that does not itself describe or disclose intelligence sources or methods can be classified as long as it "pertains to" them. SPA37. If this reading of the Executive Order prevailed, however, it would expand exponentially the universe of information that has until now been regarded as properly classifiable. Indeed, it would permit the government to classify *every* record responsive to

—56—

plaintiffs' Request because, by definition, all of them "pertain to" targeted killing, which the government regards to be an intelligence method. (For that matter, even the government's legal briefs in this litigation "pertain to" targeted killing.) The phrase "pertains to" simply cannot bear the weight the district court placed on it.

To Plaintiffs' knowledge, no other court has so sweepingly interpreted the phrase.[28] To the contrary, the courts have uniformly held that the category of information classifiable under section 1.4(c) is co-extensive with the category withholdable under the "intelligence sources and methods" provision of the NSA. *See, e.g.*, *Military Audit Project v. Casey*, 656 F.2d 724, 736 n.39 (D.C. Cir. 1981); *Phillippi*, 546 F.2d at 1015 n.14. That consistent interpretation of both withholding authorities limits them to their intended purpose: to prevent the disclosure of information that, beyond merely *pertaining* to "intelligence sources and methods," would in fact *reveal* them.

Nor would the release of the government's legal analysis jeopardize national security. If public discussion of the legal analysis related to targeted killing caused

---

[28] And none of the three cases cited by the district court yields any support for the court's position, *see N.Y. Times Co. v. Dep't of Justice*, 872 F. Supp. 2d 309, 318 (2012) (discussing segregability, not classification, of legal analysis); *Am. Civil Liberties Union v. Office of the Dir. of Nat'l Intelligence*, 2011 WL 5563520, at *5, *8 (S.D.N.Y. Nov. 15, 2011) (denying summary judgment to the government on Exemption 1), and one is blatantly contrary to it, *see Ctr. for Int'l Envtl. Law v. Office of the U.S. Trade Representative*, 505 F. Supp. 2d 150, 157 (D.D.C. 2007) (rejecting the responding agency's withholding of documents containing legal analysis under Exemption 1).

harm to the national security, it would be news to Mr. Koh, Mr. Brennan, Mr. Johnson, and Mr. Holder, who all spoke at length about the administration's legal justification for targeted killing—not to mention Press Secretary Carney, who, when asked whether the release of the White Paper was a threat to national security, answered: "No. No." Carney Briefing; *see supra* FACTS § II(D).

This sensible understanding of the government's withholding authority under Executive Order 13,526, and of the type of national-security harm Congress sought to prevent in Exemption 1, also accords with one of the overarching purposes of FOIA: to eliminate "secret law." *See, e.g.*, *Sears,* 421 U.S. at 154; *see also, e.g.*, *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 872–873 (D.C. Cir. 2010). Were the government authorized to conceal its legal authorities, the balance Congress chose to strike through FOIA—one that protects classified *facts* but requires the disclosure of previously secret *law*—would be fatally undermined.

Of course, that legal analysis cannot be withheld as an "intelligence source or method" under the Executive Order does not mean that legal analysis can never be withheld. It is conceivable that in some circumstances legal analysis will be "inextricably intertwined" with properly classifiable information. *See, e.g.*, *N.Y. Times Co.*, 872 F. Supp. 2d at 318. Here, however, there is every reason to believe that the government's legal analysis *can* be segregated from classified facts. The

speeches of senior officials and, most recently, the White Paper prove that the legal underpinnings of the targeted-killing program can be segregated from protectable "intelligence sources and methods." FOIA requires the government to disclose the former even if it must redact the latter. *See, e.g.*, *Hopkins v. Dep't of Housing and Urban Dev.*, 929 F.2d 81, 85–86 (2d Cir. 1991).

2.    Targeted killing is not a "source or method" of intelligence or a statutory "function" of the CIA.

As laid out above, *see supra* ARGUMENT § II(C), the government's withholding authorities under FOIA Exemption 3 protect "intelligence sources and methods." Though that phrase is broad, it is not limitless. The Supreme Court has tethered it to the Agency's mandate of "securing all possible data pertaining to foreign governments or the national defense and security of the United States." *Sims*, 471 U.S. at 170 (quotation marks omitted). The district court correctly concluded that "legal analysis is not an 'intelligence source or method.'" SPA45. Neither is killing: though intelligence sources and methods inform the government's decisions to kill, killing itself does not "logically fall[] within," *Wilner*, 592 F.3d at 68 (quotation marks omitted), the bounds of the statutory term. The district court erred in holding otherwise.

For the same reason, the district court erred in concluding that targeted killing is a "function" under the CIA Act. SPA47. Far from being a catchall that would effectively "accord the Agency a complete exemption from the FOIA," that

term exempts only information about the Agency's "'internal structure." *Phillippi*, 546 F2d at 1015, n.14.

## IV.  The DOJ's OIP Did Not Conduct an Adequate Search.

While even a rigorous search for documents might miss one or a few responsive records, OIP's search of four DOJ offices failed to locate *thirty* responsive e-mail chains (dated before OIP's self-determined cutoff date) with other DOJ offices that were, in fact, found by OLC. That discrepancy alone makes clear that the search terms and methods used by OIP were inadequate. *See* JA324– 333; JA453–454. An agency must revise its assessment of what constitutes a reasonable search "to account for leads that emerge during its inquiry," and the search's reasonableness depends on "what the agency knew at its conclusion rather than what the agency speculated at its inception." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998). When it realized its search had missed documents found by its sister sub-agency, the OIP should have widened its search and used a more comprehensive set of key words, or at least explained the its original failure—something it has never done in this litigation.

In addition, OIP indicated that the cutoff date for its search was November 3, 2011. JA418. None of the other responding agencies provided cutoff dates, and the date chosen by OIP has no obvious relation to the Request. However, the White Paper, which was prepared by DOJ, is dated November 8, 2011. *See* White Paper;

*see also* Daniel Klaidman, *Obama's Drone Debacle*, Daily Beast, Mar. 10, 2013, http://thebea.st/Zys6Af. Presumably, the White Paper—or, at least drafts of it—would have been within one of the offices searched by OIP. As such, OIP's failure to list the document (or drafts) demonstrates the inadequacy of its search.

For those reasons, the district court erred in summarily concluding that OIP's search was adequate under FOIA. SPA33.

## CONCLUSION

For the reasons stated above, the Court should reverse the district court and remand this case with instructions that the district court: (1) order the defendant–appellee agencies to forfeit their "no number no list" responses and to provide sufficiently detailed justifications for any responsive documents they seek to withhold; (2) order DOJ and DOD to disclose the OLC–DOD Memo; (3) order DOD to disclose the Unclassified Memos; (4) determine whether additional responsive legal memoranda exist that can no longer be withheld; and (5) order OIP to renew its search for responsive documents.

Dated:  April 15, 2013

DORSEY & WHITNEY LLP

By:   ___s/Colin Wicker_____

Eric A.O. Ruzicka
Colin Wicker

50 South Sixth Street
Minneapolis, MN 55402-1498
612-340-2959

Joshua Colangelo-Bryan
51 West 52nd Street
New York, NY 10019-6119
212-415-9200

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Jameel Jaffer
Hina Shamsi
Brett Max Kaufman

125 Broad Street, 18th Floor
New York, NY 10004
212-549-2500

## CERTIFICATE OF COMPLIANCE WiTH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with Rule 32(a)(7)(B) because it contains 13,887 words, excluding the portions of the brief exempted by Rule 32(a)(7)(B)(iii), and that it complies with typeface and type style requirements of Rule 32(a)(5)-(6) because it is printed in a proportionally spaced 14-point font, Times New Roman.


_s/Colin Wicker_____

Colin Wicker
Attorney for the American Civil Liberties Union and
The American Civil Liberties Union Foundation

**SPECIAL APPENDIX**

# TABLE OF CONTENTS

Page

Corrected Opinion Granting the Government's Motion for
    Summary Judgment and Denying Plaintiffs' Cross-Motion
    for Summary Judgment, dated January 3, 2013 ................................ SPA1

Decision and Order Granting Defendants' Motion for Summary
    Judgment and Denying Plaintiffs' Motions for Summary
    Judgment, dated January 22, 2013 ................................................... SPA69

Judgment entered January 24, 2013 ............................................................ SPA72

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
THE NEW YORK TIMES COMPANY,
CHARLIE SAVAGE, and SCOTT SHANE,

       Plaintiffs,      11 Civ. 9336 (CM)

  -against-

UNITED STATES DEPARTMENT OF JUSTICE,

       Defendant.

-----------------------------------------------------------x
AMERICAN CIVIL LIBERTIES UNION and
THE AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

       Plaintiffs,      12 Civ. 794 (CM)

  -against-

U.S. DEPARTMENT OF JUSTICE, including its
component the Office of Legal Counsel, U.S.
DEPARTMENT OF DEFENSE, including its
Component U.S. Special Operations Command,
and CENTRAL INTELLIGENCE AGENCY,

       Defendants.

-----------------------------------------------------------x

CORRECTED OPINION GRANTING THE GOVERNMENT'S
MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT[1]

---

[1] This final version of the opinion corrects several typographical, grammatical and syntactical errors and expands briefly the discussion of the court's ability (or lack of same) to declassify classified documents. It is substantively identical to the original opinion issued on January 2, 2012. It should be substituted for the original opinion for publication and appellate purposes.

**SPA1**

McMahon, J.:

## INTRODUCTION

Plaintiffs in these consolidated actions have filed Freedom of Information Act ("FOIA")
requests with the federal Government in order to obtain disclosure of information relating to a
particular tactic that is admittedly being employed in the so-called "War on Terror" – the
targeted killing of persons deemed to have ties to terrorism, some of whom may be American
citizens.

Most of what is sought in the facially overbroad request filed by the American Civil
Liberties Union ("ACLU") was properly withheld pursuant to one or more properly-invoked
exemptions that Congress wrote into the FOIA statute to guard against the disclosure of highly
confidential and operational information – if, indeed, the Government has acknowledged that any
such documents exist. Thornier issues are raised by two much narrower requests, filed by
reporters from *The New York Times*. Broadly speaking, they seek disclosure of the precise legal
justification for the Administration's conclusion that it is lawful for employees or contractors of
the United States Government to target for killing persons, including specifically United States
citizens, who are suspected of ties to Al-Qaeda or other terrorist groups. Documents responsive
to these requests would also be responsive to portions of the ACLU's request.

The FOIA requests here in issue implicate serious issues about the limits on the power of
the Executive Branch under the Constitution and laws of the United States, and about whether
we are indeed a nation of laws, not of men. The Administration has engaged in public discussion
of the legality of targeted killing, even of citizens, but in cryptic and imprecise ways, generally
without citing to any statute or court decision that justifies its conclusions. More fulsome
disclosure of the legal reasoning on which the Administration relies to justify the targeted killing

**SPA2**

of individuals, including United States citizens, far from any recognizable "hot" field of battle, would allow for intelligent discussion and assessment of a tactic that (like torture before it) remains hotly debated. It might also help the public understand the scope of the ill-defined yet vast and seemingly ever-growing exercise in which we have been engaged for well over a decade, at great cost in lives, treasure, and (at least in the minds of some) personal liberty.

However, this Court is constrained by law, and under the law, I can only conclude that the Government has not violated FOIA by refusing to turn over the documents sought in the FOIA requests, and so cannot be compelled by this court of law to explain in detail the reasons why its actions do not violate the Constitution and laws of the United States. The Alice-in-Wonderland nature of this pronouncement is not lost on me; but after careful and extensive consideration, I find myself stuck in a paradoxical situation in which I cannot solve a problem because of contradictory constraints and rules – a veritable Catch-22. I can find no way around the thicket of laws and precedents that effectively allow the Executive Branch of our Government to proclaim as perfectly lawful certain actions that seem on their face incompatible with our Constitution and laws, while keeping the reasons for its conclusion a secret. But under the law as I understand it to have developed, the Government's motion for summary judgment must be granted, and the cross-motions by the ACLU and the *Times* denied, except in one limited respect. Final rulings on that discrete issue must abide further information from the Government.

This opinion will deal only with matters that have been disclosed on the public record. The Government has submitted material to the Court *ex parte* and for *in camera* review. It is necessary to discuss certain issues relating to this classified material in order to complete the reasoning that underlies this opinion. That discussion is the subject of a separate, classified Appendix to this opinion, which is being filed under seal and is not available to Plaintiffs'

**SPA3**

counsel. In crafting that Appendix, the Court has done its best to anticipate the arguments that

Plaintiffs would have made in response to the Government's classified arguments.[2]

## THE FOIA REQUESTS

### I.    The *New York Times*' FOIA Requests

#### A.    The Shane Request

On June 11, 2010, *Times* reporter Scott Shane ("Shane") addressed a FOIA request to the

Department of Justice's ("DoJ") Office of Legal Counsel ("OLC") seeking the following:

> . . . copies of all Office of Legal Counsel opinions or memoranda since 2001 that
> address the legal status of targeted killing, assassination, or killing of people
> suspected of ties to Al-Qaeda or other terrorist groups by employees or
> contractors of the United States government. This would include legal advice on
> these topics to the military, the Central Intelligence Agency or other intelligence
> agencies. It would include the legal status of killing with missiles fired from drone
> aircraft or any other means.

(Declaration of John E. Bies ("Bies Decl."), Ex. A.)

As a member of the news media, Shane sought expedited processing of his request. (*Id.*)

On October 27, 2011, OLC denied Shane's request. (*Id.*, Ex. B.) Citing FOIA

Exemptions 1, 3, and 5, OLC withheld all responsive records pertaining to the Department of

Defense ("DoD"). (*Id.*) Citing the same exemptions, OLC provided Shane with a so-called

*Glomar* response, *Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981); *Phillippi v.*

*CIA*, 546 F.2d 1009 (D.C. Cir. 1976); that is, the OLC refused either to confirm or deny the

existence of responsive records "because the very fact of the existence or nonexistence of such

documents is itself classified, protected from disclosure by statute, and privileged." (*Id.*)

---

[2] The final draft of this unclassified opinion was provided to the FBI several days ago, in order to give the
Government an opportunity to object to the disclosure of any classified information that may have inadvertently
found its way into this document.

**SPA4**

On November 4, 2011, the *Times* appealed OLC's denial to the Director of DoJ's Office

of Information Policy ("OIP"). (Declaration of Nabiha Syed ("Syed Decl."), Ex. E.) OIP did not

respond within twenty days, as required by Section 552(a)(6)(ii) of FOIA. (*Id.* ¶ 8.)

**B.    The Savage Request**

On October 7, 2011, *Times* reporter Charlie Savage ("Savage") submitted a similar FOIA

request to OLC seeking the following:

> . . . a copy of all Office of Legal Counsel memorandums analyzing the
> circumstances under which it would be lawful for United States armed forces or
> intelligence community assets to target for killing a United States citizen who is
> deemed to be a terrorist.

(Bies Decl., Ex. C.)

Savage sought expedited processing of his request in light of his status as a reporter and

the "pressing public interest" generated by "the recent death in Yemen of Anwar Al-Awlaki, a

United States citizen who has been accused of being an 'operational' terrorist with the group Al-

Qaeda in the Arabian Peninsula." (*Id.*)

On October 27, 2011, citing FOIA Exemptions 1, 3, and 5, OLC denied Savage's request,

providing him with a blanket *Glomar* response. (*Id.*, Ex. D.) The *Times* appealed this denial to

the Director of OIP on November 7, 2011. (Syed Decl., Ex. E.) Once again OIP did not respond

within twenty days, as required by Section 552(a)(6)(ii) of FOIA. (*Id.*, ¶ 8.)

Shane, Savage, and the *Times* (together, the "*Times* Plaintiffs") filed suit on December

20, 2011.

**II.    The ACLU's FOIA Request**

On October 19, 2011, the ACLU addressed a FOIA request to various components of DoJ

and DoD, as well as the Central Intelligence Agency ("CIA"). (Bies Decl., Ex. E.) The request

**SPA5**

seeks six categories of documents created after September 11, 2001 (see Annex I for the full contents of the ACLU's request):

1.   Records pertaining to the legal basis in domestic, foreign, and international law upon which US citizens can be subjected to targeted killings.

