# 13-422, 13-445

## United States Court of Appeals
### for the
## Second Circuit

THE NEW YORK TIMES COMPANY, CHARLIE SAVAGE, SCOTT SHANE,
AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL
LIBERTIES UNION FOUNDATION,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES
DEPARTMENT OF DEFENSE, CENTRAL INTELLIGENCE AGENCY

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
THE HONORABLE COLLEEN MCMAHON

**BRIEF *AMICI CURIAE* OF THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS AND 37 OTHER MEDIA ORGANIZATIONS,
IN SUPPORT OF PLAINTIFFS-APPELLEES**

Bruce D. Brown
*Counsel of Record*
Mark R. Caramanica
Aaron Mackey
The Reporters Committee for
 Freedom of the Press
1101 Wilson Blvd., Suite 1100
Arlington, VA 22209
Telephone: (703) 807-2100
*Additional counsel appearances listed on
the pages following*

*Additional *amici* counsel:

John Zucker
Indira Satyendra
ABC, Inc.
77 W. 66th Street
New York, NY 10023

Jerald N. Fritz
Senior Vice President
Legal and Strategic Affairs
and General Counsel
Allbritton Communications Company
1000 Wilson Blvd., Suite 2700
Arlington, VA 22209
*Also counsel for POLITICO LLC*

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society
 of News Editors*

Karen Kaiser
Associate General Counsel
The Associated Press
450 W. 33rd Street
New York, NY 10001

Jonathan Bloom
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for The Association of
American Publishers, Inc.*

Bruce L. Gottlieb
Aretae Wyler
Atlantic Media, Inc.
600 New Hampshire Ave., NW
Washington, DC 20037

Charles J. Glasser, Jr.
Global Media Counsel
Bloomberg L.P.
731 Lexington Avenue
New York, NY 10022

David C. Vigilante
Johnita P. Due
Cable News Network, Inc.
1 CNN Center
Atlanta, GA 30303

Marshall Anstandig
Senior VP/General Counsel
Andrew Huntington
General Counsel/Director of Labor
Relations
California Newspapers Partnership
Bay Area News Group
750 Ridder Park Drive
San Jose, CA 95190

James Chadwick
Sheppard Mullin Richter & Hampton
LLP
390 Lytton Avenue
Palo Alto, CA 94301
*Additional Counsel for California
Newspapers Partnership*

Jim Ewert
General Counsel
California Newspaper
Publishers Association
2000 O Street, Suite 120
Sacramento, California 95811

Rachel Matteo-Boehm
Bryan Cave LLP
560 Mission Street, Suite 2500
San Francisco, CA 94105
*Counsel for Courthouse News Service*

Lance Lovell
Managing Attorney, Disputes
Cox Media Group, Inc.
6205 Peachtree Dunwoody Road
Atlanta, GA 30328

Matthew A. Leish
Vice President & Assistant General
Counsel
Daily News, LP
450 W. 33rd St., 3rd Floor
New York, NY 10001

Michael Kuritzkes
Executive Vice President
and General Counsel
Digital First Media, LLC
448 Lincoln Highway
Fairless Hills, PA 19030

Jeffrey P. Hermes
Digital Media Law Project
Berkman Center for
Internet & Society
23 Everett St., 2nd Floor
Cambridge, MA 02138

Mark H. Jackson
Jason Conti
Dow Jones & Company, Inc.
1211 Avenue of the Americas
7th Floor
New York, NY 10036

David M. Giles
Vice President/
Deputy General Counsel
The E.W. Scripps Company
312 Walnut St., Suite 2800
Cincinnati, OH 45202

Kai Falkenberg
Editorial Counsel
Forbes LLC
60 Fifth Avenue
New York, NY 10011

Barbara W. Wall
Vice President/Senior
Associate General Counsel
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107

Jonathan Donnellan
Hearst Corporation
Office of General Counsel
300 W. 57th St., 40th Floor
New York, NY 10019

J.P. Cratty
Corporate Attorney
Lee Enterprises
 201 North Harrison Street, Suite 600
Davenport, IA 52801

Karole Morgan-Prager
Juan Cornejo
The McClatchy Company
2100 Q Street
Sacramento, CA 95816

Mickey H. Osterreicher
40 Wagon Wheel Drive
East Amherst, NY 14051
*Counsel for National Press
  Photographers Association*

Denise Leary
Ashley Messenger
NPR, Inc.
1111 North Capitol St. NE
Washington, D.C. 20002

Kurt Wimmer
Covington & Burling LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
*Counsel for Newspaper
  Association of America*

Barbara L. Camens
Barr & Camens
1025 Connecticut Ave., NW
Suite 712
Washington, DC 20036
*Counsel for The Newspaper
  Guild – CWA*

Randy L. Shapiro
Maya Menendez
The Newsweek/
Daily Beast Company LLC
555 W. 18th St., 2nd Floor
New York, NY 10011

Lynn Oberlander
General Counsel
The New Yorker
4 Times Square
New York, NY 10036

Jennifer Borg
General Counsel
North Jersey Media Group Inc.
P.O. Box 75
Hackensack, NJ 07602

Jonathan D. Hart
Dow Lohnes PLLC
1200 New Hampshire Ave., NW
Washington, DC 20036
*Counsel for Online News Association*

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television
  Digital News Association*

Gail C. Gove
Chief Counsel, News
Reuters America LLC
3 Times Square, 20th Floor
New York, NY 10036

Bruce E. H. Johnson
Davis Wright Tremaine LLP
1201 Third Ave., Suite 2200
Seattle, WA 98101
*Counsel for The Seattle Times Co.*

Bruce W. Sanford
Laurie A. Babinski
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional
Journalists*

David S. Bralow
Assistant General Counsel/
East Coast Media
Karen H. Flax
Assistant General Counsel/
Publishing & Litigation
Tribune Company
220 E. 42nd St., Suite 400
New York, NY 10017

John B. Kennedy
James A. McLaughlin
Kalea S. Clark
The Washington Post
1150 15th Street, N.W.
Washington, D.C. 20071

# CORPORATE DISCLOSURE STATEMENT[1]

Pursuant to Fed. R. App. P. 26.1 and 29, *amici* state as follows:

## Reporters Committee for Freedom of the Press

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

## ABC, Inc.

ABC, Inc. is an indirect, wholly owned subsidiary of The Walt Disney Company, a publicly traded corporation.

## Allbritton Communications Company

Allbritton Communications Company is an indirect, wholly owned subsidiary of privately held Perpetual Corporation and is the parent company of entities operating ABC-affiliated television stations in the following markets: Washington; Harrisburg, Pa.; Birmingham, Ala.; Little Rock, Ark.; Tulsa, Okla.; and Lynchburg, Va.

## American Society of News Editors

American Society of News Editors is a private, non-stock corporation that has no parent.

---

[1] Pursuant to Fed. R. App. P. 29(c)(5) and Local R. 29.1(b), *amici* state as follows: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and (3) no person—other than the *amici curiae*, their members or their counsel—contributed money that was intended to fund preparing or submitting the brief.

**The Associated Press**

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

**Association of American Publishers, Inc.**

The Association of American Publishers, Inc. is a nonprofit organization that has no parent and issues no stock.

**Atlantic Media, Inc.**

Atlantic Media, Inc. is a privately held, integrated media company, and no publicly held corporation owns 10% or more of its stock.

**Bloomberg L.P.**

Bloomberg L.P.'s parent corporation is Bloomberg Inc., which is privately held, and no publicly held corporation owns 10% or more of its stock.

**Cable News Network, Inc.**

Cable News Network, Inc. is a wholly owned subsidiary of Turner Broadcasting System, Inc., which itself is a wholly owned subsidiary of Time Warner Inc., a publicly traded corporation.

**California Newspapers Partnership**

California Newspapers Partnership is a general partnership operated by Digital First Media, and includes Media News Group, Stephens Media, LLC, and Gannett Company, Inc.

**California Newspaper Publishers Association**

California Newspaper Publishers Association is a mutual benefit corporation organized under state law for the purpose of promoting and preserving the newspaper industry in California.

**Courthouse News Service**

Courthouse News Service is a privately held corporation with no parent corporation and no publicly held corporation holds more than 10 percent of its stock.

**Cox Media Group, Inc.**

Cox Media Group, Inc. is privately owned, and no publicly held corporation owns 10% or more of its stock.

**Daily News, LP**

Daily News, LP is a limited partnership that has no parent and issues no stock.

**Digital Media Law Project**

Digital Media Law Project ("DMLP") is an unincorporated association based at the Berkman Center for Internet & Society at Harvard University. DMLP is not a publicly held corporation or other publicly held entity. DMLP has no parent corporation, and no publicly held company owns 10% or more of DMLP.