2.   Records pertaining to the process by which US citizens can be designated for targeted killings, including who is authorized to make such determinations and what evidence is needed to support them.

3.   Records pertaining to the legal basis in domestic, foreign, and international law upon which the targeted killing of Anwar Al-Awlaki was authorized and upon which he was killed, including discussions of:

   a.   The domestic-law prohibitions on murder, assassination, and excessive use of force;

   b.   The Fifth Amendment Due Process Clause;

   c.   International-law prohibitions on extrajudicial killing;

   d.   The Treason Clause;

   e.   The legal basis authorizing the CIA, JSOC, or other U.S. Government entities to carry out the targeted killing of Anwar Al-Awlaki;

   f.   The Government's understanding of "imminence of harm" in the case of Anwar Al-Awlaki; and

   g.   Any requirement that the U.S. Government first attempt to capture Anwar Al-Awlaki before killing him.

4.   Records pertaining to the factual basis for the targeted killing of Anwar al-Awlaki.

5.   All records pertaining to the factual basis for the targeted killing of Samir Khan.

6.   All records pertaining to the factual basis for the targeted killing of Abdulrahman Al-Awlaki.

(*Id.* at 5-6.)

The ACLU, like the *Times*, asked for expedited processing of its request. (*Id.* at 7-9.)

**SPA6**

On November 14, 2011, citing FOIA Exemptions 1, 3, and 5, OLC denied the ACLU's request, providing it with a blanket *Glomar* response. (*Id.*, Ex. F.) The ACLU appealed this denial, to no avail. (ACLU Memo. in Support/Opp'n. at 5.)

The ACLU filed suit on February 1, 2012.

## III.    Subsequent Modification of Initial Responses

Since these cases were filed, senior executive branch officials have publicly addressed "significant legal and policy issues pertaining to U.S. counterterrorism operations and the potential use of lethal force by the U.S. government against senior operational leaders of al-Qa'ida or associate forces who have U.S. citizenship." (Declaration of John Bennett ("Bennett Decl."), ¶ 17.) Those public statements will be discussed fulsomely below.

For the moment, it is enough to say that, as a result of these statements, the Government decided it was in a position to modify its previous responses to Plaintiffs' requests. The modification consisted, in essence, of admitting that various agencies had documents pertaining to those speeches and other public comments, including: (1) the text of a March 5, 2012 speech delivered by Attorney General Eric Holder at Northwestern University School of Law (the "Northwestern Speech") (Declaration of Douglas R. Hibbard ("Hibbard Decl."), Ex. E (OIP));[3] (2) the text of a February 22, 2012 "Dean's Lecture" delivered by DoD General Counsel Jeh Johnson at Yale Law School (the "Yale Dean's Lecture") (Declaration of Robert R. Neller ("Neller Decl."), Ex. I (DoD));[4] and (3) a set of talking points "prepared for the use of the Attorney General and others in addressing hypothetical questions about Anwar al-Aulaqi's death" (Hibbard Decl. ¶ 8, Ex. C).

---

[3] *Available at* http://www.cfr.org/terrorism-and-the-law/holders-speech-targeted-killing-march-2012/p27562.

[4] *Available at* http://www.cfr.org/national-security-and-defense/jeh-johnsons-speech-national-security-law-lawyers-lawyering-obama-administration/p27448.

At the same time, OLC (Bies Decl., Ex. I), DoD (Neller Decl., Ex. J), and OIP (Hibbard Decl., Ex. F) produced three *Vaughn* indices, listing unclassified documents that were being withheld by OLC, DoD, and OIP pursuant to the deliberative, attorney-client, and/or presidential communications privileges enshrined in FOIA Exemption 5.

The CIA, which was also a recipient of the ACLU's FOIA request, acknowledged that it had a "general interest" in (1) "the legal basis . . . upon which U.S. citizens can be subjected to targeted killing" and (2) "the process by which U.S. citizens can be designated for targeted killing." (Bennett Decl. ¶ 27.) The Agency also identified two documents in its records that reflected this "general interest" and were responsive to the ACLU's request: (1) the text of the Northwestern speech and (2) the text of an April 30, 2012 speech entitled "The Ethics and Efficacy of the President's Counterterrorism Strategy," which was delivered by Assistant to the President for Homeland Security and Counterterrorism John O. Brennan at the Woodrow Wilson International Center for Scholars (the "Ethics and Efficacy Speech").[5] (*Id.*)

None of these disclosures added anything to the public record.

Although it was not the recipient of either the Savage or the Shane requests, the CIA revealed that it was asking OLC, on its behalf, to assert a *Glomar* response with respect to certain documents that, if they existed in CIA or other agency files, would implicate "CIA equities." (Bennett Decl. ¶¶ 61-62.) The CIA carved out a limited exception to its *Glomar* response to the Shane request; it represented that it had in its files no legal opinions responsive to the request that addressed CIA involvement in the operation that resulted in the death of Osama Bin Laden. (*Id.* at ¶ 64)

---

[5] *Available at* http://www.cfr.org/counterterrorism/brennans-speech-counterterrorism-april-2012/p28100.

**SPA8**

However, DoD and OLC admitted the existence of one classified legal opinion that was not listed on either agency's *Vaughn* index; this document is "responsive to the Shane and Savage requests." (Bies Decl. ¶ 30; Neller Decl. ¶ 17.) The OLC represents that its opinion "contains confidential legal advice to the Attorney General, for his use in interagency deliberations, regarding a potential military operation in a foreign country," (Bies Decl. ¶ 30.), and so excepts to disclosure of the document. DoD also excepts to disclosure of this document (though it was apparently not prepared for or directed to the Defense Department), on the ground that the legal opinion contains "information about military operations, intelligence sources and methods, foreign government information, foreign relations, and foreign activities." (Neller Decl. ¶ 17.) The document (which I shall refer to as the "OLC-DoD Memo") was withheld as classified and privileged pursuant to Exemptions 1, 3, and 5. (Bies Decl. ¶¶ 30, 38, 45; Neller Decl. ¶ 17.)

Finally, the Government partially superseded its original *Glomar* responses (neither confirming nor denying that any responsive documents exist) with so-called "No Number, No List" responses pursuant to Exemptions 1 and 3. These are responses in which the agencies admitted that responsive records existed, but would not provide any information about the number or nature of those records, on the grounds that such identifying information was itself classified. (*See* Declaration of John F. Hackett ("Hackett Decl."), ¶¶ 21-28 (DoJ); Bies Decl., ¶ 38 (OLC); Neller Decl., ¶¶ 25-26 (DoD); Bennett Decl., ¶¶ 27-37 (CIA); Hibbard Decl., ¶ 8. (OIP). The No Number, No List responses apply to both the ACLU and the *Times'* requests. As noted above, the CIA has maintained its *Glomar* response to the Shane and Savage requests, so its No Number, No List response is necessarily limited. (*See* Bennett Decl. ¶¶ 61-65.)

## HISTORY BEHIND THE FOIA REQUESTS AT ISSUE HERE

SPA9

Following the destruction of the World Trade Center and the targeting of the Pentagon by

a group of terrorists affiliated with the organization known as Al-Qaeda on September 11, 2001,

Congress passed a resolution entitled "Authorization for the Use of Military Force" ("AUMF"),

which empowers the President "to use all necessary and appropriate force against those nations,

organizations, or persons he determines planned, authorized, committed, or aided the terrorist

attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order

to prevent any future acts of international terrorism against the United States by such nations,

organizations or persons." Pub. L. No. 107–40, 115 Stat. 224 (2001). Ever since, the United

States has been engaged in an exercise known colloquially as the "War on Terror," which is

dedicated principally to the eradication of Al-Qaeda.

The primary field of battle in that war has been Afghanistan, where Al-Qaeda was

sheltered and nurtured for many years, and from which the group's now-dead leader, Osama Bin

Laden, ordered and directed the 9/11 mission. The United States military has been engaged in

that country since the fall of 2001 and continues its combat mission to this day.

However, as part of that same effort, the United States has pursued members of Al-Qaeda

and affiliated groups elsewhere in the world, both in the adjacent country of Pakistan and far

from any "hot" battlefield. In recent years, it has targeted a number of such individuals for death

and killed them, using both armed forces and unpiloted, remotely controlled precision aircraft

known as "drones." The Obama Administration has publicly admitted that the Government is

engaged in such operations:

> So let me say it as simply as I can. Yes, in full accordance with the law – and in
> order to prevent terrorist attacks on the United States and to save American lives –
> the United States Government conducts targeted strikes against specific al-Qa'ida
> terrorists, sometimes using remotely piloted aircraft, often referred to publicly as
> drones.

**SPA10**

John O. Brennan, Ethics and Efficacy Speech (Apr. 30, 2012).

Al-Qaeda operative Anwar Al-Awlaki was killed in late 2011. Speaking on September 30, 2011, the day of Al-Awlaki's death, at the "Change of Office" Chairman of the Joint Chiefs of Staff Ceremony in Fort Myer, Virginia, President Obama described Al-Awlaki as follows:

> Awlaki was the leader of external operations for al Qaeda in the Arabian Peninsula. In that role, he took the lead in planning and directing efforts to murder innocent Americans. He directed the failed attempt to blow up an airplane on Christmas Day in 2009. He directed the failed attempt to blow up U.S. cargo planes in 2010. And he repeatedly called on individuals in the United States and around the globe to kill innocent men, women and children to advance a murderous agenda.[6]

At the time of his death, Al-Awlaki was not in or near the field of battle in Afghanistan, where active military operations were taking place. He was located about 1500 miles from Afghanistan, in Yemen, a country with which the United States is not at war (indeed, which the United States counts as an ally).

Killed with Al-Awlaki was an individual named Samir Khan. Al-Awlaki's teenaged son, Abdulrahman Al-Awlaki, was killed in a separate strike in Yemen, on October 14, 2011.

Al-Awlaki, his son, and Khan were all United States citizens.[7]

The President and the Secretary of Defense (who was formerly the CIA Director) have publicly acknowledged that the United States in fact had a role in Al-Awlaki's death. Neither the President nor the Secretary of Defense has identified precisely who (other than the President) was involved in Al-Awlaki's death, including what agencies or departments may have participated in the operation that killed him or how they were involved; neither have they provided any operational details of the killings. The Court is unaware of any public statements

---

[6] *Available at* http://www.whitehouse.gov/the-press-office/2011/09/30/remarks-president-change-office-chairman-joint-chiefs-staff-ceremony.

[7] Al-Awlaki and his son were born in the United States and held dual United States and Yemeni citizenship. Khan was of Pakistani origin and a naturalized United States citizen.

**SPA11**

by named, current executive branch officials that discuss or acknowledge responsibility for, or
participation in, the killings of Khan or Al-Awlaki's son.

The various public statements that have been made about the Al-Awlaki killing, and
about targeted killings generally, will be discussed in detail later. They reveal (or seem to reveal)
that the decision to target a United States citizen for death is made by the President on the
recommendation of senior Government officials – although the identity of the officials who
made any such recommendation (if one was made) with respect to Al-Awlaki, Khan, or the child
has not been publicly revealed. According to the Attorney General of the United States and other
senior Executive Branch officials, these decisions are made pursuant to a process that is
constitutionally and statutorily compliant. In particular, Government officials insist that a United
States citizen can be targeted by the Executive Branch and still be accorded due process of law.

The Government's vociferous insistence that its decisions to kill United States citizens
are lawful, and most especially its references to due process, may seem odd in the context of
war – although there is and long has been robust debate about what to call the anti-Al-Qaeda
operation, and whether anti-terrorist operations in countries other than Afghanistan and adjacent
territory in Pakistan can fairly or legally be classified as a war. *See, e.g.,* Mark V. Vlasic,
*Assassination and Targeted Killing – A Historical and Post-Bin Laden Legal Analysis*, 43 Geo.
J. Int'l L. 259 (2012); Afsheen John Radsan & Richard Murphy, *The Evolution of Law and
Policy for CIA Targeted Killing*, 5 J. Nat'l Security L. & Pol'y 439 (2012); Laurie R. Blank,
*Defining the Battlefield in Contemporary Conflict and Counterterrorism: Understanding the
Parameters of the Zone of Conflict*, 39 Ga. J. Int'l & Comp. L. 1 (2010). However, even if there
were no such debate, it is not surprising that the Government feels somewhat defensive. Some
Americans question the power of the Executive to make a unilateral and unreviewable decision

**SPA12**

to kill an American citizen who is not actively engaged in armed combat operations against this country. Their concern rests on the text of the Constitution and several federal statutes, and is of a piece with concerns harbored by the Framers of our unique form of Government.

## CONSTITUTIONAL AND STATUTORY
## CONCERNS ABOUT TARGETED KILLINGS

As they gathered to draft a Constitution for their newly liberated country, the Founders – fresh from a war of independence from the rule of a King they styled a tyrant – were fearful of concentrating power in the hands of any single person or institution, and most particularly in the executive. That concern was described by James Madison in *Federalist No. 47* (1788):

> The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny. . . .

> The magistrate in whom the whole executive power resides cannot of himself . . . administer justice in person, though he has the appointment of those who do administer it.

Madison's statements echoed those of the great French philosopher Montesquieu, who wrote, in his seminal work *The Spirit of the Laws* (1748): "Were [the power of judging] joined to the executive power, the judge might behave with all the violence of an oppressor."

The Framers took steps to address their fear in the document they drafted. In particular, the Fifth Amendment to the Constitution provides that no person shall be "deprived of life . . . without due process of law." The words "due process of law" are not further defined in the Constitution, or in the Bill of Rights. However, "The first, central, and largely uncontroversial meaning of 'due process of law,' the meaning established in Magna Charta and applied vigorously by Coke against the first two Stuart Kings, was that the executive may not . . . restrain the liberty of a person within the realm without legal authority arising either from established common law or from statute. In other words, executive decrees are not 'law.'" Nathan S.

**SPA13**

Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1782 (2012). In the early days of the Republic, the United States Supreme Court endorsed this understanding: "The words 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in *Magna Charta*," *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 276 (1855).

Outside the criminal law context, the phrase has come to mean that no person can be aggrieved by action of the Government without first being given notice of the proposed action and an opportunity to be heard:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of action and afford them an opportunity to present their objections.

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

When a person is accused of committing a crime, and the Government has the power, upon conviction, to deprive him of life or liberty, the particular rights enumerated in the Fifth and Sixth Amendments (ranging from the right to indictment to the right to counsel) are recognized as setting the minimum guarantee of the Due Process Clause.

To at least one Founder, Alexander Hamilton, "the words 'due process' have a precise technical import, and are only applicable to the process and proceedings of the courts of justice." Alexander Hamilton, Remarks on an Act for Regulating Elections, New York Assembly, 6 Feb. 1787, in 4 *Papers of Alexander Hamilton* 34, 35 (Harold C. Syrett ed., 1962). As due process in the context of regulatory action extends to actions taken by the Executive Branch, rather than the courts, it would seem that the narrow Hamiltonian view of "due process" has long since been rejected. However, the concept of due process of law has never been understood to apply to combatants on the battlefield actively engaged in armed combat against the United States. *Cf.*

**SPA14**

*Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) ("[T]he law of war and the realities of combat may render [military detention of enemy combatants] both necessary and appropriate, and our due process analysis need not blink at those realities.") (O'Connor, J.). Indeed, during the American Civil War, hundreds of thousands of persons recognized by the United States Government as American citizens, who were engaged in armed rebellion against the country, were killed in battle without any suggestion that their due process rights were being violated.

The activities in which Al-Awlaki is alleged to have engaged violate United States law. Specifically, they constitute treason as defined in the Constitution (Art. 3, Section 3) and 18 U.S.C. § 2381, which provide:

> Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years, and fined under this title . . . .