**Digital First Media, LLC**

Digital First Media, LLC is a privately held company.  No publicly-held company owns ten percent or more of its equity interests.

iii

## Dow Jones & Company, Inc.

News Corporation, a publicly held company, is the indirect parent corporation of Dow Jones, and Ruby Newco LLC, a subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. No publicly held company owns 10% or more of Dow Jones' stock.

## The E.W. Scripps Company

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

## Forbes LLC

Forbes has no parent corporation and no company owns 10% or more of its stock.

## Gannett Co., Inc.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company holds 10% or more of its stock.

## Hearst Corporation

Hearst Corporation is privately held by the Hearst Family Trust and has no other parent. None of Hearst's subsidiaries or affiliates is publicly held, with the exception of the following companies, in which Hearst and/or its subsidiaries own minority interests: MediaNews Group, Inc., Fimilac SA (owner of Fitch Group, Inc.), Local.com, drugstore.com and Sirius Satellite Radio, Inc.

iv

## Lee Enterprises, Incorporated

Lee Enterprises, Incorporated is a publicly traded corporation with no parent company. Based upon the most recent filings with the United States Securities and Exchange Commission, no publicly held company holds ten percent (10%) or more of the outstanding stock of Lee Enterprises, Incorporated.

## The McClatchy Company

The McClatchy Company is a publicly traded Delaware corporation. Bestinver Gestion, a Spanish company, owns 10% or more of the stock of The McClatchy Company.

## National Press Photographers Association

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

## Newspaper Association of America

Newspaper Association of America is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

## The Newspaper Guild – CWA

The Newspaper Guild – CWA is an unincorporated association. It has no parent and issues no stock.

**The Newsweek/Daily Beast Company LLC**

The Newsweek/Daily Beast Company LLC: IAC/InterActiveCorp, a publicly traded company, and the Sidney Harman Trust are owners of The Newsweek/Daily Beast Company LLC., with IAC holding a controlling interest.

**The New Yorker**

The New Yorker is a national magazine published by Condé Nast, which is a division of Advance Magazine Publishers Inc. Advance Magazine Publishers Inc., a non-governmental corporate party, is a wholly-owned subsidiary of The Patriot-News Co.  One hundred percent of the stock of The Patriot-News Co. is held by Advance Publications, Inc., the shares of which are not publicly traded. There is no publicly held corporation that owns 10% or more of its stock.

**North Jersey Media Group Inc.**

North Jersey Media Group Inc. is a privately held company owned solely by Macromedia Incorporated, also a privately held company.

**NPR, Inc.**

NPR, Inc. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

**Online News Association**

Online News Association is a not-for-profit organization. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

**POLITICO LLC**

POLITICO LLC is a wholly owned subsidiary of privately held Capitol News Company, LLC.

**Radio Television Digital News Association**

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

**Reuters America LLC**

Reuters America LLC is an indirect, wholly owned subsidiary of Thomson Reuters Corporation, a publicly held company. No publicly held company owns 10% or more of the stock of Thomson Reuters Corporation.

**The Seattle Times Company**

The Seattle Times Company: The McClatchy Company owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

**Society of Professional Journalists**

Society of Professional Journalists is a non-stock corporation with no parent company.

**Tribune Company**

Tribune Company is a privately held company.

**The Washington Post**

WP Company LLC (d/b/a The Washington Post) publishes one of the nation's most prominent daily newspapers, as well as a website, www.washingtonpost.com, that is read by an average of more than 20 million unique visitors per month.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF CONTENTS ..................................................... viii

TABLE OF AUTHORITIES ..................................................x

STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE* .............. xiv

SOURCE OF AUTHORITY TO FILE ................................xv

SUMMARY OF ARGUMENT ...............................................1

ARGUMENT ..........................................................4

I. Executive Branch Overclassification Continues To Be An Ongoing Problem Despite Widespread Agreement That Many Records Are Improperly Classified And Withheld From The Public. .......................................4

  a. Numerous Government Investigations, Officials, And National Security Experts Have Concluded That The Executive Branch Improperly Classifies Too Much Information..................................................7

    i.  Government Inquiries Into The Classification System Have Long Found Broad, Improper Overclassification Activity.................................7

    ii.  Intelligence Officials And National Security Experts Agree That The Executive Branch Classifies Too Much Information. .....................10

II. To Serve As A Check Against Executive Branch Overclassification, Congress Explicitly Empowered The Judiciary To Substantively Review An Agency's Classification Claims Under Exemption 1 Of FOIA. .......................12

  a. In Amending FOIA In 1974, Congress Sought To Strengthen The Judiciary's Oversight Of The Executive Branch By Making Clear That Courts Are To Review *De Novo* Whether Classified Material Was Properly Withheld Under Exemption 1.................................................14

  b. Congress Forcefully Affirmed Its Grant Of Judicial Review Of Agency Withholdings Under Exemption 1 When It Overrode President Ford's Veto of the 1974 FOIA Amendments. .........................................17

III. Congress Deliberately Balanced FOIA's Goal Of Increasing Access To Government Records Against The Potential Harm of Releasing National Security Information When It Amended the Statute in 1974. ............19

a. Congress Addressed The Government's Fears Regarding The Potential Release Of Harmful Information By Requiring Courts To Afford Due Weight To Claims of National Security. ........................................20

b. Although Congress Required Courts To Afford Deference to Executive Branch Classification Decisions, It Did Not Intend For Courts To Simply Rubber Stamp Such Claims. ..........................................................22

CONCLUSION ..................................................................................24

CERTIFICATE OF COMPLIANCE ....................................................25

ADDENDUM ................................................................................ A-1

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. CIA*, 636 F.2d 1287 (D.C. Cir. 1980) ..........................................................13

*Campbell v. DOJ*, 164 F.3d 20 (D.C. Cir. 1998) ......................................................20

*Crooker v. Bureau of Alcohol, Tobacco & Firearms*,
   670 F.2d 1051 (D.C. Cir. 1981) (en banc) ...........................................................13

*Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003) ........................21

*Diamond v. FBI*, 707 F.2d 75 (2d Cir. 1983) ...........................................................21

*Doherty v. U.S. Dep't of Justice*, 775 F.2d 49 (2d Cir. 1985) .................................21

*Donovan v. FBI*, 806 F.2d 55 (2d Cir. 1986) .................................................... 13, 21

*EPA v. Mink*, 410 U.S. 73 (1973) ..................................................................... 14, 15

*Halpern v. F.B.I.*, 181 F.3d 279 (2d Cir. 1999) ................................................ 13, 21

*Larsen Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009) ............................................21

*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) ...............................................21

*New York Times Co. v. United States*, 403 U.S. 713 (1971) .....................................2

*Stein v. Dep't of Justice*, 662 F.2d 1245 (7th Cir. 1981) .........................................13

*U.S. Dep't of Justice v. Landano*, 508 U.S. 165 (1993) ..........................................13

*Weiner v. FBI*, 943 F.2d 972 (9th Cir. 1991) ...........................................................13

**Statutes**

5 U.S.C. § 552 ............................................................................ viii, 5, 22

Freedom of Information Act Amendments of 1974, Pub. L. No. 93-502,
  88 Stat. 1561 (1974) ............................................................................12

Freedom of Information Act, Pub. L. No. 89-487, 80 Stat. 250 (1966) ..................14

**Other Authorities**

Comm'n To Review DOD Sec. Policy and Practices, Keeping the Nation's Secrets
  49 (1985) ............................................................................8

Daniel Skallman, *In Defense of Disclosure: How Overclassification is Stifling
  Government Transparency and What Can Be Done About It*, THE NEWS MEDIA
  & THE LAW, Winter 2011, Feb. 1, 2011 .............................................................11

Def. Dep't Comm. on Classified Info., Report to the Secretary of Defense by the
  Committee on Classified Information (1956) ............................................................8

Def. Sci. Bd., Report of the Defense Science Board Task
  Force on Secrecy (1970) ............................................................................8

FREEDOM OF INFORMATION ACT AND
  AMENDMENTS OF 1974 (1975) .................................... 15, 16, 17, 18, 19, 20, 22, 23

Information Security Oversight Office, Report to the President (2011) ...............4, 5

Information Security Oversight Office, Report to the President (1982) ..................5

*Intelligence Oversight and the Joint Inquiry: Hearing Before the Nat'l Comm'n
  on Terrorists Attacks Upon the U.S.* (May 22, 2003) ..........................................10

Jack Gillum and Ted Bridis, *U.S. Citing Security to Censor More Public Records*, THE ASSOCIATED PRESS, March 12, 2013 .............................................................6

Joint Sec. Comm'n, Redefining Security: A Report to the Secretary of Defense and the Director of Central Intelligence (1994) ......................................................8