If the War on Terror is indeed a war declared by Congress pursuant to its constitutional power, and if Al-Awlaki was a combatant in that war, then he was a traitor. Even if he was not a combatant levying war against his country, but instead gave aid and comfort to enemies of the United States (such as Al-Qaeda), he was a traitor. Indeed, Al-Awlaki could arguably have committed treason if all he did was encourage others to engage in attacks on the United States; it was settled during and after World War II that activities like broadcasting messages that gave aid and comfort to an enemy of the United States (by, for example, encouraging soldiers to desert, or telling them that their cause was lost) were treasonable. *See, e.g., D'Aquino v. United States*, 192 F.2d 338 (9th Cir. 1951); *Gillars v. United States*, 182 F.2d 962 (D.C. Cir. 1950); *Chandler v.*

**SPA15**

*United States*, 171 F.2d 921 (1st Cir. 1948). And if Al-Awlaki was actually planning some sort of attack on the United States or its facilities or citizens, he was a traitor.[8]

The Framers – who were themselves susceptible to being hanged as traitors by the King of England during the Revolutionary War – were as leery of accusations of treason as they were of concentrating power in the hands of a single person or institution. As a result, the Constitution accords special protections to those accused of this most heinous of capital crimes; Article 3, Sec. 3 sets the procedural safeguard that, "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."

Interestingly, the Treason Clause appears in the Article of the Constitution concerning the Judiciary – not in Article 2, which defines the powers of the Executive Branch. This suggests that the Founders contemplated that traitors would be dealt with by the courts of law, not by unilateral action of the Executive. As no less a constitutional authority than Justice Antonin Scalia noted, in his dissenting opinion in *Hamdi*, 542 U.S. at 554, "Where the Government accuses a citizen of waging war against it, our constitutional tradition has been to prosecute him in federal court for treason or some other crime." *See also* Carlton F.W. Larson, *The Forgotten Constitutional Law of Treason and the Enemy Combatant Problem*, 154 U. Pa. L. Rev. 863 (2006).

Assuming *arguendo* that in certain circumstances the Executive power extends to killing without trial a citizen who, while not actively engaged in armed combat against the United

---

[8] He may also have been acting in violation of any number of other laws, including, *inter alia*, conspiracy to commit racketeering acts in violation of 18 U.S.C. § 1962(d); conspiracy to use weapons of mass destruction in violation of 18 U.S.C. § 2332a(a); conspiracy to commit acts of terrorism transcending national boundaries in violation of 18 U.S.C. § 2332b(a)(2); and/or conspiracy to provide material support to terrorists and/or foreign terrorist organizations in violation of 18 U.S.C. §§ 2339A(a), 2339B(a). The anti-terrorism statutes are of particular importance; entirely too few Americans know that it violates domestic U.S. law to commit or conspire to commit acts of terrorism like those assigned to Al Awlaki in public comments made about him and his activities. Those activities are, by Act of Congress, crimes.

**SPA16**

States, has engaged or is engaging in treasonous acts, it is still subject to any constraints legislated by Congress. One such constraint might be found in 18 U.S.C. § 1119, which is entitled "Foreign murder of United States nationals." This law, passed in 1994, makes it a crime for a "national of the United States" to "kill[] or attempt[] to kill a national of the United States while such national is outside the United States but within the jurisdiction of another country." The statute contains no exemption for the President (who is, obviously, a national of the United States) or anyone acting at his direction. At least one commentator has suggested that the targeted killing of Al-Awlaki (assuming it was perpetrated by the Government) constituted a violation of the foreign murder statute. Philip Dore, *Greenlighting American Citizens: Proceed with Caution*, 72 La. L. Rev. 255 (2011).

There are even statutory constraints on the President's ability to authorize covert activity. 50 U.S.C. §413b, the post-World War II statute that allows the President to authorize covert operations after making certain findings, provides in no uncertain terms that such a finding "may not authorize any action that would violate the Constitution or any statute of the United States." 50 U.S.C. § 413b(a)(5). Presidential authorization does not and cannot legitimize covert action that violates the constitution and laws of this nation.

So there are indeed legitimate reasons, historical and legal, to question the legality of killings unilaterally authorized by the Executive that take place otherwise than on a "hot" field of battle. Which is not to say that the matter is straightforward. It is not. The literal language of the Fifth Amendment, the Treason Clause, and the cited statutes notwithstanding, the Administration obviously believes that it acted lawfully in connection with the killing of Al-Awlaki (and, presumably, of Khan and the child). It has gone so far as to mount an extensive public relations campaign in order to convince the public that its conclusions are correct.

**SPA17**

## PUBLIC STATEMENTS BY SENIOR OFFICIALS
## ABOUT TARGETED KILLINGS

Plaintiffs have brought to the Court's attention at least two dozen public statements made by senior executive branch officials with respect to the Government's targeted killing program. Plaintiffs' vigilance is unsurprising. Because the records that Plaintiffs seek are largely classified, their case consists largely of the argument that, by making these statements, the Administration has waived the right to rely on FOIA exemptions for classified and privileged materials. Accordingly, the Court finds it fitting to discuss at some length the most significant of them.[9]

### I.    State Department Legal Adviser Harold Koh: American Society of International Law

On March 25, 2010, State Department Legal Adviser Harold Koh addressed the Annual Meeting of the American Society of International Law in Washington, DC.[10]

With respect to the subject of targeted killings, Mr. Koh pledged the Obama Administration's commitment to carrying out such operations in accordance with "all applicable law, including the laws of war." He also emphasized that such operations do not constitute unlawful extrajudicial killings or assassinations because "a state that is engaged in an armed conflict or in legitimate self-defense is not required to provide targets with legal process before the state may use lethal force."

---

[9] Other public statements submitted by Plaintiffs include: John Brennan's September 16, 2011 remarks at Harvard Law School, *available at* http://www.cfr.org/counterterrorism/brennans-remarks-counterterrorism-september-2011/p27572; CIA General Counsel Stephen Preston's April 10, 2012 remarks at Harvard Law School, *available at* http://www.cfr.org/rule-of-law/cia-general-counsel-stephen-prestons-remarks-rule-law-april-2012/p27912; and CNN correspondent Jessica Yellin's September 5, 2012 interview of President Obama, *available at* http://security.blogs.cnn.com/2012/09/05/obama-reflects-on-drone-warfare/.

[10] *Available at* http://www.cfr.org/international-law/legal-adviser-kohs-speech-obama-administration-international-law-march-2010/p22300.

**SPA18**

Mr. Koh assured the audience that the Government's "procedures and practices for identifying lawful targets are extremely robust." He announced that the principles of distinction and proportionality enshrined in the law of war are not mere window dressing, but are "implemented rigorously throughout the planning and execution of lethal operations to ensure that such operations are conducted in accordance with all applicable law."

## II.    President Barack Obama: Google+ Hangout

On January 30, 2012, President Obama took part in a so-called "Google+ Hangout," in which he fielded questions from online participants.[11]

In response to a question about the Government's targeted killing program, President Obama, like Mr. Koh, did not deny that such a program existed. Instead, he emphasized that the Government is "very careful in terms of how it's been applied" and does not carry out such operations "willy-nilly." Instead, the program is a "targeted, focused effort at people who are on a list of active terrorists who are trying to go in and harm Americans, hit American facilities, American bases, and so on."

President Obama urged that the program is "kept on a very tight leash" and is not "a bunch of folks in a room somewhere just making decisions." Rather, it is "part and parcel of our overall authority when it comes to battling al-Qaeda. It is not something that is being used beyond that." He insisted that the Government was "judicious" in its use of drones.

Finally, President Obama emphasized that the Government's "ability to respect the sovereignty of other countries and to limit our incursions into somebody else's territory is enhanced by the fact that we are able to pinpoint strike an al-Qaeda operative in a place where the capacities of that military and that country may not be able to get to them."

---

[11] *Available at* http://www.whitehouse.gov/photos-and-video/video/2012/01/30/president-obama-s-google-hangout.

**SPA19**

### III.  DoD General Counsel Jeh Johnson: The Yale Dean's Lecture

On February 22, 2012, DoD General Counsel Jeh Johnson delivered the Dean's Lecture at the Yale Law School. The purpose of the speech was to summarize "some of the basic legal principles that form the basis for the U.S. military's counterterrorism efforts against Al-Qaeda and its associated forces." The speech identified six such principles.

First, Mr. Johnson noted that "in the conflict against an unconventional enemy such as al Qaeda, we must consistently apply conventional legal principles" – e.g., "the law of armed conflict, including applicable provisions of the Geneva Conventions and customary international law, core principles of distinction and proportionality, historic precedent, and traditional principles of [domestic] statutory construction."

Second, Mr. Johnson asserted that the "bedrock of the military's domestic legal authority" in the conflict against al-Qaeda and associated forces remains the AUMF, which was passed by Congress immediately following the attacks of September 11, 2001. Mr. Johnson emphasized that neither the AUMF nor the term "associated forces" is "open-ended." He insisted that the AUMF "does not authorize military force against anyone the Executive labels a 'terrorist.'"[12] Instead, "it encompasses only those groups or people with a link to the terrorist attacks on 9/11, or associated forces." He defined an associated force as an (1) "organized, armed group that has entered the fight alongside al Qaeda" who is (2) "a co-belligerent with al Qaeda in hostilities against the United States or its coalition partners."

---

[12] Mr. Johnson recently reemphasized this point, in a speech given at the Oxford Union on November 30, 2012, when he said that "Our enemy does not include anyone solely in the category of activist, journalist, or propagandist. Nor does our enemy in this armed conflict include a 'lone wolf' who, inspired by al Qaeda's ideology, self-radicalizes in the basement of his own home, without ever actually becoming part of al Qaeda. Such persons are dangerous, but are a matter for civilian law enforcement, not the military, because they are not part of the enemy force." *Available at* http://www.lawfareblog.com/2012/11/jeh-johnson-speech-at-the-oxford-union/#_ftn9.

**SPA20**

Third, Mr. Johnson noted that the AUMF does not restrict the use of force to the "hot" battlefields of Afghanistan. Rather, the "AUMF authorized the use of necessary and appropriate force against the organizations and persons connected to the September 11th attacks – al Qaeda and the Taliban – without a geographic limitation." However, "International legal principles, including respect for a state's sovereignty and the laws of war, impose important limits on our ability to act unilaterally, and on the way in which we can use force in foreign territories."

Fourth, explicitly echoing Mr. Koh's comments on targeted killing, Mr. Johnson stated that, under "well-settled legal principles, lethal force against a valid military objective, in an armed conflict, is consistent with the law of war and does not, by definition, constitute an 'assassination.'"

Fifth, citing *Ex Parte Quirin*, 317 U.S. 1 (1942) and *Hamdi*, Mr. Johnson posited that "belligerents who also happen to be U.S. citizens do not enjoy immunity where non-citizen belligerents are valid military objectives."[13]

Sixth, Mr. Johnson argued that "targeting decisions are not appropriate for submission to a court" because "they are core functions of the Executive Branch, and often require real-time decisions based on an evolving intelligence picture that only the Executive Branch may timely possess."[14]

**IV.    Attorney General Eric Holder: The Northwestern Speech**

---

[13] Both *Quirin* and *Hamdi* involved individuals who were in United States custody. *Quirin* remains the lone case upholding the right to try a United States citizen before a military commission; it said nothing at all about killing a United States citizen without any sort of trial. *Hamdi* addressed the right of a United States citizen detained in the United States as an enemy combatant to challenge his confinement via habeas corpus. Again, there was no suggestion that Mr. Hamdi was to be executed without some kind of trial.

[14] Obviously the courts are in no position to decide who should or should not be targeted for any sort of action, military or judicial. In this country, courts are not investigative bodies and do not decide whom to prosecute; that is the prerogative of the Executive. Courts exist to afford due process of law to those who are accused by the Executive of violating the law.

**SPA21**

The most fulsome discussion to date of the legal basis for the Government's targeted

killing program is Attorney General Holder's Northwestern Speech on March 5, 2012. (Hibbard

Decl., Ex. E.) The public statements that preceded this speech contain bits and pieces of the

presentation that the Attorney General made at Northwestern, so in essence, the Northwestern

Speech *is* Plaintiffs' case.

The relevant passages of the Northwestern Speech are dedicated to supporting the

Government's conclusion that, under the appropriate conditions, it is lawful for the Government

to "us[e] lethal force in a foreign country, targeted against a U.S. citizen who is a senior

operational leader of al Qaeda or associated forces, and who is actively engaged in planning to

kill Americans."

The Attorney General noted that "Based on generations-old legal principles and Supreme

Court decisions handed down during World War II, as well as during this current conflict, it's

clear that United States citizenship alone does not make such individuals immune from being

targeted."[15] Nevertheless, where United States citizens are concerned, there are certain

"constitutional considerations" in play, "the most relevant [of which] is the Fifth Amendment's

Due Process Clause."[16]

"[T]he Supreme Court has made clear that the Due Process Clause . . . mandates

procedural safeguards that depend on specific circumstances." The Attorney General then

invoked the Supreme Court's "balancing approach, [which] weigh[s] the private interest that will

be affected against the interest the government is trying to protect, and the burdens the

---

[15] This is most likely a reference to *Quirin* and *Hamdi*, the two cases referenced by Mr. Johnson in the Yale Dean's Lecture.

[16] The Attorney General mentions no other relevant constitutional provisions, notably the Treason Clause, which by definition can apply only to United States Citizens.

**SPA22**

government would face in providing additional process,"[17] also noting that "Where national security operations are at stake, due process takes into account the realities of combat."[18]

Without explicitly tying it to the concept of due process of law, the Attorney General then laid out the three-part test that the Government employs in making the determination that a United States citizen may be targeted for death: First, the individual must pose an imminent threat of violent attack against the United States. Second, capture must not be feasible. Third, the operation to kill the individual must be conducted in a manner consistent with the law of war.

With respect to the imminence requirement, the Government's analysis "incorporates considerations of the relevant window of opportunity to act, the possible harm that missing the window would cause to civilians, and the likelihood of heading off future disastrous attacks against the United States." Because terrorist organizations do not operate like conventional military forces, and tend to strike without warning, "the Constitution does not require the President to delay action until some theoretical end-stage of planning – when the precise time, place, and manner of an attack become clear."[19]

With respect to the requirement that capturing the plotter be unfeasible, the analysis is "fact-specific," and often "time-sensitive." "It may depend on, among other things, whether capture can be accomplished in the window of time available to prevent an attack and without undue risk to civilians or to U.S. personnel."

---

[17] These references to the tailored nature of due process protections and the Supreme Court's balancing test are most likely references to *Mathews v. Eldridge*, 424 U.S. 319 (1976) and its progeny.

[18] Another likely reference to *Hamdi*.

[19] This appears to be an effort to distinguish the Executive's power to take action against a potential terrorist threat by al Qaeda or associated forces from, say, an effort to prosecute garden variety conspiracies, most of which – according to the standard jury instruction – must go past the "talking" stage and encompass the performance of some sort of overt act in order to become criminal. *See United States v. Wallace*, 85 F. 3d 1063, 1068 (2d Cir. 1996).

**SPA23**

With respect to the law of war requirement, the Government ensures that any use of lethal force complies with four governing principles: necessity, distinction, proportionality, and humanity. Under the principle of necessity, the target must have "definite military value." The principle of distinction dictates that only "lawful targets" (e.g., combatants, civilians directly participating in hostilities, and military objectives) may be "targeted intentionally." A military operation comports with the principle of proportionality if "the anticipated collateral damage [is] not . . . excessive in relation to the anticipated military advantage." Finally, in accordance with the principle of humanity, the Government may only use weapons that "will not inflict unnecessary suffering."

The Northwestern Speech also mentions that there are limitations imposed by international law that constrain the Government's ability to act unilaterally abroad, such as the principle of territorial sovereignty. However, "the use of force in foreign territory would be consistent with . . . international legal principles if conducted, for example, with the consent of the nation involved – or after a determination that the nation is unable or unwilling to deal effectively with a threat to the United States."[20]

The Northwestern Speech also summarizes the Government's argument for why targeted killings of US citizens do not constitute "assassinations." The argument boils down to a syllogism: assassinations are unlawful killings; the killings at issue here are not unlawful, therefore they cannot possibly be assassinations. What makes it lawful to engage in the targeted killing of U.S. citizens abroad is apparently a combination of: (1) Congressional authorization "to use *all necessary and appropriate force* against [Al-Qaeda, the Taliban, and associated forces]" in the wake of the attacks of September 11, 2001 (emphasis added); (2) the right under

---

[20] Apparently, a reference to a so-called "failed state," like, for example, Somalia.