Nat'l Comm'n on Terrorist Attacks upon the U.S., The 9/11 Commission Report (2004) .................................................................10

Office of Information Policy, Department of Justice, Summary of Annual FOIA Reports for Fiscal Year 2010 (2010) ......................................................6

Office of Information Policy, Department of Justice, Summary of Annual FOIA Reports for Fiscal Year 2011 (2011) ......................................................6

Report of the Commission on Protecting and Reducing Government Secrecy, S. Doc. No. 105-2 (1997) ......................................................................9

Scott Shane, *A Closed-Mouth Policy Even on Open Secrets*, THE N.Y. TIMES, Oct. 5, 2011 ..............................................................11

Steven Aftergood, *Reducing Government Secrecy: Finding What Works*, 27 YALE L. & POL'Y REV. 399 (2009) .................................................8

*Too Many Secrets: Overclassification as a Barrier to Critical Information Sharing: Hearing Before the Subcomm. On Nat'l Sec., Emerging Threats, and Int'l Relations of the H. Comm. on Gov't Reform*, 108th Cong. 82 (2004) .........10

## Legislative History

120 Cong. Rec. H1,787-1803 (1974) ......................................................16

120 Cong. Rec. H10864-875 (1974) ......................................................19

120 Cong. Rec. S19,806-23 (1974) .........................................................................23

H.R. Rep. No. 93-1380 (1974) (Conf. Rep.) ..........................................................20

H.R. Rep. No. 93-876 (1974)...................................................................................15

S. Rep. No. 93-854 (1974) ............................................................................... 15, 22

Veto Message From President of the United States,
   Freedom of Information Act (Nov. 18, 1974) ......................................................18

## STATEMENT OF IDENTITY
## AND INTEREST OF *AMICI CURIAE*

*Amici* comprise national and regional news organizations, nonprofit open government, freedom of information ("FOI") and First Amendment advocacy groups, and news professional and trade associations that regularly gather and disseminate news and information to the public in a variety of media or otherwise support and defend such efforts to do so.[2]

*Amici* and their members regularly investigate and report on government action and government relations.  To fully realize their constitutionally protected watchdog role, *amici* rely on the federal Freedom of Information Act, 5 U.S.C. § 552 *et seq.*, ("FOIA") to document and scrutinize the conduct of government.  To that end, they have an ongoing stake in ensuring that FOIA and similar disclosure

---

[2] *Amici* are The Reporters Committee for Freedom of the Press, ABC, Inc., Allbritton Communications Company, American Society of News Editors, The Associated Press, Association of American Publishers, Inc., Atlantic Media, Inc., Bloomberg L.P., Cable News Network, Inc., California Newspapers Partnership, California Newspaper Publishers Association, Courthouse News Service, Cox Media Group, Inc., Daily News, LP, Digital First Media, LLC, Digital Media Law Project, Dow Jones & Company, Inc., The E.W. Scripps Company, Forbes LLC, Gannett Co., Inc., Hearst Corporation, Lee Enterprises, Incorporated, The McClatchy Company, National Press Photographers Association, Newspaper Association of America, The Newspaper Guild – CWA, The Newsweek/Daily Beast Company LLC, The New Yorker, North Jersey Media Group Inc., NPR, Inc., Online News Association, POLITICO LLC, Radio Television Digital News Association, Reuters America LLC, The Seattle Times Company, Society of Professional Journalists, Tribune Company, and The Washington Post.  A description of each of the *amici* is set forth in the addendum to this brief.

laws remain robust and enable individuals to continue to open up government activity to public scrutiny.

The judiciary's *de novo* review of agency withholding determinations under Exemption 1 of FOIA serves as a crucial check against Executive Branch classification claims that may be overbroad or otherwise improper under the Executive Order governing the classification process. In the face of mounting evidence that government agencies do indeed overclassify thousands of documents and often fail to justify the basis for such classifications, the judiciary serves as the primary basis for independent review of Executive Branch claims of national security. Moreover, by exercising its explicit grant of power to review agency classification claims under FOIA, the judiciary serves as a linchpin in the democratic system, helping to balance the need for secrecy claimed by the Executive Branch against the need for the citizenry to stay informed about the actions of its government. *Amici* respectfully ask this Court to reverse the District Court and order the disclosure of the documents in question, as they lie at the core of government action on matters of life and death and belong in the public domain to be subject to the scrutiny of the people.

## <u>SOURCE OF AUTHORITY TO FILE</u>

Pursuant to Fed. R. App. P. 29(a) *amici* represent that all parties have consented to this filing.

# SUMMARY OF ARGUMENT

The Executive Branch's refusal to release documents detailing the legal reasoning by which it determines whether and how the government can use lethal force against a U.S. citizen lays bare the need for this Court to fully exercise its powers under the Freedom of Information Act to scrutinize whether such a withholding is lawful. Although this case is about particular documents that have been withheld in response to Plaintiffs-Appellants' FOIA requests, it is emblematic of a larger concern: As the Executive Branch continues to classify millions of documents—more than at any time in our nation's history—it simultaneously asks the judiciary to rubber stamp its classification decisions.

By making more documents secret and then asking the judiciary to dispense with any meaningful review of its classification decisions,[3] the Executive Branch seeks a rule from this Court that is not only incompatible with the text and spirit of FOIA but that is also antithetical to our nation's democratic principles of an informed citizenry and a transparent government.[4] These concerns call into

---

[3] The Justice Department's unfounded assertion that federal courts are to play a very limited role in reviewing its classification decisions is not limited to this case, as the government has made similar arguments in a case pending before the U.S. Court of Appeals for the District of Columbia. *See* Appellants' Br. at 54, *Center for Int'l Envtl. Law v. Office of U.S. Trade Rep.*, No. 12-5136 (D.C. Cir. Sept. 17, 2012) (arguing that the district court in the case engaged in "searching judicial review" when it failed to agree with the government that it had properly classified a document requested under FOIA).

[4] These concerns are heightened by the fact that the District Court in this case appeared to confine its inquiry under FOIA's Exemption 1 to whether the agencies followed proper procedures in classifying the documents. *See* Decision at SPA36, *reported at New York Times Co. v. U.S. Dep't of Justice*, __ F. Supp. 2d __, at *19,

question not only the Executive Branch's motivations in classifying so many documents but also threaten the fundamental legitimacy and respect for the classification system itself.  As Justice Potter Stewart stated in his concurrence in *New York Times Co. v. United States*, "when everything is classified, then nothing is classified, and the system becomes one to be disregarded by the cynical or the careless, and to be manipulated by those intent on self-protection or self-promotion."  403 U.S. 713, 729 (1971).

    *Amici* submit this brief to emphasize two important points.  First, despite the Executive Branch's oft-stated public commitment to government transparency, the overall amount of information classified by agencies has climbed exponentially to more than 90 million classification decisions during the 2011 fiscal year, in contrast with the 16 million classification decisions made during the 1980 fiscal year.  This growth comes despite the fact that sources both inside and outside of the Executive Branch have estimated that between 50 and 90 percent of material is improperly classified, leading to the broad withholding of information that should otherwise be public.

    Second, through legislative history and the text of FOIA, it is clear that Congress explicitly intended the judiciary to determine whether the Executive Branch has lawfully asserted classification claims in response to FOIA requests.  In particular, the legislative history of the 1974 FOIA amendments makes clear that

---

2013WL 50209 (S.D.N.Y. Jan. 3, 2013) ("It lies beyond the power of this Court to declassify a document that has been classified in accordance with proper procedures on the ground that the court does not think the information contained therein ought to be kept secret.").

Congress sought to dispel any federal court reluctance to scrutinize classification claims related to documents withheld under Exemption 1.  Indeed, Congress *commanded* courts—overriding a presidential veto to enact the amendments—that they must substantively review the legitimacy of classification claims made within the context of Exemption 1.  And although such judicial scrutiny was to afford due weight to an agency's classification determination—a recognition of the President's primacy in areas of foreign affairs—such deference does not amount to a rubber stamp of agency action.  Congress affirmatively gave such power to the judiciary because it saw FOIA as a meaningful vehicle for informing the public on issues related to national security and foreign policy and because it sought to curb rampant overclassification.

These important principles provide meaningful historical context to the dispute currently before this Court.  This case is fundamentally about the amount of information the government must make public when it prescribes rules on whether and how it can use lethal force against U.S. citizens.  In the face of the Executive Branch's failure to disclose the documents at issue here, FOIA instructs the judiciary to serve as the check against excessive or unlawful classification decisions.  This Court has the power to determine whether the documents in question can be properly withheld and to override the Executive Branch's classification determination.  *Amici* respectfully request that this Court embrace the powers Congress explicitly granted it under FOIA and order that the documents withheld in this case be disclosed.