**SPA24**

international law to "take action against enemy belligerents" in times of armed conflict; (3) the

President's power under the Constitution "to protect the nation from any imminent threat of

violent attack;"[21] and (4) the inherent right of national self-defense enshrined in international

law.

Finally, the Northwestern Speech explains that the "due process" guaranteed by the Fifth

Amendment does not equate to "judicial process." Mr. Holder admitted that, "The Constitution's

guarantee of due process is ironclad, and it is essential – but, as a recent court decision makes

clear, it does not require judicial approval before the President may use force abroad against a

senior operational leader of a foreign terrorist organization with which the United States is at war

– even if that individual happens to be a U.S. citizen." Holder did not identify which recent court

decisions so held.[22] Nor did he explain exactly what process was given to the victims of targeted

killings at locations far from "hot" battlefields, other than Executive consideration of the factors

discussed above (i.e., the individual is believed to pose an "imminent threat" to the country and

cannot feasibly be captured).

---

[21] Actually, the President's oath of office – which appears in the text of the Constitution itself, at Art. 2, Sec. 1, Cl. 8 – requires him to promise that he will faithfully execute his office and "preserve, protect and defend the Constitution of the United States" – not the territory of the United States, and not the people of the United States. It seems that the Founders subscribed to the notion that, as long as the President looked out for the Constitution, the country would be safe.

[22] Although Mr. Holder did not identify any such decisions, one likely candidate is *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010), which is, ironically, the case in which Al-Awlaki's father sued in federal court in the District of Columbia to get Al-Awlaki taken off the Government's kill list. His case was dismissed for lack of standing. The passage upon which the Attorney General most likely relied is the following: "Here, plaintiff asks this Court to do exactly what the D.C. Circuit forbid in *El-Shifa* – assess the merits of the President's (alleged) decision to launch an attack on a foreign target. Although the 'foreign target' happens to be a U.S. citizen, the same reasons that counseled against judicial resolution of the plaintiffs' claims in *El-Shifa* apply with equal force here." *Id.* at 47 (citing *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010)).

**SPA25**

## V.    Assistant to the President for Homeland Security and Counterterrorism John O. Brennan: The Ethics and Efficacy Speech

On April 30, 2012, Assistant to the President for Homeland Security and Counterterrorism John O. Brennan delivered the Ethics and Efficacy Address at the Woodrow Wilson International Center for Scholars in Washington, DC.

Mr. Brennan began the relevant portion of his remarks by stating plainly that "Yes, in full accordance with the law – and in order to prevent terrorist attacks on the United States and to save American lives – the United States Government conducts targeted strikes against specific al-Qa'ida terrorists, sometimes using remotely piloted aircraft, often referred to publicly as drones." Mr. Brennan identified the purpose of his speech as, per President Obama's instructions, "to be more open with the American people about these efforts."

Explicitly echoing the Attorney General, Mr. Koh, and Mr. Johnson, Mr. Brennan also asserted the legality of targeted strikes as a matter of both domestic and international law. He argued that Article II of the Constitution and the AUMF empowered the President to engage in targeted drone strikes against "those nations, organizations, and individuals responsible for 9/11." Under international law, such operations would be consistent with the "inherent right of national self-defense," including when conducted "outside of an active battlefield, at least when the country involved consents or is unable or unwilling to take action against the threat."

Mr. Brennan also argued that targeted strikes are ethical under the law of war. Like the Attorney General, Mr. Brennan emphasized that drone strikes comport with the fundamental law of war principles of necessity, distinction, proportionality, and humanity.

## SPECIFIC PUBLIC DISCUSSION OF THE
## KILLING OF ANWAR AL-AWLAKI

The speeches discussed above deal with targeted killings generally in the context of the War on Terror. The ACLU Plaintiffs have also called the Court's attention to a number of public statements made by President Obama and Secretary of Defense (and former Director of the CIA) Leon Panetta that address the killing of Anwar Al-Awlaki.

Anwar Al-Awlaki was killed on September 30, 2011. Approximately a year and a half earlier, on March 26, 2010, then-CIA Director Panetta was quoted in a *Wall Street Journal* article, saying that "[Anwar Al-Awlaki is] clearly someone we're looking for . . . . There isn't any question that he's one of the individuals we're focusing on."[23] (Wicker Decl., Ex. 21.)

The day Al-Awlaki was killed, the Armed Forces Press Service, a component of DoD, published an item on the DoD website with the headline "Panetta: Awlaki Airstrike Shows U.S.-Yemeni Cooperation."[24] (Wicker Decl., Ex. 14.) The article was based on a press conference that had been held earlier in the day, at which Secretary Panetta stated:

> Well, this has been a bad year for terrorists. You know, we – we just have seen a major blow – another major blow to al-Qaida, someone who was truly an operational arm of al-Qaida in this node of Yemen. And, you know, we had always had tremendous concern that after getting bin Laden, that someone like Awlaki was a primary target because of his continuing efforts to plan attacks against the United States. . . .
>
> As far as the operational elements here, I'm not going to speak to those except to say that we've been working with the Yemenis over a long period of time to be able to target Awlaki, and I want to congratulate them on their efforts, their intelligence assistance, their operational assistance to get this job done.[25]

(Wicker Decl., Ex. 22.)

------------------------------------

[23] Keith Johnson, *U.S. Seeks Cleric Backing Jihad*, W.S.J., Mar. 26, 2010, *available at* http://online.wsj.com/article/SB10001424052748704094104575144122756537604.html.

[24] *Available at* http://www.defense.gov/news/newsarticle.aspx?id=65512.

[25] *Available at* http://www.defense.gov/transcripts/transcript.aspx?transcriptid=4890.

**SPA27**

President Obama also addressed the killing of Al-Awlaki on September 30. Speaking at the "Change of Office" Ceremony for the outgoing and incoming Chairmen of the Joint Chiefs of Staff, President Obama stated that the killing of Al-Awlaki was a "significant milestone" and "a tribute to our intelligence community."[26] (Normand Decl., Ex. H.) A few weeks later, President Obama appeared on "The Tonight Show with Jay Leno" on October 25 and was asked about Anwar Al-Awlaki. The President replied that Al-Awlaki "was probably the most important al Qaeda threat that was out there after bin Laden was taken out, and it was important that, working with the Yemenis, *we* were able to remove him from the field."[27] (Wicker Decl., Ex. 5) (emphasis added.)

In January 2012, Secretary Panetta appeared on the CBS program "60 Minutes," where he was again asked to discuss Al-Awlaki's killing and the legal basis for it.[28] (Wicker Decl. ¶ 14.) The interviewer, Scott Pelley ("Pelley"), said to Secretary Panetta, "You killed Al-Awlaki"; Secretary Panetta nodded affirmatively. (*Id.*) Pelley then engaged in the following exchange with Secretary Panetta about the legal authority to kill U.S. citizens suspected of being terrorists:

> Pelley: So it's the requirement of the administration under the current legal understanding that the President has to make that declaration?
>
> Secretary Panetta: That is correct.
>
> Pelley: Not you?
>
> Secretary Panetta: That's correct.
>
> Pelley: Only the President can decide?

---

[26] *Available at* http://www.whitehouse.gov/the-press-office/2011/09/30/remarks-president-change-office-chairman-joint-chiefs-staff-ceremony.

[27] *Available at* http://news.yahoo.com/transcript-president-obamas-interview-tonight-show-jay-leno-003505288.html.

[28] *Available at* http://www.cbsnews.com/video/watch/?id=7396830n.

**SPA28**

Secretary Panetta: Well, it's a recommendation we make, it's a recommendation the CIA director makes in my prior role, but in the end when it comes to going after someone like that, the President of the United States has to sign off.

(*Id.*)

## DISCUSSION

### I.    Standard of Review

Summary judgment is the typical means for disposing of cases challenging a Government's agency's FOIA response. *See Center for Biological Diversity v. US Marine Corps,* No. 00 Civ. 2387, 2003 WL 26121134, at *3 (D.D.C. Aug. 21, 2003) (citing Fed. R. Civ. P. 56(c); *McGehee v. CIA,* 697 F.2d 1095, 1101 (D.C. Cir. 1983); *Founding Church of Scientology v. NSA,* 610 F.2d 824, 836 (D.C. Cir. 1979); *Nat'l Cable Television Ass'n, Inc., v. FCC,* 479 F.2d 183, 186 (D.C. Cir. 1973)). A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A district court reviews the agency's FOIA determination *de novo. Wilner v. NSA,* 592 F.3d 60, 69 (2d Cir. 2009); *see also* 5 U.S.C. § 552(a)(4)(B). Exemptions are to be narrowly construed. *See Halpern v. F.B.I.,* 181 F.3d 279, 287 (2d Cir. 1999). All doubts as to the applicability of the asserted FOIA exemption are to be resolved in favor of disclosure. *Wilner,* 592 F.3d at 69.

Summary judgment in the agency's favor is appropriate where:

**SPA29**

the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith. Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible.

*Wilner*, 592 F.3d at 73 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

An agency resisting disclosure of records responsive to a FOIA request bears the burden of demonstrating that the asserted FOIA exemption applies. *Wilner v. NSA*, 592 F.3d 60, 68-69 (2d Cir. 2009). However, "Affidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney v. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). In the national security context, agency declarations are entitled to substantial deference. *See CIA v. Sims*, 471 U.S. 159, 179; *ACLU v. Dep't of Justice*, 681 F.3d 61, 72 (2d Cir. 2012) (the "*Waterboarding Case*").

Deference to the Government's explanations does not, however, mean acquiescence. *ACLU v. Office of the Dir. Of Nat'l Intelligence*, No. 10 Civ. 4419, 2011 WL 5563520, at *5 (S.D.N.Y. Nov. 15, 2011) (quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998)) ("*ODNI*"). Courts have rejected Government affidavits for being vague and conclusory and reading like "bureaucratic double-talk." *See Halpern*, 181 F.3d at 293; *see also generally ODNI*, 2011 WL 5563520.

Understanding that a district court should endeavor "to create as complete a public record as is possible," *ODNI*, 2011 WL 5563520, at *12 (quoting *Phillippi*, 546 F.2d at 1013), FOIA nonetheless empowers a district court to conduct *in camera* review of documents withheld pursuant to a FOIA exemption. 5 U.S.C. § 552(a)(4)(B). A district court may also conduct *in camera* review of classified affidavits when national security is at issue. *See ODNI*, 2011 WL 5563520, at *12. Courts have found *in camera* review to be appropriate in cases involving all

**SPA30**

three of the FOIA exemptions at issue here. *See, e.g., The New York Times Co. v. Dep't of Justice*, --- F . Supp. 2d ----, 2012 WL 1869396 (S.D.N.Y. May 17, 2012) (the "*Patriot Act Case*") (Exemptions 1 and 3); *Brennan Ctr. for Justice v. Dep't of Justice*, No. 09 Civ. 8756, 2011 WL 4001146, at *6 (S.D.N.Y. Aug. 30, 2011) *aff'd in part, rev'd in part, and remanded by* 697 F.3d 184 (2d Cir. 2012) (Exemption 5). However, where the response comes from the CIA, *in camera* review of documents is discouraged; 50 U.S.C. § 431(f)(2) directs that, "the court shall, to the fullest extent practicable, determine issues of fact based on sworn written submissions of the parties."

The Court notes that *in camera* review "is not a substitute for the government's burden of proof." *Halpern*, 181 F.3d at 295 (quoting *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 743 (9th Cir. 1980)).

FOIA also provides that "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Accordingly, the agency must provide "a detailed justification for [its] decision that non-exempt material is not segregable." *Mead Data Central v. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977); *accord Nat'l Immigration Project of the Nat'l Lawyers Guild v. Dep't of Homeland Sec.*, 842 F. Supp. 2d 720, 725 n. 5 (S.D.N.Y. 2012). The agency is entitled to a presumption that it complied with its obligation to disclose reasonably segregable material. *Sussman v. US Marshals Service*, 494 F.3d 1106, 1117 (D.C. Cir. 2011); *accord Ferrigno v. Dep't of Homeland Sec*, No. 09 Civ. 5878, 2011 WL 1345168, at *10 (S.D.N.Y. Mar. 29, 2011).

A district court "must make specific findings of segregability regarding the documents to be withheld" before ruling that an asserted FOIA exemption is applicable. *Sussman v. US*

**SPA31**

*Marshals Serv.*, 494 F.3d at 1116; *accord Ferrigno*, 2011 WL 1345168, at *10. Non-exempt portions of a document may only be withheld if they are "inextricably intertwined" with the exempt portions. *Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Reserve Sys.*, 463 F.3d 239, 249 n. 10 (2d Cir. 2006); *Sussman*, 494 F.3d at 1116; *Patriot Act Case*, 2012 WL 1869396, at *6.

It is within the district court's discretion to conduct *in camera* of a withheld document to review the Government's segregability decisions. *See, e.g., Ferrigno*, 2011 WL 1345168, at *10-11.

## II.  The Government Conducted An Adequate Search for Responsive Documents

As part of their challenge to the Government's response to their requests, plaintiffs allege that the Government conducted a less than adequate search for responsive documents. I reject this challenge.

An agency can show that it has conducted an adequate search for records responsive to a FOIA request by demonstrating, through affidavits or declarations, that it has conducted "a search . . . reasonably calculated to discover the requested documents." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999); *see also Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). The agency need not show that it "actually uncovered every document extant." *Grand Cent. P'ship*, 166 F.3d at 489. Nor is the agency required to search every record system; it need only search those systems in which it believes responsive records are likely to be located. *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 497 (S.D.N.Y. 2010).

The Second Circuit has noted that:

> to establish the adequacy of a search, agency affidavits must be relatively detailed and nonconclusory, and submitted in good faith . . . . affidavits submitted by an agency are accorded a presumption of good faith. This presumption cannot be rebutted by purely speculative claims about the existence and discoverability of

**SPA32**

other documents . . . . [I]n order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations.

*Grand Cent. P'Ship*, at 489-90 (internal citation, quotation marks, and editing omitted).

A "reasonably detailed" affidavit should set forth the search terms used, describe the type of search conducted, and indicate that all files likely containing responsive records were searched. *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "Even if these conditions are met the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." *Founding Church of Scientology of Washington, D.C., Inc. v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979).

In this case, the Government's explanation of its searches can be found in the following declarations:

1.  OLC (DoJ): Bies Declaration, ¶¶ 18-28.

2.  OIP (DoJ): Hibbard Declaration, ¶¶ 7-34.

3.  DoD: Neller Declaration, ¶¶ 9-10.

4.  CIA: Classified Bennett Declaration.

The court has reviewed these explanations and concludes that the searches by the responding agencies comported with their statutory obligations.

### III.    The FOIA Responses Were Legally Compliant

The responding agencies invoke three separate exemptions to excuse their refusal to produce any documents responsive to the FOIA requests other than the speeches and public statements that have been discussed above.

**SPA33**

## EXEMPTION 1

Exemption 1 to FOIA exempts from disclosure records that are "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1). Section 1.1(a) of Executive Order ("E.O.") 13526 (the relevant executive order in this case) establishes the following criteria for the classification of national security information:

Information may be originally classified under the terms of this order only if all of the following conditions are met:

(1) an original classification authority is classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Section 1.4 of E.O. 13526 provides that:

Information shall not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security in accordance with section 1.2 of this order, and it pertains to one or more of the following:

(a) military plans, weapons systems, or operations;

(b) foreign government information;

(c) intelligence activities (including covert action), intelligence sources or methods, or cryptology;

(d) foreign relations or foreign activities of the United States, including confidential sources;

**SPA34**

(e) scientific, technological, or economic matters relating to the national security;

(f) United States Government programs for safeguarding nuclear materials or facilities;

(g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or

(h) the development, production, or use of weapons of mass destruction.

Section 1.2 of E.O. 13526, which is referenced in Section 1.4, pertains to classification levels:

(a) Information may be classified at one of the following three levels:

(1) "Top Secret" shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority is able to identify or describe.

(2) "Secret" shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe.

(3) "Confidential" shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe.