## ARGUMENT

**I.** **Executive Branch Overclassification Continues To Be An Ongoing Problem Despite Widespread Agreement That Many Records Are Improperly Classified And Withheld From The Public.**

The Executive Branch has classified more information than at any point in our nation's history. According to the latest annual report prepared by the Information Security Oversight Office ("ISOO"), which is responsible for oversight of the Executive Branch's classification system, agencies made more than 92 million classification decisions during the 2011 Fiscal Year. Information Security Oversight Office, Report to the President, at p. 2 (2011).[5] The 2011 total represents the highest number of classifications made since the office began tracking classification decisions in 1979. In reviewing ISOO's annual reports, a clear trend emerges showing that although classification decisions dropped between the late 1980s and through the 1990s, the last decade has seen a sharp increase in the amount of information that the government is classifying. In Figure 1 below, *amici* graphically illustrate the annual total classification decisions reported by ISOO.[6] The chart clearly shows an exponential uptick in the amount of information that has been classified annually.

---

[5] *Available at* http://www.archives.gov/isoo/reports/2011-annual-report.pdf.

[6] To create Figure 1, *amici* reviewed every ISOO annual report from 1980 to 2011 and charted the total number of classification decisions reported. An archive of all of ISOO's reports is available at http://www.archives.gov/isoo/reports/.



**Figure 1: Total Classification Decisions FY 1980-2011**

**Source:** Information Security Oversight Office

In the years since 1980, when the Executive Branch made more than 16 million classification decisions,[7] the number of classification decisions has increased nearly by a factor of six.  Although ISOO's 2011 report attributes the extreme growth in classification decisions to agencies increasingly using electronic communications such as classified web pages, emails, and bulletin boards,[8] the practical upshot is that agencies are classifying more information than ever.

At the same time, agencies are also increasingly using FOIA's Exemption 1 to withhold records.[9]  Federal agencies cited the exemption 3,743 times to

---

[7] Information Security Oversight Office, Report to the President, at p. 6 (1982), *available at* http://www.archives.gov/isoo/reports/1982-annual-report.pdf.

[8] *See* Information Security Oversight Office, Report to the President, at p. 7 (2011), a*vailable at* http://www.archives.gov/isoo/reports/2011-annual-report.pdf .

[9] 5 U.S.C. § 552(b)(1) exempts from disclosure under FOIA records that are "(A) specifically authorized under criteria established by an Executive order to be kept

withhold records in 2010,[10] while in 2011 agencies cited the exemption 4,333 times.[11]  Although the Department of Justice has yet to issue a report on the number of times Exemption 1 was cited by all federal agencies during the 2012 fiscal year, an analysis performed by The Associated Press showed Exemption 1 was cited 5,223 times by agencies to withhold records during the last fiscal year, a marked increase from previous years.  Jack Gillum and Ted Bridis, *U.S. Citing Security to Censor More Public Records*, THE ASSOCIATED PRESS, March 12, 2013, *available at* 2013 WLNR 6084243.[12]  The data show that agencies' use of Exemption 1 to withhold information under FOIA has increased by 40 percent since 2010.

The increasing use of classification to shield documents from the public and the subsequent use of Exemption 1 to withhold them under FOIA compound the problem of state secrecy and inhibit meaningful discussion about important government activities.  In this climate of secrecy, it is now more important than

---

secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."

[10] *See* Office of Information Policy ("OIP"), Department of Justice, Summary of Annual FOIA Reports for Fiscal Year 2010, at p. 7 (2010), *available at* http://www.justice.gov/oip/foiapost/fy2010-ar-summary.pdf.  2010 was the first year OIP published a government-wide tally of the number of times all agencies claimed particular FOIA exemptions.

[11] *See* Office of Information Policy, Department of Justice, Summary of Annual FOIA Reports for Fiscal Year 2011, at p. 8 (2011), *available at* http://www.justice.gov/oip/foiapost/fy-2011-annual-report-summary.pdf.

[12] To facilitate access to secondary sources, "WLNR," or Westlaw NewsRoom, citations are provided whenever possible.

ever that federal courts exercise their role in checking Executive Branch classification decisions.

### a. Numerous Government Investigations, Officials, And National Security Experts Have Concluded That The Executive Branch Improperly Classifies Too Much Information.

Numerous sources from both within and outside the government have concluded that the Executive Branch overclassifies broad swaths of information, making secret records that should otherwise be public.  The only real contention among various sources appears to be exactly how much information is overclassified, as estimates vary from roughly half to nearly all.  Regardless of the precise number of documents that are improperly classified, given the overwhelming rise in the amount of information that officials do classify, it is clear that the Executive Branch too often defaults to secrecy rather than engaging in a good-faith analysis of whether material should be concealed in the first place.

### i. Government Inquiries Into The Classification System Have Long Found Broad, Improper Overclassification Activity.

Government investigations have repeatedly identified overclassification as a serious problem that has not only affected public confidence in the ability of the Executive Branch to legitimately shield information from disclosure but that has also harmed the government's capacity to share critical intelligence internally.  As far back as 1956, government inquiries into the classification system identified how vague classification standards and a lack of accountability for improper classification led to overclassification.  *See* Def. Dep't Comm. on Classified Info., Report to the Secretary of Defense by the Committee on Classified Information 6,

13-14 (1956).  By 1970, one task force established to investigate the classification

of scientific and technical information determined that classification of such

information could be decreased by "as much as 90 percent by limiting the amount

of information classified and the duration of its classification."  Def. Sci. Bd.,

Report of the Defense Science Board Task Force on Secrecy, at v (1970), *available*

*at* http://www.fas.org/sgp/othergov/dsbrep.pdf.[13]

Similarly, a 1985 Department of Defense commission examining

classification concluded that "too much information appears to be classified and

much at higher levels than is warranted."  Comm'n To Review DOD Sec. Policy

and Practices, Keeping the Nation's Secrets 49 (1985), *available at*

http://www.fas.org/sgp/library/stilwell.html.  Less than a decade later, another

defense department commission found that the classification system had "grown

out of control" and that neither officials working in the government nor the public

trusted that it was working properly.  *See* Joint Sec. Comm'n, Redefining Security:

A Report to the Secretary of Defense and the Director of Central Intelligence 6

(1994), *available at* http://www.fas.org/sgp/library/jsc/.

Perhaps one of the most thorough reviews of the classification system came

in 1997 when the late Sen. Daniel P. Moynihan (D-N.Y.) chaired a congressionally

mandated commission on the issue.  *See* Report of the Commission on Protecting

---

[13] The history of government investigations into overclassification described in this
section was cataloged in more detail by Steven Aftergood, director of the Project
on Government Secrecy at the Federation of American Scientists.  *See* Steven
Aftergood, *Reducing Government Secrecy: Finding What Works*, 27 YALE L. &
POL'Y REV. 399 (2009).

and Reducing Government Secrecy, S. Doc. No. 105-2 (1997), *available at* http://www.fas.org/sgp/library/moynihan/.  The commission concluded that agencies regularly used the classification system to deny public access to the policymaking process and that "[t]here needs to be some check on the unrestrained discretion to create secrets."  *Id*. at xxi-xxii.  The commission also noted that ISOO conservatively estimated that roughly ten percent of information was improperly classified while others put the mark much higher, including former National Security Council Executive Secretary Rodney B. McDaniel, who estimated that only ten percent of classification was legitimate.  *Id*. at 36.

A key finding of Moynihan's commission was that regardless of the amount of information that was improperly classified, overclassification stemmed from "the continued failure of classifiers to engage in a rigorous assessment of the need for classification."  *Id*. at 36.  The report provided a flood of findings and anecdotes to support its conclusion, including how when commission staffers asked officials why particular information was classified, the officials either could provide no explanation for their decisions or said that it was simply the way the agency operated.  *Id*.  These sobering accounts at best demonstrate a lack of understanding about the purposes of classification or, at worst, a careless disregard for the specific standards that must be met in order for an official to classify a document.

The practice of Executive Branch agencies to overclassify can also end up jeopardizing security, as overclassification and excessive compartmentalization of information hindered efforts to understand the planning efforts that preceded the

9

Sept. 11, 2001 terrorist attacks.  *See* Nat'l Comm'n on Terrorist Attacks upon the U.S., The 9/11 Commission Report 417 (2004), available at http://www.9-11commission.gov/report/911Report.pdf.

> ### ii.  Intelligence Officials And National Security Experts Agree That The Executive Branch Classifies Too Much Information.