(b) Except as otherwise provided by statute, no other terms shall be used to identify United States classified information.

(c) If there is significant doubt about the appropriate level of classification, it shall be classified at the lower level.

It should also be noted that Section 1.7(a) of E.O. 13256 places certain limitations on classification:

(a) In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to:

(1) conceal violations of law, inefficiency, or administrative error;

(2) prevent embarrassment to a person, organization, or agency;

**SPA35**

(3) restrain competition; or

(4) prevent or delay the release of information that does not require protection in the interest of the national security.

Nearly all of the documents located in response to the FOIA requests here under review are classified, and appropriate affidavits have been filed by appropriate authorities from each of the responding agencies. There is no evidence suggesting that proper procedures were not followed when these documents were classified. *See Nat'l Catholic Reporter Pub. Co. v. FBI*, 514 F. Supp. 1149, 1153 (D.D.C. 1981); *Kanter v. Dep't of State*, 479 F. Supp. 921, 924 (D.D.C. 1979). It lies beyond the power of this Court to declassify a document that has been classified in accordance with proper procedures on the ground that the court does not think the information contained therein ought to be kept secret. *Cf. Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007) ("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified."). All a court can do with a document that has been classified using proper procedures is determine whether classification protection has been waived. *Public Citizen v. Dep't of State*, 11 F.3d 198 (D.C. Cir. 1993); *Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983). And that is precisely what the ACLU and the *Times* argue: the Government cannot invoke Exemption 1 with respect to documents relating to targeted killings using drones because, through its relentless public relations campaign of recent months, the Government has waived the right to rely on the documents' classified status and/or demonstrated that the withheld legal analysis has been adopted as official policy. Plaintiffs argue further that, to the extent the requests seek legal analysis (and that is all the *Times* requests seek), such analysis is not a proper subject of classification. I will address that issue first.

**A.    Legal Analysis May Appropriately Be Classified**

All Plaintiffs argue that legal analysis is not the proper subject of classification. Indeed, they note that the Government cites not a single case which holds that legal analysis can properly be classified.

The Government counters that E.O. 13256 does not contain a specific carve-out for legal analysis; rather, E.O. 13526 applies to any information that "pertains to" the various items listed in Section 1.4. Therefore, legal analysis that "pertains to" military plans or intelligence activities (including covert action), sources or methods – all of which are classified matters – can indeed be classified.

Several cases support the proposition that legal analysis can be withheld as classified pursuant to Exemption 1. *See, e.g., Patriot Act Case*, 2012 WL 1869396, at *1, 6; *ODNI*, 2011 WL 5563520, at *8; *Ctr. for Int'l Environ. Law v. Office of the US Trade Rep.*, 505 F. Supp. 2d 150, 154 (D.D.C. 2007) ("*CIEL I*"). I see no reason why legal analysis cannot be classified pursuant to E.O. 13526 if it pertains to matters that are themselves classified.

### B.     The Government Has Not Waived The Benefit of Classification

"Voluntary disclosures of all or part of a document may waive an otherwise valid FOIA exemption." *Dow Jones & Co., Inc. v. Dep't of Justice*, 880 F. Supp. 145, 150-51 (S.D.N.Y. 1995) (citing *Mobil Oil Corp. v. E.P.A.*, 879 F.2d 698, 700 (9th Cir. 1989); *Afshar v. Dep't of State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983); *Mehl v. E.P.A.*, 797 F.Supp. 43, 47 (D.D.C. 1992)), *vacated in part on other grounds by* 907 F. Supp. 79 (S.D.N.Y. 1995). The FOIA requester bears "the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar*, 702 F.2d at 1130 (D.C. Cir. 1983); *accord Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy*, 891 F.2d 414, 421 (2d Cir. 1989).

**SPA37**

Plaintiffs argue that the many speeches and public pronouncement discussed above constitute a waiver of Exemption 1's shielding of classified documents from disclosure.

The Second Circuit has made clear that it is the rare case where the Government waives Exemption 1 protection:

> the application of Exemption 1 is generally unaffected by whether the information has entered the realm of public knowledge. A limited exception is permitted only where the government has officially disclosed the specific information the requester seeks.

*Halpern*, 181 F.3d at 294 (citing *Hudson River Sloop*, 891 F.2d at 421 (2d Cir. 1989)).

Such official disclosure is governed by a "strict test." *Wilson v. C.I.A.*, 586 F.3d 171, 186 (2d Cir. 2009).

> Classified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) "[is] as specific as the information previously released," (2) "match[es] the information previously disclosed," and (3) was "made public through an official and documented disclosure."

*Id.* (quoting *Wolf*, 473 F.3d at 378). For example, Exemption 1 is not waived if an agency official merely discusses the "general subject matter" of the records sought. *Public Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993).

In sum, the key to the official disclosure analysis in the Exemption 1 context is the "insistence on *exactitude*[, which] recognizes the Government's vital interest in information relating to national security and foreign affairs." *Wolf*, 473 F.3d at 378 (emphasis added) (internal quotation marks omitted); *accord Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 512 (S.D.N.Y. 2010).

As to documents containing operational details of targeted killing missions (including but not limited to the operation that took out Al-Awlaki), there has been no official disclosure of sufficient exactitude to waive the Government's right to assert their classification as a

justification for not providing them to the ACLU. Indeed, there has been no disclosure of

operational details at all, except of the military operation that resulted in the killing of Osama

Bin Laden. The most that can be said of the various public statements made by President Obama

and Secretary Panetta with respect to the drone strike that claimed the life of Anwar Al-Awlaki is

that the Government claims to have had some role in it. The President of the United States went

on late night television and admitted that "we" (i.e., the United States Government) had a role in

the operation that ended Al-Awlaki's life; Secretary Panetta confirmed that disclosure with a nod

of his head. But neither official offered any information about who was involved in the decision-

making process or in the execution of the mission. No operational details were disclosed, other

than the fact that the operation was carried out with cooperation from Yemeni security forces. To

the extent that the ACLU contends that these extremely limited statements constitute official

disclosure sufficient to waive Exemption 1 protection of the factual basis for the targeted killing

of Anwar Al-Awlaki, I cannot agree.

　　As Plaintiffs have not identified a single statement by a current, named executive branch

official that mentions the killings of Samir Khan and Abdulrahman Al-Awlaki, there has

obviously been no waiver of Exemption 1 protection of any documents the responding agencies

may possess concerning the factual basis for "targeting" them (if indeed that occurred).

　　We turn, then, to documents responsive to Plaintiffs' requests to the extent that they seek

the analysis used to justify the legality of targeted killings, whether of United States citizens or

otherwise.

　　The Northwestern Speech discussed the legal considerations that the Executive Branch

takes into account before targeting a suspected terrorist for killing. Indeed, the speech constitutes

a sort of road map of the decision-making process that the Government goes through before

deciding to "terminate" someone "with extreme prejudice." It is a far cry from a "general discussion" of the subject matter.

But the Holder speech is also a far cry from a legal research memorandum. The speech mentions relevant doctrines but does not explain the actual reasoning that led the Government to conclude that the targeted killing of a suspected terrorist complies with the law of war, or accords a suspect due process of law, or does not constitute assassination. In fact, in the approximately 15 minutes (out of an approximately 40 minute speech) that Attorney General Holder devoted to the subject of the Government's targeted killing program, he did not cite to a single specific constitutional provision (other than the Due Process Clause), domestic statute (other than the AUMF), treaty obligation, or legal precedent. Nor did he address many key matters that are covered by the FOIA requests: for example, Mr. Holder did not address why the Treason Clause was not violated by killing a United States citizen who was engaged in apparently treasonous activities – or, in the alternative, why the Treason Clause simply did not apply.

The lack of authority and the vague and imprecise discussion of the legal issues that must have been considered by the Administration does not necessarily render the Attorney General's remarks "general" within the meaning of *Public Citizen*. But no lawyer worth his salt would equate Mr. Holder's statements with the sort of robust analysis that one finds in a properly constructed legal opinion addressed to a client by a lawyer.

Nor can it be said that Mr. Holder revealed *the exact* legal reasoning behind the Government's conclusion that its actions comply with domestic and international law. In fact,

**SPA40**

when you really dissect the speech, all it does is recite general principles of law and the Government's legal conclusions.[29]

My learned colleague Judge Scheindlin has held that repeated disclosure of legal analysis can support a finding of waiver. *See Nat'l Day Laborer Org. Network v. Immigration and Customs Enforcement*, 827 F. Supp. 2d 242, 256-57 (S.D.N.Y. 2011). The core legal conclusions of the Northwestern Speech have been repeated publicly on many occasions by other senior executive branch officials (see above). If their words do not qualify as official and documented disclosure, then that phrase has no recognizable meaning. As a result, the ACLU and the *Times* argue that this case is the same case as *Nat'l Day Laborer*. But it is not, because none of those public pronouncements reveals the necessarily detailed legal analysis that supports the Administration's conclusion that targeted killing, whether or citizens or otherwise, is lawful.[30]

The only question, then, is whether the court needs to review the only classified document that has been publicly identified as containing legal advice responsive to the *Times'* FOIA requests – the OLC-DoD Memo – in order to insure that the Holder speech is less specific than the Memo, and see whether the rubric it disclosed matches the advice that was given him by OLC.

*In camera* review of withheld documents may be appropriate to determine whether Exemption 1 has been waived. *See Public Citizen v. Dep't of State*, No. 91 Civ. 746, 1991 WL

---

[29]Some of the preceding pages include an effort by one person (me), who has some rudimentary knowledge of the law in this area, to anticipate arguments that might be made in support of the Administration's position, and even to respond to them, as a way of framing discussion. This sort of "reverse engineering" of the Administration's legal reasoning has been going on for as long as targeted killings and drone strikes have been in the public consciousness. But informed guesses by outsiders are no substitute for disclosure of the precise reasoning that underlies the Government's decision to proceed with targeted killings and drone strikes, and so have no bearing on the waiver analysis.

[30] Contrast these speeches with the so-called "Torture Memo" that was prepared by DoJ officials to set out a purportedly principled justification for the legality of "enhanced interrogation techniques." The Memo has been roundly criticized for the quality of its legal analysis, but it was at least recognizable as a legal opinion.

179116, at *3 (D.D.C. Aug. 27, 1991). But such review is not necessary here. As the Second

Circuit has noted, "A court should only consider information *ex parte* and *in camera* that the

agency is unable to make public if questions remain after the relevant issues have been identified

by the agency's public affidavits and have been tested by plaintiffs." *Wilner*, 592 F.3d at 75–76.

It is plain that the Attorney General's discussion of the legal underpinnings of the Government's

targeted killing program in the Northwestern Speech, which cites almost no specific authority,

could not possibly be *the exact* legal analysis purportedly contained in the OLC-DoD Memo

(unless standards at OLC have slipped dramatically). I do not need to review the OLC-DoD

Memo *in camera* to know that its legal analysis would be far more detailed and robust.

Furthermore, even if the Attorney General's speech could be said to include "self-serving

partial disclosures of classified information," this complaint is more "properly addressed to

Congress, not to this court." *Public Citizen*, 11 F.3d at 204. This Court, like the DC Circuit, is

"unwilling to fashion a rule that would require an agency to release all related materials any time

it elected to give the public [some] information about a classified matter. To do so would give

the Government a strong disincentive ever to provide its citizenry with briefings of any kind on

sensitive topics." *Id.* at 203.

Finally, Exemption 5 plainly applies (see below), so *in camera* review to resolve whether

Exemption 1 also applies would not be appropriate.

### EXEMPTION 3

Under Exemption 3, records and information "specifically exempted from disclosure by

statute" need not be disclosed. 5 U.S.C. § 552(b)(3). In analyzing an Exemption 3 assertion, a

court must first determine whether the statute invoked is an exemption statute under FOIA, and

**SPA42**

then determine whether the withheld records meet the exemption statute's criteria for nondisclosure. *Sims*, 471 U.S. at 167; *Wilner*, 592 F.3d at 72.

The Second Circuit has noted that "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Wilner*, 592 F.3d at 72 (quoting *Ass'n of Retired R.R. Workers v. U.S. R.R. Retirement Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987)). Accordingly, in the Exemption 3 context, a court should "not closely scrutinize the contents of a withheld document." *Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993); *accord Patriot Act Case*, 2012 WL 1869396, at *5.

### A.    The National Security Act

Section 102A(i)(1) of the National Security Act ("NSA"), as amended, 50 U.S.C. § 403-1(i)(1), provides that "the Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." It is well settled that Section 102A(i)(1) of the NSA is an exempting statute within the meaning of Exemption 3. *See Sims*, 471 U.S. at 167 (discussing prior version of NSA); *Waterboarding Case*, 681 F.3d at 72-73 (citing *Larson*, 565 F.3d at 865 (D.C. Cir. 2009)) (discussing current version of NSA).

The Government contends that its public declarations amply demonstrate that disclosure of records, or even the number and nature of records that may exist, that are specific to the individuals named in the ACLU's FOIA request would disclose information pertaining to intelligence sources and methods in violation of the NSA. (*See* Bennett Decl. ¶¶ 24, 39-54, 60; Hackett Decl. ¶¶ 20-23.)

**SPA43**

The ACLU's principal argument against Exemption 3 is that the targeted killing of United States citizens does not constitute an "intelligence source or method" within the meaning of the NSA.[31] In support of this argument, the ACLU cites excerpts from the Supreme Court's discussion of intelligence sources and methods in *Sims*:

> Congress simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence. . . .
>
> General Vandenberg, then the Director of the Central Intelligence Group, the Agency's immediate predecessor, emphasized that "foreign intelligence [gathering] consists of securing all possible data pertaining to foreign governments or the national defense and security of the United States."

471 U.S. at 169-71 (quoting General Vandenberg's testimony at a 1947 Senate hearing).

According to the ACLU, General Vandenberg's definition of intelligence gathering does not encompass "Placing individuals on kill lists and then killing them," and thus information pertaining to the Government's targeted killing program should be disclosed. (ACLU Memo. in Support/Opp'n at 41.)

The Government counters that *Sims* stands for the proposition that "Congress intended to give the Director of Central Intelligence *broad* power to protect the secrecy and integrity of the intelligence process." 471 U.S. at 170 (emphasis added); *accord Waterboarding Case*, 681 F.3d at 73-74. The Government also points out that Judge Collyer of the District Court for the District of Columbia rejected the ACLU's argument just last year:

> At first blush, there is force to Plaintiffs' argument that a "targeted-killing program is not an intelligence program" in the most strict and traditional sense, the argument bolstered by the principle that FOIA exemptions are to be narrowly construed. *See Public Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 813 (D.C. Cir. 2008). Nonetheless, Plaintiffs seek too narrow a reading of the authority conferred by the NSA to protect "intelligence sources and methods." The "Supreme Court has recognized the broad sweep of 'intelligence sources'

---

[31] The *Times* Plaintiffs do not appear to join in this argument.

warranting protection in the interest of national security." *Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007); *see also Fitzgibbon v. CIA*, 911 F.2d 755, 760–63 (D.C. Cir. 1990). . . .

The Court has no reason to second-guess the CIA as to which programs that may or may not be of interest implicate the gathering of intelligence . . . .

Plaintiffs' argument that a program of drone strikes cannot form the basis of, or involve, intelligence sources or methods also ignores the scope of the CIA's specific authority to engage in activities beyond "traditional" intelligence gathering (however defined), such as intelligence activities and operations, covert operations, and foreign relations activities.

*ACLU v. Dep't of Justice*, 808 F. Supp. 2d 280, 290-92 (D.D.C. 2011) (the "*Drone Strike Case*").[32]

I agree with my distinguished colleague Judge Collyer that the ACLU's argument is without merit.

All Plaintiffs argue that legal analysis, which is what they really seek, cannot be considered an "intelligence source or method" within the meaning of the NSA, and challenge the Government to show that the legal opinions whose disclosure is sought "logically fall[] within the claimed exemptions." *Wilner*, 592 F.3d at 69.