Just as oversight inquiries have shown that the Executive Branch too often improperly classifies information, intelligence officials and national security experts have also regularly admitted that agencies overclassify information.  For example, former Deputy Undersecretary of Defense, Counterintelligence, and Security Carol A. Haave, who served in the George W. Bush administration, estimated that improper classification accounted for 50 percent of the total amount of information classified.  *See Too Many Secrets: Overclassification as a Barrier to Critical Information Sharing: Hearing Before the Subcomm. On Nat'l Sec., Emerging Threats, and Int'l Relations of the H. Comm. on Gov't Reform*, 108th Cong. 82 (2004).

Former CIA Director Porter Goss told the 9/11 Commission that "we overclassify very badly.  There's a lot of gratuitous classification going on." *Intelligence Oversight and the Joint Inquiry: Hearing Before the Nat'l Comm'n on Terrorists Attacks Upon the U.S.* (May 22, 2003), *available at* http://www.9-11commission.gov/archive/hearing2/9-11Commission_Hearing_2003-05-22.pdf. Even President Obama has recognized that a national security bureaucracy staffed by 4.2 million people with security clearances leads to overclassification.  *See*

10

Scott Shane, *A Closed-Mouth Policy Even on Open Secrets*, THE N.Y. TIMES, Oct. 5, 2011, *available at* 2011 WLNR 20339753.

Perhaps one of the most coherent descriptions of the problem of overclassification came from J. William Leonard, the former head of ISOO, who said that government officials often fail to adhere to the standards required to classify a document or simply classify information without any justification. Daniel Skallman, *In Defense of Disclosure: How Overclassification is Stifling Government Transparency and What Can Be Done About It*, THE NEWS MEDIA & THE LAW, Winter 2011, Feb. 1, 2011, *available at* http://www.rcfp.org/browse-media-law-resources/news-media-law/news-media-and-law-winter-2011/defense-disclosure.  Leonard said that "[e]ven though the standards are relatively minimal, there are standards that have to be met, and one of the things that I'm constantly chagrined at is how often I encounter agencies just simply asserting classification." *Id*.  He added that it is "even more distressing [. . .] when other branches of government, be it the judicial or the legislature, just automatically [defer] to that assertion." *Id*.

The numerous government inquiries into overclassification and the statements by government officials make clear that much information that should be publicly disclosed is instead improperly classified.  Although quantifying the exact amount of information that is overclassified is challenging, it is abundantly evident to everyone that a great deal of information is withheld from the public because of dubious and often unjustifiable classification claims.  It is also apparent that much of the problem stems from the fact that the Executive Branch has failed

11

to exercise proper oversight of the classification system and that the other branches of government have had difficulty scrutinizing agency classification decisions.

But as is discussed more fully below, FOIA provides a partial solution to the overclassification problem.  FOIA represents the combined oversight efforts of the legislative and judicial branches. Through its amendments to FOIA in 1974, Congress sought to reign in Executive Branch overclassification by requiring courts to scrutinize whether agencies have properly classified documents they withhold under Exemption 1.

## II.   To Serve As A Check Against Executive Branch Overclassification, Congress Explicitly Empowered The Judiciary To Substantively Review An Agency's Classification Claims Under Exemption 1 Of FOIA.

In the face of the Executive Branch's power to classify information without meaningful oversight, creating the potential for millions of documents to be kept secret, Congress enacted FOIA and subsequently strengthened it to ensure that the judiciary had the authority to scrutinize an agency's classification claims.  *See* Freedom of Information Act Amendments of 1974, Pub. L. No. 93-502, 88 Stat. 1561.  The 1974 amendments to FOIA were not just idle tinkering by Congress. Rather, it sought to prevent improper and overbroad classification claims and provide meaningful review of Executive Branch decisions so that citizens could better understand the actions of their government.  The judiciary's role becomes increasingly important when, as in the present case, the Executive Branch asks for extreme deference for its initial classification decision.

12

This Court has recognized Congress' explicit command that, after the 1974 FOIA amendments, federal courts were to substantively review agency classification claims under Exemption 1. *See Halpern v. F.B.I.*, 181 F.3d 279, 291 (2d Cir. 1999) (discussing Congress' clear intent to strengthen review of Exemption 1 withholdings); *Donovan v. FBI*, 806 F.2d 55, 59 (2d Cir. 1986), *abrogated in part on other grounds by U.S. Dep't of Justice v. Landano*, 508 U.S. 165 (1993) (recognizing that the 1974 FOIA amendments intended to bolster federal courts' ability to review agency classification claims under Exemption 1). Other federal circuit courts have similarly acknowledged the impact of the 1974 amendments. *See, e.g., Allen v. CIA*, 636 F.2d 1287, 1295 (D.C. Cir. 1980) (recognizing that Congress charged courts "with the responsibility of reviewing de novo the substantive as well as procedural propriety of the classification"), *abrogated on other grounds by Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C. Cir. 1981) (en banc); *Wiener v. FBI*, 943 F.2d 972, 980 (9th Cir. 1991) (recognizing federal court's role to review the propriety of classification claims under Exemption 1); *Stein v. Dep't of Justice*, 662 F.2d 1245, 1256-57 (7th Cir. 1981) (reviewing the procedural and substantive aspects of an agency's classification claim under Exemption 1). The cases demonstrate that federal courts across the country implemented Congress' command in the 1974 FOIA amendments.

a. **In Amending FOIA In 1974, Congress Sought To Strengthen The Judiciary's Oversight Of The Executive Branch By Making Clear That Courts Are To Review *De Novo* Whether Classified Material Was Properly Withheld Under Exemption 1.**

The original enactment of FOIA in 1966 did not give federal courts the explicit power to review whether material was properly classified and withheld under Exemption 1.  Rather, it only conferred on courts the power to determine whether the Executive Branch had followed the proper classification procedures. In *EPA v. Mink*, 410 U.S. 73 (1973), the U.S. Supreme Court construed FOIA to limit a court's inquiry under Exemption 1 to procedural review.  At the time the Court reviewed the statute, the text of section 552(b)(1) included only the first clause of the current version of the statute, exempting from disclosure records "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy."   Freedom of Information Act, Pub. L. No. 89-487, 80 Stat. 250 (1966).

In *Mink* the Court held that the test under Exemption 1 as it was originally written "was to be simply whether the President has determined by Executive Order that particular documents are to be kept secret." *Mink*, 410 U.S. at 82.  The Court also construed FOIA as forbidding courts to conduct *in camera* review of documents that the Executive Branch had classified.  *Id*. at 81.  Justice Potter Stewart, acknowledging the lack of judicial oversight of the Executive Branch's classification claims, noted in concurrence that the Court's interpretation of FOIA meant that there was "no means to question an Executive decision to stamp a document 'secret,' however cynical, myopic, or even corrupt that decision might

14

have been." *Id*. at 95 (Stewart, J., concurring). Recognizing that the limitation on judicial inquiry was a statutory constraint, the Court acknowledged Congress' power to amend the law to allow for substantive review of classification claims. *Id*. at 83.

Congress responded immediately to reverse the *Mink* decision. In the legislative history of the 1974 amendments, Congress explicitly directed federal courts to engage in the type of inquiry at issue in the present case. The Senate Judiciary Committee's report on the bill stated that the amendments to Exemption 1

> will necessitate a court to inquire during de novo review not only into the superficial evidence—a "Secret" stamp on a document or set of records—but also into the inherent justification for the use of such a stamp. Thus a government affidavit certifying the classification of material pursuant to executive order will no longer ring the curtain down on an applicant's effort to bring such material to public light.

S. Rep. No. 93-854 (1974), *reprinted in* FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 182 (1975).[14] The House pursued the same legislative objective. *See* H.R. Rep. No. 93-876, *reprinted in* FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 127 ("Two amendments to this Act included in this bill are aimed at increasing the authority of the courts to engage in a full review of agency action with respect to information classified by the Department of Defense and other agencies under Executive order and authority.").