In reply, the Government notes, "It is entirely logical and plausible that the legal opinion contains information pertaining to military plans, intelligence activities, sources and methods, foreign government information, and foreign relations." (Gov't Memo. in Opp'n/Reply 6.) But that begs the question. In fact, legal analysis is not an "intelligence source or method." As my colleague, The Hon. Alvin K. Hellerstein, put it in *ACLU v. Dep't of Defense*, 389 F. Supp. 2d 547, 565 (S.D.N.Y. 2005) (the "*Torture Memo Case*"), "A memorandum from DoJ to CIA

---

[32] The *Drone Strike Case* is currently up on appeal in the D.C. Circuit (No. 11-5320). Oral argument was held on September 20, 2012.

interpreting the Convention Against Torture, does not, by its terms, implicate intelligence

sources or methods." (internal quotation marks and editing omitted)

That, of course, does not render the legal analysis disclosable. First, FOIA exemptions

other than Exemption 3 may bar disclosure – especially here, where the legal analysis is

classified. Second, it may well be that legal analysis in a particular document is inextricably

intertwined with information that is statutorily exempt from disclosure, including information

about intelligence sources and methods that is statutorily exempt form disclosure. Indeed, that is

"entirely logical and plausible," as the Government notes.

But it is also entirely logical and plausible that such information could be redacted from

the legal analysis. There is probably no way, short of *in camera* inspection, to determine whether

the legal analysis that is not statutorily protected by the NSA is inextricably intertwined with

material that is protected from disclosure by statute.

Again, however, *in camera* inspection would be pointless here, because Exemption 5

plainly applies.

**B.    The CIA Act**

Section 6 of the CIA Act protects information concerning the "functions" of the CIA,

including: intelligence sources and methods, and names, official titles, salaries, or numbers of

personnel employed by the Agency. 50 U.S.C. § 403g. Section 6 is also an exempting statute

within the meaning of Exemption 3. *Baker v. CIA*, 580 F.2d 664, 667 (D.C. Cir. 1978).

The D.C. Circuit has held that Section 6 does not grant the CIA the authority "to refuse to

provide any information at all about anything it does." *Phillippi*, 546 F.2d at 1015 n. 14 (D.C.

Cir. 1976). Rather, the aim of Section 6 is to shield the CIA from having to "divulge information

about its internal structure." *Id.* Section 6 "offers a limited sanctuary from the CIA's FOIA

**SPA46**

obligations because '[o]nly the specific information on the CIA's personnel and internal structure that is listed in the statute will obtain protection from disclosure.'" *Drone Strike Case*, 808 F. Supp. 2d at 287-88 (quoting *Baker*, 580 F.2d at 670).

In the *Drone Strike Case*, a case involving an ACLU FOIA request quite similar to the one here, Judge Collyer said the following with regard to Section 6:

> The fact of the existence or nonexistence of responsive information falls within the ambit of [Section 6] because whether the CIA cooperates with, is interested in, or actually directs drone strikes pertains to (possible) functions of CIA personnel. *See Riquelme v. CIA*, 453 F.Supp.2d 103, 111 (D.D.C. 2006) (accepting CIA's argument that FOIA request seeking information relating to CIA agents' "activities, assistance, participation, involvement, and contacts" speaks to the "functions" of CIA agents, protected from disclosure under [Section 6]). Plaintiffs' FOIA request – sent to multiple agencies – is clearly designed, at least in part, to determine which agencies, and its personnel, are involved in drone strikes and in what capacities. . . .
>
> In the end, the CIA is justifiably concerned that revealing the existence or nonexistence of records sought on the various topics sought by Plaintiffs could alone reveal information on the CIA's internal structure and its capabilities and potential interests and involvement in/operation of the drone program. Although the matter is not entirely free from doubt, the Court is satisfied that the CIA has properly invoked [Section 6] of the CIA Act to withhold this fact under Exemption 3.

*Id*. at 288-89.

Once again I must agree with Judge Collyer. To the extent that the ACLU seeks information regarding the CIA's participation, if any, in the Government's targeted killing program, that information is properly withheld under Exemption 3 and the CIA Act. And, as with the NSA, the CIA Act's prohibition on the disclosure of intelligence sources or methods would apply to the targeted killing program itself, but not to the withheld legal analysis.

## EXEMPTION 5

Exemption 5 to FOIA exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in

litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 covers documents withheld under

the deliberative process privilege (a.k.a., the executive privilege) and the attorney-client

privilege, both of which the Government has invoked with respect to the OLC-DoD Memo.

*Tigue v. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002).

> The Second Circuit has summarized the Exemption 5 analysis as follows:

> the appropriate analysis requires us to determine whether the documents sought
> more closely resemble the type of internal deliberative and predecisional
> documents that Exemption 5 allows to be withheld, or the types of documents that
> section 552(a)(2) requires be disclosed.

*Brennan Ctr. for Justice v. Dep't of Justice*, 697 F.3d 184, 202 (2d Cir. 2012). FOIA Section

552(a)(2) provides that an agency must make available for public inspection, among other things:

"(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the

adjudication of cases [and] (B) those statements of policy and interpretations which have been

adopted by the agency and are not published in the Federal Register."

### A.    The Attorney-Client and Deliberative Process Privileges

The attorney-client privilege protects confidential communications between client and

counsel made for the purpose of obtaining or providing legal assistance." *In re Cnty. of Erie*, 473

F.3d 413, 418 (2d Cir. 2007). The privilege is construed narrowly and the party invoking it has

the burden of proof. *Id*. "In civil suits between private litigants and government agencies, the

attorney-client privilege protects most confidential communications between government

counsel and their clients that are made for the purpose of obtaining or providing legal

assistance." *Id*. "A party invoking the attorney-client privilege must show (1) a communication

between client and counsel that (2) was intended to be and was in fact kept confidential, and (3)

was made for the purpose of obtaining or providing legal advice." *Id*. at 419.

**SPA48**

To qualify for the deliberative process privilege, an agency record must be "predecisional" and "deliberative." *Grand Cent. P'ship*, 166 F.3d at 482 (citing *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)).

A document is "predecisional" when it is "prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Bd.*, 421 U.S. at 184. Predecisional documents "reflect the personal opinions of the writer rather than the policy of the agency." *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks omitted). The agency need not identify a specific decision that the document preceded; the document need only have been "prepared to assist [agency] decisionmaking on a specific issue." *Tigue*, 312 F.3d at 80; *see also N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n. 18 (1975) "Finally, 'the privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment.'" *Grand Cent. P'ship*, 166 F.3d at 482 (quoting *Ethyl Corp. v. E.P.A.*, 25 F.3d 1241, 1248 (4th Cir. 1994). As the Supreme Court has noted:

> Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process.

*Sears*, 421 U.S. at 151 n. 18.

"A document is 'deliberative' when it is actually . . . related to the process by which policies are formulated." *Grand Cent. P'Ship*, 166 F.3d at 482 (internal quotation marks omitted) (alteration in original). In determining whether a document is deliberative, the Second Circuit has emphasized the following factors: (1) whether the document "formed an important, if not essential, link in [the agency's] consultative process"; (2) whether the document reflects the

**SPA49**

opinion of its author rather than agency policy; and (3) whether the document might "reflect inaccurately upon or prematurely disclose the views of [the agency]." *Id.* at 483.

"[T]o carry its burden, the agency must describe [in its *Vaughn* indices] not only the contents of the document but also enough about its context, [i.e.,] the agency's decisionmaking process, to establish that it is a pre-decisional part thereof." *SafeCard Serv., Inc. v. SEC*, 926 F.2d 1197, 1204 (D.C. Cir. 1991). "Since the applicability of the deliberative process privilege depends on the content of each document and the role it plays in the decisionmaking process, an agency's affidavit must correlate facts in or about each withheld document with the elements of the privilege." *Judicial Watch, Inc. v. US Postal Serv.*, 297 F. Supp. 2d 252, 259-60 (D.D.C. 2004) (citing *Senate of Puerto Rico on Behalf of the Judiciary Committee v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980); *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).

As part of its campaign of increased transparency about the legality of targeted killings, the Government produced to Plaintiffs *Vaughn* indices from OLC (Bies Decl., Ex. I), DoD (Neller Decl., Ex. J), and OIP (Hibbard Decl., Ex. F). These affidavits describe (in limited terms akin to a traditional privilege log) 74 non-classified documents responsive to Plaintiffs' FOIA requests that the Government has withheld under Exemption 5. The vast majority of the documents were withheld under the deliberative process privilege. Slightly fewer were withheld under both the deliberative privilege and the attorney-client privilege. A few were withheld pursuant to the attorney-client privilege alone. Just one, from the OIP *Vaughn* index (Document

**SPA50**

1), was withheld under the "presidential communications privilege"; it was also withheld under the deliberative process privilege.[33]

***OLC***: In its *Vaughn* index, OLC identifies 60 non-classified, responsive documents that it has withheld pursuant to the deliberative process privilege. (Bies Decl., Ex. I.) All of these documents are described as email chains reflecting internal and/or interagency deliberations among Government attorneys and officials. (*Id.*) The subject matter of these email chains is uniformly the legal basis "for the use of lethal force in a foreign country against U.S. citizens in certain circumstances." (*Id.*) All 60 of the documents withheld by OLC were withheld under both the attorney-client privilege and the deliberative process privilege – which is hardly surprising, given OLC's role in the Executive Branch. (*Id.*)

The OLC-DoD Memo was identified by OLC but does not appear on its *Vaughn* index. The Government contends that the OLC-DoD Memo was properly withheld under the deliberative process privilege because:

> it is confidential, pre-decisional, and deliberative. The document is pre-decisional because it was prepared in advance of Executive Branch decisions regarding a potential military operation in a foreign country, and it is deliberative because it contains legal advice by OLC attorneys to other Executive Branch officials in connection with potential decisions regarding such an operation. . . . Compelled disclosure of the document would undermine the deliberative processes of the Government and chill the candid and frank communications necessary for effective governmental decision-making.

(Bies Decl. ¶ 31.) The Government also argues that the OLC-DoD Memo was also properly withheld under attorney-client privilege because:

> The document reflects confidential communications between OLC and Executive Branch clients made for the purpose of providing legal advice. In providing legal

---

[33] The presidential communications privilege applies "to communications in performance of a President's responsibilities, . . . and made in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1997) (internal quotation marks, citation, and formatting omitted). None of the parties addresses this privilege in any detail and it has no bearing on the outcome of this case, so the Court will not dwell on it.

**SPA51**

> advice contained in the opinion, OLC was serving an advisory role as legal
> counsel to the Executive Branch. Having been requested to provide counsel of the
> law, OLC stood in a special relationship of trust with the Attorney General, as
> well as other participants in the interagency deliberations in connection with
> which the advice was prepared. Just as disclosure of client confidences in the
> course of seeking legal advice would seriously disrupt the relationship of trust so
> critical when attorneys formulate legal advice to their clients, disclosure of the
> advice itself would be equally disruptive to that trust.

(Bies Decl. ¶ 32; *see also* Neller Decl. ¶ 24.)[34]

The *Times*' sole apparent goal at this point is to get a hold of the OLC-DoD Memo,

which, it assumes, contains the final legal analysis and justification it seeks. (*See* NYT Memo. in

Support/Opp'n at 6-7, 11, 14-15, 25.; NYT Reply Memo. at 3, 9-10.) Indeed, the only publicly-

identified document that the *Times* Plaintiffs ask this Court to declare "public" and order

disclosed is the OLC-DoD Memo. (NYT Memo. in Support/Opp'n at 25; NYT Reply Memo. at

10.) As I read the briefs, the *Times* does not seek disclosure of anything that appears on OLC's

*Vaughn* Index.

The *Times* does not disagree that the OLC-DoD Memo might at one time have been

properly withheld under the deliberative process and/or attorney-client privileges. (*See* NYT

Memo. in Support/Opp'n at 14.) It argues instead that the privilege has been overcome because

of one or more of the following: waiver, adoption, and/or the working law doctrine.

The ACLU, for its part, piggybacks on the *Times*' Exemption 5 arguments, and explicitly

states that it is not seeking the 60 email chains listed on OLC's *Vaughn* index. (ACLU Memo. in

Support/Opp'n at 48 n. 44.) I thus need not discuss those emails further.

***OIP***: In its *Vaughn* index, OIP describes four documents withheld pursuant to the

deliberative process privilege. (Hibbard Decl., Ex. F.) Document 1 is a set of draft talking points

---

[34] OIP did not invoke attorney-client privilege and DoD invoked it only as to the CAPSTONE presentation
described above. (*See* Neller Decl., Ex. J.)

**SPA52**

prepared for the Attorney General in preparation for a briefing with the President; it was apparently attached to a non-responsive, internal email at DoJ. (*Id.*) Document 2 is briefing material prepared for the Attorney General ahead of upcoming testimony; this too was apparently attached to a non-responsive, internal email at DoJ. (*Id.*) Document 3 is an email chain from State Department officials to various officials at DoJ regarding the Northwestern Speech; portions of these emails were excised as non-responsive. (*Id.*) Document 4 is an internal DoJ email chain concerning language in Document 1; portions of these emails were also excised as non-responsive. (*Id.*)

The *Times* Plaintiffs appear to have little interest in these documents and do not press their claim to them; the ACLU specifically disclaims any interest in having them disclosed. I need not discuss them, either.

**_DoD_**: The Defense Department identifies in its *Vaughn* index nine documents withheld pursuant to the deliberative process privilege alone. (Neller Decl., Ex. J.)

Documents 1-7 are email chains among Government attorneys discussing changes to the Northwestern Speech and Dean's Lecture. (*Id.*) The ACLU (the only party to direct a FOIA request to DoD) has disclaimed interest in having these communications disclosed. (ACLU Memo. in Support/Opp'n at 48 n. 44).

The tenth document on DoD's *Vaughn* index, Document 8, was withheld solely under the attorney-client privilege. (Neller Decl., Ex. J.) It is described as a "CAPSTONE presentation presented by the General Counsel on February 1, 2012, to officers who recently obtained the rank of 0-7 regarding international legal principles." (Neller Decl. ¶ 15.) It is plainly a communication from attorney to client and so is not disclosable unless the privilege has been waived. The ACLU does not contend otherwise.

**SPA53**

However, Documents 9 and 10 are of great interest to the ACLU. Both are described on the *Vaughn* index as: "Memorandum from Legal Counsel to Chairman of the Joint Chiefs of Staff to the National Security Legal Advisor with legal analysis regarding the effect of U.S. citizenship on targeting enemy belligerents." (*Id.*) Document 10 was apparently "subsequent to and references document number 6." (*Id.*) This appears to be a typographical error, since Document 6 is one of the email chains discussing the Northwestern Speech. The logical reference would be to Document 9, which is likely an earlier iteration of Document 10. Both documents were withheld pursuant to Exemption 5's deliberative process privilege.

The ACLU argues that the *Times'* analysis about why the OLC-DoD Memo ought to be made public applies with equal force to the two non-classified legal memoranda identified on DoD's *Vaughn* index (see below). (ACLU Memo. in Support/Opp'n at 48-49.) In response, Lieutenant General Robert R. Neller represents that Documents 9 and 10 (the "Unclassified Memos") are exempt under the deliberative process privilege because, "They are predecisional and deliberative, as they contain opinions, advice, and recommendations as part of the consultative process. Disclosure of this information could chill full, frank and open discussions on matters between legal counsel." (Neller Decl. ¶ 16.)

I cannot take the good General's wholly conclusory word for that. Unlike the other responders, he does nothing more than parrot the relevant statutory language. That is never enough to avoid disclosure under FOIA. *Larson*, 565 F.3d at 864 ( "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not carry the government's burden"); *accord ODNI*, 2011 WL 5563520, at *5; *see also Defenders of Wildlife v. US Border Patrol*, 623 F. Supp. 2d 83, 90 (D.D.C. 2009) ("Where the agency's affidavits or declarations merely parrot the language of the statute and are drawn in conclusory terms, as they

**SPA54**

are here, the Court's ability to conduct its own review of the agency's determinations is severely frustrated.") (internal quotation marks omitted). As I have no other information about these documents, I will need a more fulsome response from the Defense Department before I can reach any conclusion, one way or the other, about the applicability of the deliberative process privilege to these two documents. *See Elec. Frontier Found. v. Dep't of Justice*, 826 F. Supp. 2d 157, 166-73 (D.D.C. 2011).