Beyond superseding *Mink*, Congress also sought to lodge its frustration with overbroad and improper classification efforts by the Executive, exactly the type of

---

[14] *Available at* http://www.loc.gov/rr/frd/Military_Law/pdf/FOIA-1974.pdf.

overclassification that has plagued the system since its inception.  As Rep. Patsy Mink (D-Haw.)—the named plaintiff in the *Mink* case—stated on the House floor during debates on the bill, "Our intention in making this change is to place a judicial check on arbitrary actions by the Executive to withhold information that might be embarrassing, politically sensitive, or otherwise concealed for improper reasons rather than truly vital to national defense or foreign policy."  120 Cong. Rec. H1,787-803 (1974), *reprinted in* FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 260.  "We are not saying any material must be released, only that it must be submitted to an impartial judge to determine whether its withholding meets the provisions and purposes of the act."  *Id*.[15]

The Senate was equally concerned with the Executive Branch improperly classifying documents to avoid FOIA's disclosure requirements and feared that an agency's initial decision to classify information would not be reviewed by a neutral party.  Referring to government officials with security clearances, Sen. Alan Cranston (D-Cal.) said that "we must not let 17,364 bureaucrats be the final judges of what we are to know from our Government."  *Id.* at 301 (1975).  Sen. Edmund

---

[15] Other supporters of the House bill provided similar statements regarding the amendment's purpose. *See, e.g.*, *id*. at 237 ("Experience has taught us, however, that the scope of this legitimate shield which was provided by the act could be stretched to suit particular partisan or personal purposes.") (comments of Rep. Spark Matsunaga (D-Haw.)); *id*. at 273 ("These new procedures, I hope, will reduce the appalling incidence of smokescreen 'national security' defenses raised by the Government in Freedom of Information Act cases.") (comments of Rep. Michael Harrington (D-Mass.)); *id*. at 389 ("First of all, this does allow a court to review what could, and sometimes, I am sure, in the past, has been an arbitrary decision to classify a document for security reasons.") (comments of Rep. Carlos Moorhead (R-Cal.)).

Muskie (D-Me.) echoed these sentiments, stating that "by giving classified material a status unlike that of any other claimed Government secret, we foster the outworn myth that only those in possession of military and diplomatic confidences can have the expertise to decide with whom and when to share their knowledge." *Id*. at 305.

The legislative history and statements by supporters of the amendments to Exemption 1 demonstrate that Congress intended not only to overrule the *Mink* decision but also to impose a structural check on the Executive Branch's ability to assert national security or foreign policy-based withholdings under FOIA.  In essence, the purpose of the 1974 amendments was to push back against improper classification, an issue that, as described above, persists to this day.  Congress therefore clearly empowered federal courts to scrutinize the substance of a withholding under FOIA's Exemption 1 so as to create additional oversight of the Executive Branch, recognizing that agencies sometimes fail to engage in the rigorous process necessary to classify information.

### b.  Congress Forcefully Affirmed Its Grant Of Judicial Review Of Agency Withholdings Under Exemption 1 When It Overrode President Ford's Veto of the 1974 FOIA Amendments.

Congress made plain its intent to place a judicial check on Executive Branch classification claims under Exemption 1 when it overrode a presidential veto and passed the 1974 amendments into law.  President Ford vetoed the legislation in part because he believed courts lacked the expertise to review classification decisions.  *See* Veto Message From President of the United States, Freedom of

17

Information Act (Nov. 18, 1974), *reprinted* in FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 484 (1975) ("However, the courts should not be forced to make what amounts to the initial classification decision in sensitive and complex areas where they have no particular expertise.").  Although Congress was sensitive to concerns raised by the President regarding the federal courts' ability to properly determine whether documents should have been classified, it ultimately believed that courts could and should make such determinations.  The override vote was 371 to 31 in the House and 65 to 27 in the Senate.  *See* FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 431, 480.

In passing the 1974 Amendments to FOIA, members of Congress trusted that the judiciary could undertake review of classification decisions.  Sen. Muskie made Congress' faith in the judiciary clear during the debates after President Ford's veto when he said, "I cannot understand why we should trust a Federal judge to sort out valid from invalid claims of executive privilege in litigation involving criminal conduct, but not trust him or his colleagues to make the same unfettered judgments in matters allegedly connected to the conduct of foreign policy."  FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 449 (1975).  Rep. William Broomfield (R-Mich.) also expressed his confidence in the judiciary when he said, "I have faith that in genuinely gray areas, Federal judges will tend to rule in favor of national security.  But when something clearly does not meet the test, it is going to come out."  *Id.* at 418.[16]

---

[16] Other members of Congress expressed similar beliefs that the judiciary should be empowered to review decisions regarding the propriety of Exemption 1

Additionally, Congress believed that by enabling judicial review, it was fundamentally strengthening FOIA and furthering the statute's purpose by increasing government transparency.  *See* 120 Cong. Rec. H10,864-875, *reprinted in* FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 407 ("By our votes to override this veto we can put the needed teeth in the freedom of information law to make it a viable tool to make 'open government' a reality in America.") (comments of Rep. Moorhead (D-Pa.)).

In essence, Congress turned aside President Ford's concern that the federal courts could not make appropriate determinations regarding whether material was properly classified and withheld under Exemption 1 of FOIA.  Instead, it believed that the benefit of fostering increased government transparency through active judicial scrutiny of Exemption 1 withholdings outweighed the President's concerns.

## III. Congress Deliberately Balanced FOIA's Goal Of Increasing Access To Government Records Against The Potential Harm of Releasing National Security Information When It Amended the Statute in 1974.

Although Congress intended to provide a meaningful check against Executive Branch classification decisions, it remained sensitive to the fact that such review could potentially lead to the release of information which may do actual harm to national security or foreign policy interests.  Accordingly, Congress

---

withholdings.  *See id*. at 406 ("I find it totally unrealistic to assume—as apparently the President's legal advisers have assumed—that the Federal judiciary system is somehow not to be trusted to act in the public interest to safeguard truly legitimate national defense or foreign policy secrets of our government") (comments of Rep. Moorhead (D-Pa.)).

sought to carefully balance the Executive Branch's concerns regarding judicial scrutiny of agency classification decisions against FOIA's overarching goal of transparency by requiring courts to provide some level of deference to agency classification claims. This process, embedded into the analysis courts undertake when reviewing Exemption 1 withholdings, protects both the statute's transparency goal and the need to protect legitimate secrets.

But, as the legislative history makes clear, Congress did not envision a level of deference wherein a federal court simply rubber stamps an agency's classification claim and does not conduct a good-faith inquiry into the Executive Branch's underlying justifications. As the D.C. Circuit recognized when scrutinizing an agency's classification claims under Exemption 1, "[D]eference is not equivalent to acquiescence." *Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).

> **a. Congress Addressed The Government's Fears Regarding The Potential Release Of Harmful Information By Requiring Courts To Afford Due Weight To Claims of National Security.**

In an effort to satisfy Executive Branch concerns regarding judicial review of classification determinations, Congress instructed courts to give due consideration to an agency's decision to withhold documents under Exemption 1. *See* H.R. Rep. No. 93-1380 (1974) (Conf. Rep.), *reprinted in* FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 229 ("Accordingly, the conferees expect that Federal courts, in making *de novo* determinations in section 552(b)(1) cases under the Freedom of Information law, will accord substantial

weight to an agency's affidavit concerning the details of the classified status of the disputed record.").[17]  This Court and others took the standard enunciated by Congress and incorporated it into the review they undertake when scrutinizing Exemption 1 claims.  *See Halpern*, 181 F.3d at 292 (discussing Congress' inclusion of the "substantial weight" standard in the 1974 FOIA amendments); *Donovan*, 806 F.2d at 60 (discussing that courts are "to grant 'substantial deference' to agency affidavits that implicate national security"); *Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 52 (2d Cir. 1985) (describing the "substantial weight to which agency classifications are entitled"); *Diamond v. FBI*, 707 F.2d 75, 79 (2d Cir. 1983) ("We  [. . .] must pay substantial deference to the affidavit submitted by the agency in the 'national security' context."); *see also Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009) ("We 'accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'") (quoting *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003); *McGehee v. Casey*, 718 F.2d 1137, 1148 (D.C. Cir. 1983) (adopting the

---

[17] Rep. Moorhead (D-Pa.) articulated the inquiry courts were to make in these cases:

> The bill contains the requirement [. . .] that, where there is a stamp, a classification stamp, the court could go behind that, but we specified that the court should give great weight to an affidavit that this was properly classified.  What we are trying to overrule is the situation described in the famous *Mink* case, where the court said to Congress, no matter how frivolous or capricious the classification should be, that the court could not go behind it.

120 Cong. Rec. H10,001-009, *reprinted in* FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 388.

"substantial weight" review standard from the legislative history of the 1974 FOIA amendments).

In creating such a standard, Congress recognized the Executive Branch's interests and balanced them against the command of FOIA that government records are presumptively open. 5 U.S.C. § 552(a)(4)(B) (stating that the burden is on the government to justify withholding documents under FOIA). This standard, deliberately calibrated by Congress, strikes a balance between FOIA's transparency goals and the Executive Branch's concerns about national security.

### b. Although Congress Required Courts To Afford Deference to Executive Branch Classification Decisions, It Did Not Intend For Courts To Simply Rubber Stamp Such Claims.

Despite Congress providing that courts must afford deference to an agency classification claim under Exemption 1 of FOIA, it did not intend such deference to swallow the purpose behind strengthening FOIA in 1974. As discussed *supra*, erasing the distinction between affording an agency deference and rubber stamping an agency's classification claim would leave FOIA exactly where it was in *Mink*'s wake and before the 1974 Amendments.