**B.      Defenses to the Assertion of Exemption 5**

Plaintiffs assert that three different doctrines – waiver, adoption, and working or "secret" law – defeat the Government's assertion of Exemption 5 to shield the OLC-DoD Memo and the two DoD Unclassified Memos from disclosure.[35] Because waiver and adoption merge, at least in the context of the deliberative process, I will discuss them together. And because they bar disclosure of the OLC-DoD Memo, there is no need to discuss the concept of secret or working law, and only a limited basis on which to mention attorney-client privilege.

**i.      Waiver/Adoption in the Context of the Deliberative Privilege**

As they did with Exemption 1, Plaintiffs argue that the speeches and other public pronouncements on which they rely indicate that the Government has chosen to make public the legal basis underlying its ability to target civilians, including especially United States citizens, for killing without trial, thereby waiving the protection of Exemption 5.

The case law suggests that the bar for waiver might be slightly lower in the Exemption 5 context than for Exemption 1: "Specificity is the touchstone in the waiver inquiry, and thus, neither general discussions of topics nor partial disclosures of information constitute waiver of an otherwise valid FOIA exemption." *Dow Jones*, 880 F. Supp. at 151. Any semantic differences

---

[35] As I am unable to determine whether the deliberative process privilege applies to the Unclassified Memos – leaving open the possibility that the privilege may not apply, which would likely require that they be disclosed – the analysis that follows on defenses to the assertion of Exemption 5 will focus exclusively on the OLC-DoD Memo.

between "exactitude" and "specificity" need not detain us, however: Second Circuit precedent indicates that waiver of the deliberative process privilege only occurs when a pre-decisional document has been adopted as final policy. *See Tigue*, 312 F.3d at 80-81. At least two of my colleagues have so held explicitly. *See Elec. Privacy Info. Ctr. v. Dep't of Justice*, 584 F. Supp. 2d 65, 78 (D.D.C. 2008) ("The deliberative process privilege is waived only if there is an 'express' adoption of OLC memoranda.") (citing *Sears*, 421 U.S. at 152); *Strini v. Edwards Lifesciences Corp.*, No. 05 Civ. 440, 2007 WL 1017280, at *4 (N.D.N.Y. Mar. 30, 2007) (citing *Tigue* for the proposition that the "deliberative process privilege may be waived by publication or public adoption of [an] otherwise privileged document").

This stands to reason; a pre-decisional document should be stripped of its privilege when it becomes, in effect, *the decision* of the agency. While "Agencies are, and properly should be, engaged in a continuing process of examining their policies," once a memo "ripen[s] into [an] agency decision[]," it is fair game for FOIA disclosure. *Sears*, 421 U.S. at 151 n. 18. Thus, the doctrines of waiver and adoption are interlinked where the deliberative process privilege is concerned.

Plaintiffs argue that the various public statements by Executive Branch officials on which they rely purport to disclose information about final policies that have been adopted by the Executive to target individuals and to decide whether or not they can lawfully be killed by Executive fiat.

"An agency may be required to disclose a document otherwise entitled to protection under the deliberative process privilege if the agency has chosen '*expressly* to adopt or incorporate by reference [a] . . . memorandum previously covered by Exemption 5 in what would otherwise be a final opinion.'" *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356

**SPA56**

(2d Cir. 2005) (quoting *Sears*, 421 U.S. at 161) (emphasis added). Adoption can defeat both the deliberative and the attorney-client privilege. *Id.* at 360.

The first thing to note about adoption is that it refers to the adoption of a "memorandum" – i.e., adoption of a particular document. *See Bronx Defenders v. Dep't of Homeland Sec.*, No. 04 Civ. 8576, 2005 WL 3462725, at *4 (S.D.N.Y. Dec. 15, 2005) (discussing "adoption or incorporation of a *particular document* into agency policy") (citing *La Raza*, 411 F.3d at 358) (emphasis added). "[T]here must be evidence that an agency has *actually* adopted or incorporated by reference the document at issue; mere speculation will not suffice." *La Raza*, 411 F.3d at 360 (emphasis in original). Casual or minor references to a document do not constitute adoption. *Id.*

Furthermore, the agency must also have adopted the reasoning of the document, not just its conclusions. *Id.* at 358-59; *accord Wood v. F.B.I.*, 432 F.3d 78, 84 (2d Cir. 2005). In other words, "where an agency, having reviewed a subordinate's non-binding recommendation, makes a 'yes or no' determination without providing any reasoning at all, a court may not infer that the agency is relying on the reasoning contained in the subordinate's report." *La Raza*, 411 F.3d at 359.

The adoption inquiry is necessarily fact-specific. A district court "must examine *all* the relevant facts and circumstances in determining whether express adoption or incorporation by reference has occurred." *Id.* at 357 n. 5 (emphasis in original). Indeed, the Second Circuit has rejected "a bright-line test . . . whereby a document may be deemed expressly adopted or incorporated only in the event that an agency, in essence, uses specific, explicit language of adoption or incorporation." *Id.*

The parties contest how express the agency's adoption of the withheld document must be. Citing *Bronx Defenders*, Plaintiffs argue that "adoption can be premised on only implicit reliance on a document's legal analysis" and that "an express or explicit statement of incorporation is not required." (NYT Memo. in Support/Opp'n at 17.)

The Government, noting that the doctrine extends only to express adoption, argues that express means express (Gov't Opp'n/Reply at 28-29) – the perfect example of its position being *La Raza*, where then-Attorney General John Ashcroft (among other DoJ officials) made frequent and explicit public reference to both the reasoning and conclusions of a particular OLC memo setting forth a change in DoJ policy to permit state and local law enforcement agencies to enforce the civil provisions of federal immigration law. 411 F.3d at 358-59. For example, in a March 11, 2003 letter to one of the plaintiffs, the Attorney General stated that:

> *Let me first state clearly the policy of the Department on this issue.* The Department's Office of Legal Counsel (OLC) previously opined that state and local law enforcement officials have inherent authority to make arrests for criminal immigration law violations generally. It has now additionally opined that they possess inherent authority to arrest individuals whose names have been entered into the [NCIC database] because they have both (1) violated civil provisions of the federal immigration laws that render them deportable and (2) been determined by federal authorities to pose special risks, either because they present national security concerns or because they are absconders who have not complied with a final order of removal or deportation. Thus, when state and local law enforcement officers encounter an alien who poses special risks and has been listed in the NCIC database for violating the [Immigration and Nationality Act], they may arrest that individual and transfer him to the custody of the Immigration and Naturalization Service (INS). The policy and the authority are no broader than this, and the narrow, limited mission that we are asking state and local police to undertake is a voluntary one.

*Id.* at 353-54 (emphasis in original).

The various public statements on which Plaintiffs rely in this case are obviously grounded in legal analysis that was performed by someone for someone. But there is no suggestion, in any of those speeches or interviews, that the legal reasoning being discussed is the

**SPA58**

reasoning set out in the OLC-DoD Memo, a document which the Government acknowledges exists. This document, unlike the OLC opinions on local enforcement of immigration laws, has never been mentioned in any public statement. For that matter, OLC has never been mentioned in any public statement; none of the speeches attribute any legal principles announced to OLC or to any opinion it has issued. This contrasts with *Bronx Defenders*, where there were numerous and express public references to an OLC memorandum that the plaintiffs sought, as well as to conclusions that were attributed to OLC. *See* 2005 WL 3462725, at *4.

Of course, the Government undoubtedly goes too far when it suggests (as it does) that "explicit" adoption of a memorandum requires the use of "magic words." Courts have consistently rejected that formalistic position in favor of a more holistic approach. *See La Raza*, 411 F.3d at 357 n. 5; *Nat'l Day Laborer*, 827 F. Supp. 2d at 258; *Bronx Defenders*, 2005 WL 3462725, at *6. For example, in *Nat'l Day Laborer*, the plaintiffs presented significant evidence, both direct and circumstantial, that a particular memorandum drafted by the Office of the Principal Legal Advisor of the Immigration and Customs Enforcement Agency had been adopted by the agency as its policy. *See* 827 F. Supp. 2d at 254-56, 258-59. Indeed, this was "an instance where the agency . . . continually relied upon and repeated in public the arguments made in the Memorandum," *id.* at 259 – even though there does not appear to have been a public reference to the memorandum by an Executive Branch official as explicit as those in *La Raza*. Instead, pieces of the memorandum, while not explicitly acknowledged as such, popped up repeatedly in various expressions of Government policy, including public statements by Government officials, documents issued by the Government, and internal Government communications. *Id.* at 254-56, 258-59. My colleague Judge Scheindlin noted, "[U]nless the defendants have unlawfully withheld other legal memoranda from plaintiffs and this Court, it was the *only* document

**SPA59**

comprehensively laying out the legal authority for making Secure Communities mandatory. Thus, the analysis in the Memorandum seems to be the only rationale that the agency could have relied upon and adopted as the legal basis for the policy." *Id.* at 259.

In this case, however, there is no evidence that the Government "continually relied upon and repeated in public the arguments made" *specifically* in the OLC-DoD Memo. *Nat'l Day Laborer*, 827 F. Supp. 2d at 259. All Plaintiffs say is that, in the ordinary course, "OLC opinions are not mere advice, but rather establish the binding parameters within which officials may operate without fear of prosecution in areas that are not ordinarily subject to judicial review – such as the realm of national security." (NYT Reply Memo. at 7-8.) That may be so, but it is sheer speculation that this particular OLC memorandum – addressed to the Attorney General (Bies Decl. ¶ 30), "pertaining to the Department of Defense" (*id.*), and "regarding a potential military operation in a foreign country" (*id.*) – contains the legal analysis that justifies the Executive Branch's conclusion that it is legal in certain circumstances to target suspected terrorists, including United States citizens, for killing away from a "hot" field of battle. "Mere speculation will not suffice" to support a conclusion that a particular document has been adopted as official agency policy, *La Raza*, 411 F.3d at 360, and aside from speculation, there is no indication that the OLC-DoD Memo is the "the *only* document *comprehensively* laying out the [Government's] legal authority" with respect to targeted killing operations. *Nat'l Day Laborer*, 827 F. Supp. 2d at 259.

Plaintiffs so argue because this Memorandum is the only document containing legal analysis and opinions whose existence has been disclosed to them. But as chronicled at the beginning of this opinion, various agencies have filed No Number, No List Responses to both FOIA requests; and the CIA has asserted a *Glomar* response to the requests from the two *Times*

**SPA60**

reporters (which seek only legal opinions). As a result, it is impossible even to know *whether* any

other legal opinions aside from the OLC-DoD Memo exist, let alone whether senior

Administration officials were actually relying, in whole or in part, on some other opinion or

opinions that might (or might not) exist when they made their public statements.

While *in camera* review of a withheld document can be an appropriate way to determine

whether a document's reasoning and conclusion have been adopted by an agency, *cf. Brennan*

*Ctr. for Justice*, 2011 WL 4001146, at *6-7, it is not appropriate here. *In camera* review is

pointless where there has been no public reference to a particular document. Review of the OLC-

DoD Memo would not answer the question of whether the Attorney General and other Executive

Branch officials, in making their public statements, relied on *this document specifically*. Even if

the OLC-DoD Memo contains language *identical* to that uttered by the Attorney General and

others in the various public statements on which Plaintiffs rely, that would still not necessarily

constitute proof that the Government had adopted *this document in particular* as its policy.

In sum, the Court finds that the Government has neither expressly adopted nor

incorporated by reference the OLC-DoD Memo. Accordingly, the deliberative process privilege

still adheres to this document, *see Tigue*, 312 F.3d at 80-81, and Exemption 5 remains a valid

basis for its being withheld.

### ii.    Waiver in the Context of the Attorney-Client Privilege

The only publicly-disclosed document that is withheld under the attorney-client privilege

alone is the CAPSTONE presentation by the General Counsel of DoD, which none of the

Plaintiffs apparently seeks (see above).

The attorney-client privilege is waived when a party "mak[es] 'a deliberate decision to

disclose privileged materials in a forum where disclosure was voluntary and calculated to benefit

the disclosing party.'" *Nat'l Immigration Project*, 842 F. Supp. 2d at 728 (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 184 (2d. Cir. 2000)). There is not the slightest evidence that Mr. Johnson's presentation to senior officers was ever deliberately disclosed in any forum, let alone in circumstances where disclosure was voluntary and calculated to benefit the disclosing party. Therefore, there has been no waiver of the privilege with respect to the CAPSTONE presentation.

Plaintiffs contend that the Government, through the various public statements discussed herein, has waived the attorney-client privilege with respect to the OLC-DoD Memo. The Court need not rule on this issue, however, as the deliberative process plainly applies to this document, so it was properly withheld under Exemption 5.

### *Glomar* and No Number, No List Responses

As noted above, OLC initially responded to Plaintiffs' FOIA requests with so-called *Glomar* responses (except that it acknowledged that DoD had records it would not identify that were responsive to Shane's request). (*See* Bies Decl., Exs. B, D, F.) Since the filing of these cases, those *Glomar* responses have been superseded by so-called No Number, No List responses with respect to DoJ (Hackett Decl. ¶¶ 21-28), OLC (Bies Decl. ¶ 38), DoD (Neller Decl. ¶¶ 25-26), and OIP (Hibbard Decl. ¶ 8).

The CIA has persisted in its initial *Glomar* response with respect to the Shane and Savage requests (even though they were not addressed to the CIA), superseding it only to the limited extent of disclosing that it has no legal opinions in its files concerning its participation in the operation that killed Osama Bin Laden. (*See* Bennett Decl. ¶¶ 61-65.) By contrast, the CIA decided that it "can confirm the existence of records responsive to ACLU's request without harming national security" (Bennett Decl. ¶ 27), although it refuses to confirm or deny the

existence of any records that would also be responsive to the Shane and Savage requests – that is to say, legal opinions. (Bennett Decl. ¶ 65 n. 7.) However, that is as far as it went; the Agency, like OLC and DoD, asserts a No Number, No List response, insisting that it "cannot further describe or even enumerate on the public record the number, types, dates, or other descriptive information about these responsive records because to do so would reveal classified information about the nature and extent of the CIA's interest in [the] broad topics [addressed by the ACLU's FOIA request]." (*Id.* ¶¶ 27-28.)

A *Glomar* response is appropriate when "to confirm or deny the existence of records . . . would cause harm cognizable under a FOIA exception." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982); *see also Roth v. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011). A No Number, No List response is employed where the "details that would appear in a *Vaughn* index" are protected by a FOIA exemption. *Bassiouni v. CIA*, 392 F.3d 244, 246 (7th Cir. 2004). Although the Seventh Circuit suggested in *Bassiouni* that the two types of response are really one and the same, I beg to differ; when it gives a No Number, No List response, an agency admits that it has documents responsive to a FOIA request, but refuses to disclose the number or nature of those documents; when it gives a *Glomar* response, the agency neither confirms nor denies that responsive documents exist at all. That said, there is considerably less law addressing No Number, No List responses than there is on *Glomar*; but such law as exists suggests that *Glomar* law should be used to evaluate the propriety of a No Number, No List response.

The standard of review for *Glomar* and No Number, No List responses is identical to that of an assertion of a FOIA exemption, as these responses are themselves invocations of one or more FOIA exemptions. *See Wilner*, 592 F.3d at 68; *Wolf*, 473 F.3d at 378. Here, the Government invoked Exemptions 1 (classification) and 3 (specifically exempted by statute) as

**SPA63**

the basis for its No Number, No List responses. (*See* Hackett Decl. ¶¶ 21-28; Bies Decl. ¶ 38;

Neller Decl. ¶¶ 25-26, Bennett Decl. ¶¶ 27-37; Hibbard Decl. ¶ 8.)