Moreover, in amending FOIA, Congress not only intended that courts would need to scrutinize agency classification claims under Exemption 1, it also anticipated that courts would sometimes determine that the Executive Branch had improperly invoked the exemption. *See* S. Rep. No. 93-854, *reprinted in* FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 183:

> It is essential, however, to the proper workings of the Freedom of Information Act that any executive branch review, itself, be

> reviewable outside the executive branch. [. . .] The judgments involved may often be delicate and difficult ones, but someone other than interested parties—officials with power to classify and conceal information—must be empowered to make them.

Sen. Ted Kennedy (D-Mass.) recognized that accountability for classification claims necessarily meant that courts would come to different conclusions in some instances, saying that "[j]udicial review will be effective only if a Federal judge is authorized to review classification decisions objectively, without any presumptions in favor of secrecy. That is what our system of checks and balances is all about." 120 Cong. Rec. S19,806-823, *reprinted in* FREEDOM OF INFORMATION ACT AND AMENDMENTS OF 1974, at 438.

In light of the expansive legislative history that makes evident Congress' intent in amending FOIA in 1974, this Court has the authority to scrutinze the agency classification claims at issue in the present case, even as it provides the Executive Branch with some deference. This deference, however, is no bar to this Court exercising its duty under FOIA to rigorously review the agency classification determinations at issue and, should they be found to be improper, order the documents' disclosure.

## **CONCLUSION**

For the foregoing reasons, *amici* respectfully urge this Court to reverse the District Court's decision with respect to its findings regarding Exemption 1.

Dated:        April 22, 2013
              Arlington, VA


                                    Respectfully submitted,

                                    By:    /s/ Bruce D. Brown

                                    Bruce D. Brown
                                    *Counsel of Record*
                                    Mark R. Caramanica
                                    Aaron Mackey
                                    1101 Wilson Blvd., Suite 1100
                                    Arlington, VA 22209
                                    Phone: (703) 807-2100
                                    bbrown@rcfp.org
                                    *Counsel for* amicus curiae *The Reporters Committee for Freedom of the Press*

24

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-face and volume limitations set forth in Fed. R. of App. P. 32(a)(7)(B) as follows: The type face is fourteen-point Times New Roman font, and the word count is 6,354, excluding the portions of the brief exempted by Rule 32(a)(7)(B)(iii).

<u>/s/ Bruce D. Brown</u>
Bruce D. Brown

# ADDENDUM

Descriptions of *amici curiae*:

**The Reporters Committee for Freedom of the Press** is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance and research in First Amendment and Freedom of Information Act litigation since 1970.

**ABC, Inc.**, alone and through its subsidiaries, owns and operates, inter alia, ABC News, abcnews.com, the ABC Television Network and local broadcast television stations, including WABC-TV in New York City, which regularly gather and report news to the public. Programs produced and disseminated by ABC News include "World News with Diane Sawyer," "20/20," "Nightline," "Good Morning America" and "This Week."

**Allbritton Communications Company** is the parent company of entities operating ABC-affiliated television stations in the following markets: Washington; Harrisburg, Pa.; Birmingham, Ala.; Little Rock, Ark.; Tulsa, Okla.; and Lynchburg, Va. In Washington, it operates broadcast station WJLA-TV, the 24-hour local news service, NewsChannel 8 and the news websites WJLA.com and TBD.com. An affiliated company operates the ABC affiliate in Charleston, S.C.

With some 500 members, **American Society of News Editors** ("ASNE") is an organization that includes directing editors of daily newspapers throughout the Americas. ASNE changed its name in April 2009 to American Society of News Editors and approved broadening its membership to editors of online news

providers and academic leaders. Founded in 1922 as American Society of Newspaper Editors, ASNE is active in a number of areas of interest to top editors with priorities on improving freedom of information, diversity, readership and the credibility of newspapers.

**The Associated Press** ("AP") is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. AP's members include approximately 1,500 daily newspapers and 25,000 broadcast news outlets throughout the United States. AP has its headquarters and main news operations in New York City and has staff in 321 locations worldwide. AP reports news in print and electronic formats of every kind, reaching a subscriber base that includes newspapers, broadcast stations, news networks and online information distributors in 116 countries.

**The Association of American Publishers, Inc.** ("AAP") is the national trade association of the U.S. book publishing industry. AAP's members include most of the major commercial book publishers in the United States, as well as smaller and nonprofit publishers, university presses and scholarly societies. AAP members publish hardcover and paperback books in every field, educational materials for the elementary, secondary, postsecondary and professional markets, scholarly journals, computer software and electronic products and services. The Association represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment.

**Atlantic Media, Inc.** is a privately held, integrated media company that publishes *The Atlantic*, *National Journal* and *Government Executive*. These award-

A-2

winning titles address topics in national and international affairs, business, culture, technology and related areas, as well as cover political and public policy issues at federal, state and local levels. *The Atlantic* was founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others

**Bloomberg L.P.**, based in New York City, operates Bloomberg News, which is comprised of more than 1,500 professionals in 145 bureaus around the world. Bloomberg News publishes more than 6,000 news stories each day, and The Bloomberg Professional Service maintains an archive of more than 15 million stories and multimedia reports and a photo library comprised of more than 290,000 images. Bloomberg News also operates as a wire service, syndicating news and data to over 450 newspapers worldwide with a combined circulation of 80 million people in more than 160 countries. Bloomberg News operates the following: cable and satellite television news channels broadcasting worldwide; WBBR, a 24-hour business news radio station that syndicates reports to more than 840 radio stations worldwide; *Bloomberg Markets* and *Bloomberg Businessweek* magazines; and Bloomberg.com, which receives 3.5 million individual user visits each month.

**Cable News Network, Inc.** ("CNN"), a division of Turner Broadcasting System, Inc., a Time Warner Company, is the most trusted source for news and information. Its reach extends to the following: nine cable and satellite television networks; one private place-based network; two radio networks; wireless devices around the world; CNN Digital Network, the No. 1 network of news websites in the United States; CNN Newsource, the world's most extensively syndicated news

service; and strategic international partnerships within both television and the digital media.

**California Newspapers Partnership** is the publisher of more than two dozen daily newspapers and many weekly newspapers throughout California, including the San Jose Mercury News, Oakland Tribune, Contra Costa Times, Marin Independent Journal, Santa Cruz Sentinel, Pasadena Star-News, San Gabriel Valley Tribune, and many others. It is a general partnership operated by Digital First Media, and includes Media News Group, Stephens Media, LLC, and Gannett Company, Inc. It is one of the largest news-gathering and reporting enterprises in California.

**The California Newspaper Publishers Association** ("CNPA") is a nonprofit trade association representing the interests of nearly 850 daily, weekly and student newspapers throughout California. For over 130 years, CNPA has worked to protect and enhance the freedom of speech guaranteed to all citizens and to the press by the First Amendment of the United States Constitution and Article 1, Section 2 of the California Constitution. CNPA has dedicated its efforts to protect the free flow of information concerning government institutions in order for newspapers to fulfill their constitutional role in our democratic society and to advance the interest of all Californians in the transparency of government operations.

**Courthouse News Service** is a California-based legal news service for lawyers and the news media that focuses on court coverage throughout the nation,

A-4

reporting on matters raised in trial courts and courts of appeal up to and including the U.S. Supreme Court.

**Cox Media Group, Inc.** is an integrated broadcasting, publishing, direct marketing and digital media company. Its operations include 15 broadcast television stations, a local cable channel, a leading direct marketing company, 85 radio stations, eight daily newspapers and more than a dozen non-daily print publications and more than 100 digital services.

**Daily News, LP** publishes the New York Daily News, a daily newspaper that serves primarily the New York City metropolitan area and is the sixth-largest paper in the country by circulation. The Daily News' website, NYDailyNews.com, receives approximately 22 million unique visitors each month.

**Digital First Media, LLC's** more than 800 multi-platform products reach 61 million Americans each month across 18 states.

**Digital Media Law Project** ("DMLP") provides legal assistance, education and resources for individuals and organizations involved in online and citizen media. DMLP is jointly affiliated with Harvard University's Berkman Center for Internet & Society, a research center founded to explore cyberspace, share in its study and help pioneer its development, and the Center for Citizen Media, an initiative to enhance and expand grassroots media.

**Dow Jones & Company, Inc.** is the publisher of The Wall Street Journal, a daily newspaper with a national circulation of over two million, WSJ.com, a news website with more than one million paid subscribers, Barron's, a weekly business and finance magazine and, through its Dow Jones Local Media Group, community

A-5

newspapers throughout the United States. In addition, Dow Jones provides real-time financial news around the world through Dow Jones Newswires, as well as news and other business and financial information through Dow Jones Factiva and Dow Jones Financial Information Services.