When the Government issues a *Glomar* or No Number, No List response, "there are no

relevant documents for the court to examine other than the affidavits which explain the Agency's

refusal." *Wolf*, 473 F.3d at 374 n.4 (internal quotation marks omitted); *see also Jarvik v. CIA*,

741 F. Supp. 2d 106, 123 (D.D.C. 2010). Moreover, courts play a rather limited role when such

responses are filed: "When . . . a court finds that the government's public affidavits sufficiently

allege the necessity of a *Glomar* [or No Number, No List] response, *ex parte* and *in camera*

review of additional, confidential material is unnecessary and beyond the role assigned to the

judiciary by applicable law." *Wilner*, 592 F.3d at 76. I have already noted that Government

declarations in the national security context are entitled to substantial deference. *See Sims*, 471

U.S. at 179; *Waterboarding Case*, 681 F.3d at 72; *Wilner*, 592 F.3d at 76.

Nevertheless, in supporting a *Glomar* or No Number, No List response, the Government

must provide "specific, non-conclusory justifications for withholding . . . [the requested]

information." *Roth*, 642 F.3d at 1178; *see also Jarvik*, 741 F. Supp. 2d at 123.

In the *Drone Strike Case*, 808 F. Supp. 2d 280 (D.D.C. 2011) – where the ACLU

submitted a FOIA request to the CIA seeking similarly detailed information on the CIA's

involvement in targeted killings via drone strikes – the ACLU argued that the CIA has waived its

right to rely on a *Glomar* response on the basis of public statements made by former CIA

Director Leon Panetta. These statements included remarks during a question and answer session

following a speech at the Pacific Council on International Policy, a *Washington Post* interview, a

*Wall Street Journal* article quoting Director Panetta, and an ABC News interview. *Id.* at 293-97.

Not surprisingly, many of the statements on which the ACLU here relies are the same as those relied on in the *Drone Strike Case*.

Judge Collyer ruled against the ACLU on two grounds. With respect to whether Panetta had disclosed CIA involvement in drone strikes, she held that:

> Even if Director Panetta were speaking squarely on the issue of drone strikes, he never acknowledged the CIA's involvement in such program. That Director Panetta acknowledged that such a program exists and he had some knowledge of it, or that he was able to assess its success, is simply not tantamount to a specific acknowledgment of the CIA's involvement in such program, nor does it waive the CIA's ability to properly invoke *Glomar*. . . .

*Id*. at 294.

Second, Judge Collyer held that in none of Panetta's public statements did he make reference to any specific *records* related to the ACLU's FOIA request. *Id*. at 297. "[O]nly by inference . . . might one conclude that the CIA might have some kind(s) of documentation somewhere." *Id*.

The ACLU makes essentially the same arguments to me that it made to Judge Collyer. The Government does not argue former adjudication, so I will not address it here; but it relies heavily on Judge Collyer's opinion to rebut the ACLU's contention that the CIA's right to assert a *Glomar* response to its requests has been waived.

There is tension at the very least, if not ground for waiver, between the CIA's assertion, on the one hand, of a "general interest in" the "legal basis upon which U.S. citizens can be subjected to targeted killing" and "the process by which U.S. citizens can be designated for targeted killing" (Bennett Decl. ¶ 27) and, on the other hand, its *Glomar* and No Number, No List responses to the FOIA requests in this suit. But while only the most naïve among us would ever assume that the CIA was entirely uninterested in "OLC opinions . . . . concerning targeted lethal operations conducted by the CIA against terrorists, including those who are U.S. citizens

**SPA65**

(Bennett Decl. ¶¶ 61-62), it is a far cry from the extremely general statements made by President

Obama and Secretary (and former CIA Director) Panetta about the involvement of the

"intelligence community" in such operations to a conclusion that the Agency had waived its right

to assert a *Glomar* response if disclosing the existence of such documents in its files would

expose classified material containing intelligence sources and methods.

Moreover, as the DC Circuit has noted, in the *Glomar* waiver context, "the *specific

information at issue* [in a *Glomar* response) is the existence *vel non* of records." *Wolf*, 473 F.3d

at 379 (emphasis in original) (internal citation and quotation marks omitted). Therefore, what

waives *Glomar* is an acknowledgement that records do in fact exist. In no statement made by

either the President or Secretary Panetta is there a reference to the existence of any particular

*records* that pertain to targeted killing operations – whether by drone strikes or otherwise, and

whether involving American citizens or otherwise. *See Drone Strike Case*, 808 F. Supp. 2d at

297.

With respect to the No Number, No List responses issued by DoJ (Hackett Decl. ¶¶ 21-

28), OLC (Bies Decl. ¶ 38), DoD (Neller Decl. ¶¶ 25-26), OIP (Hibbard Decl. ¶ 8), and CIA

(Bennett Decl. ¶¶ 27-37), none of the parties has directed the Court to case law addressing under

what circumstances a No Number, No List response is waived, nor could the Court find any.

Neither *Bassiouni* nor *Jarvik*, the two cases upon which the Government principally relies,

touches on waiver in the No Number, No List context. I assume the standards for assessing

waiver in this context are identical to the standards for assessing waiver in the national security

context generally – i.e., "Classified information that a party seeks to obtain or publish is deemed

to have been officially disclosed only if it (1) '[is] as specific as the information previously

released,' (2) 'match[es] the information previously disclosed,' and (3) was 'made public

**SPA66**

through an official and documented disclosure.'" *Wilson*, 586 F.3d at 186 (quoting *Wolf*, 473
F.3d at 378). As in *Wolf*, 473 F.3d at 379, the specific information at issue in the No Number, No
List context would be the number and nature of records withheld under Exemptions 1 and 3 – in
other words, the information that traditionally appears in a *Vaughn* index.

Plaintiffs have provided the Court with every public pronouncement by a senior
Executive Branch official that touches on the intelligence community's involvement in the
Government's targeted killing program. In none of these statements is there a reference to any
particular records pertaining to the program, let alone the *number* or *nature* of those records.

Accordingly, the waiver argument with respect to the Government's *Glomar* and No
Number, No List responses is without merit.


**CONCLUSION**

The Government's motion for summary judgment is granted except to the extent of
permitting the DoD to submit a supplemental and more detailed justification for why the
deliberative process privilege applies to the two Unclassified Memos on its Vaughn Index.
Plaintiffs' cross motions for summary judgment are denied except as to the open issue described
above.

This constitutes the decision and order of the Court. The Clerk of the Court is directed to
remove the motions at Docket 11 Civ. 9336 # 10 and 19 and Docket 12 Civ. 794 # 24 and 34
from the Court's list of open motions.


**SPA67**

Dated: January 3, 2013

U.S.D.J.

BY ECF TO ALL COUNSEL

**SPA68**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
THE NEW YORK TIMES COMPANY,
CHARLIE SAVAGE, and SCOTT SHANE,

                              Plaintiffs,                    11 Civ. 9336 (CM)

        -against-

UNITED STATES DEPARTMENT OF JUSTICE,

                              Defendant.

-------------------------------------------------------------x
AMERICAN CIVIL LIBERTIES UNION and
THE AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

                              Plaintiffs,                    12 Civ. 794 (CM)

        -against-

U.S. DEPARTMENT OF JUSTICE, including its
component the Office of Legal Counsel, U.S.
DEPARTMENT OF DEFENSE, including its
Component U.S. Special Operations Command,
and CENTRAL INTELLIGENCE AGENCY,

                              Defendants.

-------------------------------------------------------------x

**DECISION AND ORDER**

McMahon, J.:

        On January 3, 2013, the Court entered summary judgment in this Freedom of Information

Act ("FOIA") case in favor of the Government, but reserved judgment with respect to whether

the deliberative process privilege (and, by extension, Exemption 5 to FOIA) applies to two

unclassified memoranda identified by the Department of Defense ("DoD") in its *Vaughn* index

1

**SPA69**

(the "Unclassified Memos"). (*See* Declaration of Lieutenant General Robert R. Neller ("Neller Decl."), Ex. J, Documents 9 and 10.) I found General Neller's justification for why DoD was withholding the Unclassified Memos lacking and permitted the Government to submit a supplemental declaration, in the hopes of receiving a more detailed explanation of DoD's reasoning. *See New York Times Co. v. Dep't of Justice*, Nos. 11 Civ. 9336, 12 Civ. 794, --- F. Supp. 2d ----, 2013 WL 50209, at *31, 38 (S.D.N.Y. Jan. 3, 2013). To that end, on January 18, the Government submitted the Declaration of Brigadier General Richard C. Gross ("Gross Decl."), Legal Counsel to the Chairman of the Joint Chiefs of Staff.

The relevant legal standards for the deliberative process privilege can be found in the Court's January 3 opinion at *27-28. Having reviewed the Gross Declaration, I conclude that the Unclassified Memos fall squarely within the deliberative process privilege and thus were properly withheld under Exemption 5. General Gross has demonstrated to my satisfaction that the Unclassified Memos are both predecisional and deliberative, for the reasons articulated in the Court's original decision. (*See* Gross Decl., ¶ 8.)

Accordingly, the Government's motion for summary judgment with respect to the Unclassified Memos is granted and Plaintiffs' cross motions for summary judgment are denied.

The Clerk of the Court is directed to enter judgment for the Government and to close both cases.

This constitutes the decision and order of the Court.

2

**SPA70**

Dated: January 22, 2013

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

**SPA71**

```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____         │
│ DATE FILED: 1/24/13             │
└─────────────────────────────────┘
```

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

THE NEW YORK TIMES COMPANY, CHARLIE
SAVAGE, and SCOTT SHANE,

                Plaintiffs,

          -against-

UNITED STATES DEPARTMENT OF JUSTICE,
          Defendant.

11 **CIVIL** 9336 (CM)

**JUDGMENT**

------------------------------------------------------------X

AMERICAN CIVIL LIBERTIES UNION and
THE AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

                Plaintiffs,

          -against-

U.S. DEPARTMENT OF JUSTICE, including its
Component the Office of Legal Counsel, U.S.
DEPARTMENT OF DEFENSE, including its
Component U.S. Special Operations Command,
and CENTRAL INTELLIGENCE AGENCY,

                Defendants.

12 **CIVIL** 0794 (CM)

------------------------------------------------------------X

Whereas the above-captioned action having come before this Court, and the matter having

come before the Honorable Colleen McMahon, United States District Judge, and the Court, on

January 22, 2013, having rendered its Decision and Order granting the Government's motion for

summary judgment with respect to the Unclassified Memos, denying Plaintiffs' cross motions for

summary judgment, and directing the Clerk of the Court to enter judgment for the Government and

to close both cases, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Decision and Order dated January 22, 2013, the Government's motion for summary

judgment with respect to the Unclassified Memos is granted and Plaintiffs' cross motions for

**SPA72**

summary judgment are denied; accordingly, both of the cases are closed.

**Dated:**  New York, New York
        January 24, 2013

                                        RUBY J. KRAJICK
                                    ———————————————————
                                        Clerk of Court
                    **BY:**
                                    ———————————————————
                                        Deputy Clerk


                                THIS DOCUMENT WAS ENTERED
                                ON THE DOCKET ON _____


**SPA73**

**United States District Court**
**Southern District of New York**
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

Date:

In Re:

-v-

Case #:            (      )

Dear Litigant,

Enclosed is a copy of the judgment entered in your case.

Your attention is directed to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, which requires that if you wish to appeal the judgment in your case, you must file a notice of appeal within 30 days of the date of entry of the judgment (60 days if the United States or an officer or agency of the United States is a party).

If you wish to appeal the judgment but for any reason you are unable to file your notice of appeal within the required time, you may make a motion for an extension of time in accordance with the provision of Fed. R. App. P. 4(a)(5). That rule requires you to show "excusable neglect" or "good cause" for your failure to file your notice of appeal within the time allowed. Any such motion must first be served upon the other parties and then filed with the Pro Se Office no later than 60 days from the date of entry of the judgment (90 days if the United States or an officer or agency of the United States is a party).

The enclosed Forms 1, 2 and 3 cover some common situations, and you may choose to use one of them if appropriate to your circumstances.

The Filing fee for a notice of appeal is $5.00 and the appellate docketing fee is $450.00 payable to the "Clerk of the Court, USDC, SDNY" by certified check, money order or cash. **No personal checks are accepted.**

Ruby J. Krajick, Clerk of Court

by: _____

_____, Deputy Clerk

APPEAL FORMS

U.S.D.C. S.D.N.Y. CM/ECF Support Unit                    1                    Revised: May 4, 2010

**SPA74**

**United States District Court**
**Southern District of New York**
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

—————————————————————X

                                                    **NOTICE OF APPEAL**

        -V-

—————————————————————X                    civ.          (    )

Notice is hereby given that _____
                                                         (party)
hereby appeals to the United States Court of Appeals for the Second Circuit from the Judgment [describe it]

entered in this action on the _____ day of _____ , _____ .
                                          (day)                    (month)              (year)


_____
                (Signature)

_____
                (Address)

_____
        (City, State and Zip Code)

Date: _____          (        ) _____ - _____
                                                        (Telephone Number)


**Note:** You may use this form to take an appeal provided that it is received by the office of the Clerk of the
District Court within 30 days of the date on which the judgment was entered (60 days if the United States
or an officer or agency of the United States is a party).

**SPA75**

FORM 1

# United States District Court
## Southern District of New York
### Office of the Clerk
### U.S. Courthouse
### 500 Pearl Street, New York, N.Y. 10007-1213

———————————————————X
|
|
|                                **MOTION FOR EXTENSION OF TIME**
|                                 **TO FILE A NOTICE OF APPEAL**
-V-                              |
|
|                                civ.          (   )
|
———————————————————X

Pursuant to Fed. R. App. P. 4(a)(5), _____ respectfully
                                                          (party)

requests leave to file the within notice of appeal out of time. _____
                                                                              (party)

desires to appeal the judgment in this action entered on _____ but failed to file a
                                                                    (day)

notice of appeal within the required number of days because:

[Explain here the "excusable neglect" or "good cause" which led to your failure to file a notice of appeal within the
required number of days.]

_____
(Signature)

_____
(Address)

_____
(City, State and Zip Code)

Date: _____        (      ) _____-_____
                                          (Telephone Number)

Note: You may use this form, together with a copy of Form 1, if you are seeking to appeal a judgment and
did not file a copy of Form 1 within the required time. If you follow this procedure, these forms must be
received in the office of the Clerk of the District Court no later than 60 days of the date which the judgment
was entered (90 days if the United States or an officer or agency of the United States is a party).

District Court will receive it within the 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).

FORM 3

### United States District Court
### Southern District of New York
#### Office of the Clerk
#### U.S. Courthouse
#### 500 Pearl Street, New York, N.Y. 10007-1213

————————————————X

           **AFFIRMATION OF SERVICE**

    -V-

           civ.     ( )

————————————————X

I, _____, declare under penalty of perjury that I have

served a copy of the attached _____

_____

upon _____

_____

whose address is: _____

_____

Date: _____
     New York, New York

                          _____
                                 (Signature)

                          _____
                                 (Address)

                          _____
                       (City, State and Zip Code)

FORM 4

APPEAL FORMS

**SPA77**

FORM 2

## United States District Court
### Southern District of New York
#### Office of the Clerk
#### U.S. Courthouse
#### 500 Pearl Street, New York, N.Y. 10007-1213

```
------------------------------X
                              |
                              |         NOTICE OF APPEAL
                              |              AND
          -v-                 |     MOTION FOR EXTENSION OF TIME
                              |
                              |         civ.        (   )
                              |
------------------------------X
```

1.    Notice is hereby given that _____ hereby appeals to
                                                      (party)
the United States Court of Appeals for the Second Circuit from the judgment entered on _____.
                    [Give a description of the judgment]


2.    In the event that this form was not received in the Clerk's office within the required time

_____ respectfully requests the court to grant an extension of time in
               (party)
accordance with Fed. R. App. P. 4(a)(5).

        a.    In support of this request, _____ states that
                                                          (party)
this Court's judgment was received on _____ and that this form was mailed to the
                                                (date)
court on _____ .
               (date)

                                        _____
                                                  (Signature)

                                        _____
                                                  (Address)

                                        _____
                                             (City, State and Zip Code)

Date: _____            (    ) _____ - _____
                                             (Telephone Number)

**Note:** You may use this form if you are mailing your notice of appeal and are not sure the Clerk of the

APPEAL FORMS

**SPA78**

U.S.D.C. S.D.N.Y. CM/ECF Support Unit            4            Revised: May 4, 2010