**The E.W. Scripps Company** is a diverse, 131-year-old media enterprise with interests in television stations, newspapers, local news and information websites and licensing and syndication. The company's portfolio of locally focused media properties includes: 10 TV stations (six ABC affiliates, three NBC affiliates and one independent); daily and community newspapers in 13 markets; and the Washington-based Scripps Media Center, home of the Scripps Howard News Service.

**Forbes LLC** is the publisher of Forbes and other leading magazines, including Forbes Life and Forbes Asia, as well as an array of investment newsletters and the leading business website, Forbes.com.  Forbes has been covering American and global business since 1917.

**Gannett Co., Inc.** is an international news and information company that publishes 82 daily newspapers in the United States, including *USA TODAY*, as well as hundreds of non-daily publications. In broadcasting, the company operates 23 television stations in the U.S. with a market reach of more than 21 million households. Each of Gannett's daily newspapers and TV stations operates Internet sites offering news and advertising that is customized for the market served and integrated with its publishing or broadcasting operations.

A-6

**Hearst Corporation** is one of the nation's largest diversified media companies. Its major interests include the following: ownership of 15 daily and 38 weekly newspapers, including the *Houston Chronicle*, *San Francisco Chronicle* and *Albany* (N.Y.) *Times Union*; interests in an additional 43 daily and 74 non-daily newspapers owned by MediaNews Group, which include *The Denver Post* and *The Salt Lake Tribune*; nearly 200 magazines around the world, including *Good Housekeeping*, *Cosmopolitan* and *O, The Oprah Magazine*; 29 television stations, which reach a combined 18% of U.S. viewers; ownership in leading cable networks, including Lifetime, A&E and ESPN; business publishing, including a minority joint venture interest in Fitch Ratings; and Internet businesses, television production, newspaper features distribution and real estate.

**Lee Enterprises, Incorporated**, based in Davenport, Iowa, is the publisher of 46 daily newspapers nationwide, with a joint interest in four others.  Lee's markets include St. Louis, MO; Lincoln, NE; Madison, WI; Davenport, IA; Billings, MT; Bloomington, IL; and Tucson, AZ.

**The McClatchy Company** publishes 30 daily newspapers and 46 non-daily newspapers throughout the country, including *The Sacramento* (Cal.) *Bee*, *The Miami Herald*, *The Kansas City* (Mo.) *Star* and *The Charlotte* (N.C.) *Observer*. The newspapers have a combined average circulation of approximately 2 million daily and 2.7 million Sunday.

**National Press Photographers Association** ("NPPA") is a nonprofit organization dedicated to the advancement of photojournalism in its creation, editing and distribution. NPPA's almost 8,000 members include television and still

photographers, editors, students and representatives of businesses that serve the photojournalism industry. Since 1946, NPPA has vigorously promoted freedom of the press in all its forms, especially as that freedom relates to photojournalism.

**Newspaper Association of America** ("NAA") is a nonprofit organization representing the interests of more than 2,000 newspapers in the United States and Canada. NAA members account for nearly 90% of the daily newspaper circulation in the United States and a wide range of non-daily newspapers. The Association focuses on the major issues that affect today's newspaper industry, including protecting the ability of the media to provide the public with news and information on matters of public concern.

**The Newspaper Guild – CWA** is a labor organization representing more than 30,000 employees of newspapers, newsmagazines, news services and related media enterprises. Guild representation comprises, in the main, the advertising, business, circulation, editorial, maintenance and related departments of these media outlets. The Newspaper Guild is a sector of the Communications Workers of America. CWA is America's largest communications and media union, representing over 700,000 men and women in both private and public sectors.

**The Newsweek/Daily Beast Company LLC** publishes *Newsweek* magazine and operates the website TheDailyBeast.com. The 80-year-old *Newsweek* magazine became an industry leader by going all-digital in 2013. It is now one of the largest tablet magazines in the world. Available weekly across digital platforms, *Newsweek* is written with a global perspective for a global audience. The Daily Beast, founded by Newsweek/Daily Beast Editor in Chief Tina Brown

in 2008, offers award-winning journalism spanning every major news vertical, from politics and world news to fashion, film, and art.  Winner of the 2012 Webby Award for Best News Website, The Daily Beast attracts 15 million visitors per month and is among the fastest-growing news destinations on the web.

**The New Yorker** is an award-winning magazine, published weekly in print, digital, and online. Its writers, including Jane Mayer, David Grann, and Raffi Khatchadourian, regularly use information gained from federal and state freedom of information laws to report on matters of state, national, and international importance.

**North Jersey Media Group Inc.** ("NJMG") is an independent, family-owned printing and publishing company, parent of two daily newspapers serving the residents of northern New Jersey: *The* (Bergen County) *Record*, the state's second-largest newspaper, and *The* (Passaic County) *Herald News*. NJMG also publishes more than 40 community newspapers serving towns across five counties, including some of the best weeklies in the state. Its magazine group produces high-quality glossy magazines, including *(201) Best of Bergen*, nearly a dozen community-focused titles and special-interest periodicals, such as *The Parent Paper*. The company's Internet division operates many news and advertising websites and online services associated with the print publications.

**NPR, Inc.** is an award-winning producer and distributor of noncommercial news programming. A privately supported, not-for-profit membership organization, NPR serves a growing audience of more than 26 million listeners each week by providing news programming to 285 member stations that are

A-9

independently operated, noncommercial public radio stations. In addition, NPR provides original online content and audio streaming of its news programming. NPR.org offers hourly newscasts, special features and 10 years of archived audio and information.

**Online News Association** ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers, academics, students and others who produce news for the Internet or other digital delivery systems. ONA hosts the annual Online News Association conference and administers the Online Journalism Awards. ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

**POLITICO LLC** is a nonpartisan, Washington-based political journalism organization that produces a newspaper and website covering politics and public policy.

**Radio Television Digital News Association** ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism. RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

**Reuters America LLC** serves the financial markets and news media with real-time, high-impact multimedia news and information services and is part of Reuters, the world's largest international news agency. Through Reuters.com and affiliated websites around the world and via multiple platforms, including online, mobile, video and outdoor electronic displays, Reuters provides trusted, unbiased, professional-grade business news, financial information, market data and national and international news directly to an audience of business professionals around the world. In addition, Reuters publishes a portfolio of market-leading titles and online services, providing authoritative and unbiased market intelligence to investment banking and private equity professionals.

**The Seattle Times Company**, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with *The Issaquah Press*, *Yakima Herald-Republic*, *Walla Walla Union-Bulletin*, *Sammamish Review* and *Newcastle-News*, all in Washington state.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**Tribune Company** operates broadcasting, publishing and interactive businesses, engaging in the coverage and dissemination of news and entertainment

programming. On the broadcasting side, it owns 23 television stations, a radio station, a 24-hour regional cable news network and "Superstation" WGN America. On the publishing side, Tribune publishes eight daily newspapers — *Chicago Tribune*, *Hartford* (Conn.) *Courant*, *Los Angeles Times*, *Orlando Sentinel* (Central Florida), *The* (Baltimore) *Sun*, *The* (Allentown, Pa.) *Morning Call*, (Hampton Roads, Va.) *Daily Press* and *Sun-Sentinel* (South Florida).

**WP Company LLC** (d/b/a The Washington Post) publishes one of the nation's most prominent daily newspapers, as well as a website, www.washingtonpost.com, that is read by an average of more than 20 million unique visitors per month.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 22, 2013, I electronically filed the foregoing Brief for *Amici Curiae* with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.  I further certify that my electronic filing caused the foregoing to be filed through the Court's ECF system, which will serve notice of the filing on the following registered counsel for the parties:

David Edward McCraw
Stephen Nathaniel Gikow
The New York Times Company
(212) 556-4031
mccrad@nytimes.com
Stephen.gikow@nytimes.com

Jameel Jaffer
Hina Shamsi
Brett Max Kaufman
The American Civil Liberties Foundation
(212) 607-3300
jjaffer@aclu.org
hshamsi@aclu.org
bkaufman@aclu.org

Joshua Colagelo Bryan
Eric Ruzicka
Colin Wicker
Dorsey & Whitney LLP
(212) 415-9200
Colangelo.joshua@dorsey.com
Ruzicka.eric@dorsey.com
Wicker.colin@dorsey.com
*Additional counsel for ACLU*

Sara Sheive Normand
Sharon Swingle
Matthew Collette
U.S. Department of Justice, Appellate Division
202-353-2689
Sarah.Norman@usdoj.gov
Sharon.Swingle@usdoj.gov
Matthew.Collette@usdoj.gov

<u>/s/ Bruce D. Brown</u>
Bruce D. Brown