# 13-0422-cv(L), 13-0445-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

———————————————

THE NEW YORK TIMES COMPANY, CHARLIE SAVAGE, SCOTT SHANE,
AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES
UNION FOUNDATION,

*Plaintiffs-Appellants,*

— v. —

UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES
DEPARTMENT OF DEFENSE, CENTRAL INTELLIGENCE AGENCY,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL LIBERTIES UNION FOUNDATION

JAMEEL JAFFER
HINA SHAMSI
BRETT MAX KAUFMAN
THE AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 17th Floor
New York, New York 10004
(212) 607-3300

JOSHUA COLANGELO-BRYAN
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, New York 10019
(212) 415-9200

– and –

ERIC RUZICKA
COLIN WICKER
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402
(612) 340-2959

*Attorneys for Plaintiffs-Appellants American Civil Liberties Union
and American Civil Liberties Union Foundation*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ................................................................................1

ARGUMENT .......................................................................................1

I.    The Government's Official Acknowledgments About The Targeted-Killing Program Defeat Its "No Number No List" Responses........................1

II.   The Agencies' Withholding of the OLC–DOD Memo, the Unclassified Memos, and Any Other Responsive OLC Memoranda is Unlawful.................................................................................17

III.  OIP Did Not Conduct an Adequate Search for Records ...............................28

CONCLUSION .................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Afshar v. Dep't of State*,
  702 F.2d 1125 (D.C. Cir. 1983).......................................................8

*Al-Aulaqi v. Obama*,
  727 F. Supp. 2d 1 (D.D.C. 2010)...................................................23

*Alfred A. Knopf, Inc. v. Colby*,
  509 F.2d 1362 (4th Cir. 1975).................................................10, 11

*Am. Civil Liberties Union v. CIA*,
  710 F.3d 422 (D.C. Cir. 2013).................................................5, 14

*Am. Civil Liberties Union v. Dep't of Def.*,
  628 F.3d 612 (D.C. Cir. 2011).......................................................11

*Ameziane v. Obama*,
  699 F.3d 488 (D.C. Cir. 2012).............................................9, 10, 13

*Bonner v. Dep't of State*,
  928 F.2d 1148 (D.C. Cir. 1991).......................................................4

*Brennan Center for Justice at N.Y. Univ. Sch. of Law v. Dep't of Justice*,
  697 F.3d 184 (2d Cir. 2012) .........................................18-19, 20, 25

*Campbell v. U.S. Dep't of Justice*,
  164 F.3d 20 (D.C. Cir. 1998).........................................................28

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980).................................................20, 24

*Earth Pledge Found. v. CIA*,
  988 F. Supp. 623 (S.D.N.Y. 1996) .................................................8

*Fitzgibbon v. CIA*,
  911 F.2d 755 (D.C. Cir. 1990).................................................6, 8, 11

*Frugone v. CIA*,
  169 F.3d 772 (D.C. Cir. 1999).......................................................9

*Garb v. Republic of Pol.*,
  440 F.3d 579 (2d Cir. 2006) .........................................................5

*Gardels v. CIA*,
    689 F.2d 1100 (D.C. Cir. 1982)....................................................................11

*Grand Central Partnership, Inc. v. Cuomo*,
    166 F.3d 473 (2d Cir. 1999) .......................................................................28

*Hepting v. AT & T Corp.*,
    439 F. Supp. 2d 974 (N.D. Cal. 2006).........................................................12

*Hoch v. CIA*,
    No. 88-5422, 1990 WL 102740 (D.C. Cir. July 20, 1990)............................6

*Military Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981)..................................................................8, 11

*Moore v. CIA*,
    666 F.3d 1330 (D.C. Cir. 2011)....................................................................8

*Murphy v. Dep't of Army*,
    613 F.2d 1151 (D.C. Cir. 1979)....................................................................8

*N.Y. Times Co. v. U.S. Dep't of Justice*,
    872 F. Supp. 2d 309 (S.D.N.Y. 2012).........................................................27

*Nat'l Council of La Raza v. Dep't of Justice*,
    411 F.3d 350 (2d Cir. 2005) ...........................................................18, 19, 20

*NLRB v. Sears, Roebuck, & Co.*,
    421 U.S. 132 (1975)....................................................................................18

*Phillippi v. CIA*,
    546 F.2d 1009 (D.C. Cir. 1976)..................................................................26

*Phillippi v. CIA*,
    655 F.2d 1325 (D.C. Cir. 1981)....................................................................8

*Powell v. U.S. Bureau of Prisons*,
    927 F.2d 1239 (D.C. Cir. 1991)....................................................................4

*Pub. Citizen, Inc. v. Office of Mgmt. & Budget*,
    598 F.3d 865 (D.C. Cir. 2010)...............................................................22, 24

*Scheer v. Dep't of Justice*,
    35 F. Supp. 2d 9 (D.D.C. 1999)....................................................................4

*Terkel v. AT & T Corp.*,
    441 F. Supp. 2d 899 (N.D. Ill. 2006)..........................................................12

*United States v. Marchetti*,
    466 F.2d 1309 (4th Cir. 1972) ........................................................11

*Wilner v. Nat'l Sec. Agency*,
    592 F.3d 60 (2d Cir. 2009) ...........................................................26

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009) .....................................................8, 11

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) .............................................. 10-11

**Statutes & Other Authorities:**

U.S. Const. amend. V ...............................................................................24

5 U.S.C. § 552(b) ....................................................................................27

50 U.S.C. § 403g .....................................................................................26

50 U.S.C. § 413b ....................................................................................12

Fed. R. Evid. 201(d) ..................................................................................5

Jack Goldsmith, *The Significance of DOJ's Weak Response to Rogers'
    Acknowledgment of CIA Drone Strikes*, Lawfare (Feb. 15, 2013,
    10:09 AM), http://bit.ly/YnEqmj ...........................................6

Memorandum from David Barron, Acting Assistant Attorney Gen., Office
    of Legal Counsel, U.S. Dep't of Justice, for Attorneys of the Office
    (July 16, 2010), http://1.usa.gov/ZWlpuo ....................................23

Republican Policy Committee Statement on Freedom of Information
    Legislation, S. 1160, 112 Cong. Rec. 13020 (1966), *reprinted in*,
    Subcomm. on Admin. Practice, S. Comm. on the Judiciary, 93d
    Cong., Freedom of Information Act Source Book: Legislative
    Materials, Cases, Articles, at 59 (1974) .......................................17

## INTRODUCTION

The government's opposition brief is the latest installment in its ongoing effort inside U.S. courtrooms to obscure truths known outside of them. Over and over again, the government has asked the Judiciary to endorse its aggressive extension of the concept of official secrecy to unprecedented lengths. The Freedom of Information Act's very existence owes to legislators' concerns about the public's access to national-security information in particular, and those legislators explicitly warned about the dangers inherent in campaigns of selective disclosure in the context of foreign policy. It is no overstatement to say that the FOIA was enacted to grant the public rights to information about precisely the kinds of matters now before this Court. The Court should not—indeed, under the FOIA, cannot—allow itself to be enlisted in the government's effort here.

## ARGUMENT

### I.    The Government's Official Acknowledgments About The Targeted-Killing Program Defeat Its "No Number No List" Responses

As Plaintiffs have explained, the government's "no number no list" responses were not justified when they were first provided or when the district court issued its summary-judgment ruling. *See* ACLU Br. 37–49. But even if they had been, official disclosures since the district court's ruling have dissipated whatever force the government's arguments once had.

- <u>On February 4, 2013</u>, NBC News published—and, on February 8, 2013, the government officially released—a white paper produced by the Department of Justice ("DOJ") explaining the sources of the government's claimed legal authority to carry out targeted killings of U.S. citizens, the scope of that authority, the relevance of the Fourth and Fifth Amendments, the appropriateness of judicial review, and the import of federal statutes constraining the government's authority to use lethal force. *See* ACLU Br. 20–23; *see also Department of Justice White Paper*, Nov. 8, 2011, http://bit.ly/YKXeN8 ("White Paper").

- <u>On February 7, 2013</u>, John O. Brennan appeared before the Senate Select Committee on Intelligence for a hearing on his nomination to the Directorship of the Central Intelligence Agency ("CIA"). During the hearing, Mr. Brennan and members of the Committee acknowledged that the United States had killed Anwar al-Aulaqi, that the CIA had an operational role in the U.S. targeted-killing program, that the DOJ's Office of Legal Counsel ("OLC") had provided legal advice "establish[ing] the legal boundaries" of the targeted-killing program, and that the White Paper described the legal theory on the basis of which the government had concluded that Mr. al-Aulaqi's killing would be lawful. *See* ACLU Br. 12–13, 17, 19, 24 & n.10; *see also Open Hearing on the Nomination of John O. Brennan to be Director of the Central Intelligence Agency Before the S. Select Comm. on Intelligence* at 5:18–20, 113th Cong. (Feb. 7, 2013), http://1.usa.gov/15fr1Sx ("Brennan Hearing Tr.").

- <u>On May 22, 2013</u>, Attorney General Eric Holder sent a letter to Congress acknowledging that the United States had "specifically targeted and killed one U.S. citizen, Anwar al-Aulaqi," and that it had killed three others, including Abdulrahman al-Aulaqi and Samir Khan. The letter described the purported facts upon which the government had concluded that Anwar al-Aulaqi's killing would be lawful. It also reiterated the legal arguments that underlie its purported authority to kill U.S. citizens suspected of terrorism. *See* Letter from Eric H. Holder, Jr., Attorney General, to Patrick J. Leahy, Chairman of the Senate Committee on the Judiciary (May 22, 2013), http://1.usa.gov/11bGJZi ("Holder Letter").

- <u>On May 23, 2013</u>, President Barack Obama delivered an address at National Defense University in Washington, D.C., about his administration's counterterrorism policies. The President acknowledged that the government had killed Anwar al-Aulaqi and described the purported facts that led the

government to conclude that the killing would be appropriate and lawful. *See* Barack Obama, Remarks by the President at the National Defense University (May 23, 2013), http://wh.gov/hrTq ("Obama NDU Speech").

- <u>Over the past six months</u>, Members of Congress—including, most notably, the chairpersons of the Senate and House Select Committees on Intelligence—have acknowledged the United States' killing of Anwar al-Aulaqi, the CIA's operational role in that killing, the CIA's ongoing operational role in targeted killings more generally, the military's ongoing operational role in targeted killings, the existence of OLC memoranda setting out the government's purported legal authority to kill U.S. citizens suspected of terrorism, and the government's reliance on the White Paper's legal analysis in its killing of Mr. al-Aulaqi. *See* ACLU Br. 12–13, 15–17, 18–19, 24 nn.9 & 10.

The government concedes that these disclosures—or some of them, at least—require the agencies to provide more fulsome responses to Plaintiffs' FOIA request (the "Request"). *See* Opp. 47, 48 n.13. Thus, in light of the disclosures, the government acknowledges for the first time that it possesses a "significant number" of documents containing legal advice and factual information relating to the targeted-killing program. Opp. 47. This meager "acknowledgment," however, does not satisfy the government's obligations under the FOIA. Nor does the government's bald and unsupported assertion that the government is "not in a position to disclose additional details" about those documents, Opp. 47–48. Because official disclosures since the district court's opinion have completely undermined the government's argument that Plaintiffs' FOIA Request cannot be processed like any other, the government must identify and describe the records that are responsive to the Request, release those records that can be released, and

—3—

provide *Vaughn* declarations explaining its withholdings. *See* ACLU Br. 45–46 (discussing the importance of the *Vaughn* requirement in FOIA cases).

To be fair, it is not entirely lost on the government that its disclosures over the last six months are in tension with its "no number no list" responses. *See* Opp. 48 n.13 (addressing the possibility that the Court might find the disclosures to be relevant). But rather than seriously grapple with the implications of the disclosures, the government proposes that the Court should simply disregard them—because the disclosures were made too recently, *see* Opp. 46; because they were made by officials of the wrong branch of government, *see* Opp. 34–36, 36 n.10; or because they were made by officials of the right branch of government but from the wrong agencies, Opp. 36–37. None of these arguments has merit.

To begin with, the government is wrong that the Court cannot (or should not) consider official disclosures made after the agency record was complete. While judicial review of agency decisions in FOIA cases normally "focuses on the time the determination to withhold is made," *Bonner v. Dep't of State*, 928 F.2d 1148, 1152 & n.10 (D.C. Cir. 1991), the courts have applied a more flexible rule where "post-decision disclosure . . . goes to the very heart of the contested issue." *Scheer v. Dep't of Justice*, 35 F. Supp. 2d 9, 13 (D.D.C. 1999) (citing *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242–43 (D.C. Cir. 1991)). Indeed, the D.C. Circuit recently reviewed post-district-court-decision disclosures in

considering another FOIA request relating to the targeted-killing program. *See Am. Civil Liberties Union v. CIA*, 710 F.3d 422, 431 n.10 (D.C. Cir. 2013) ("*Drones FOIA*").

It would make little sense for appellate courts to close their eyes to official disclosures made after a district-court judgment in FOIA cases. If they did, FOIA requesters would be forced to file new requests every time the government made new disclosures and, consequently, the same FOIA cases would come before the courts over and over again, each time with an incrementally expanded agency record. The public's right to know about the government's conduct would be defeated by endless iteration, and the courts' resources taxed by a proliferation of near-identical lawsuits. Nothing prevents the Court from taking judicial notice of the government's recent disclosures, and no purpose would be served by the Court's ignoring them. *See, e.g.*, *Garb v. Republic of Pol.*, 440 F.3d 579, 594 n.18 (2d Cir. 2006) (explaining that judicial notice "'may be taken at any stage of the proceeding,'" including on appeal (quoting Fed. R. Evid. 201(d)).

Nor is there any merit to the government's contention that official acknowledgement can never be accomplished by former Executive Branch officials or by officials of coordinate branches. While it is certainly true that disclosures by such officials do not "necessarily" constitute official acknowledgement, Opp. 36 n.10, it is a wholly different thing to propose that such

—5—

disclosures are always and categorically insufficient. Plaintiffs know of no court that has endorsed that sweeping proposition, and the D.C. Circuit, whose jurisprudence this Court has often looked to in FOIA cases, has explicitly eschewed it. *See Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (expressly declining to reach the question); *see also* ACLU Br. 38 n.19 (citing *Hoch v. CIA*, No. 88-5422, 1990 WL 102740, at *1 (D.C. Cir. July 20, 1990) (per curium) ("We cannot so easily disregard the disclosures by congressional committees. . . . This circuit has never squarely ruled on this issue, but we need not do so to decide this case." (footnotes omitted))); Jack Goldsmith, *The Significance of DOJ's Weak Response to Rogers' Acknowledgment of CIA Drone Strikes*, Lawfare (Feb. 15, 2013, 10:09 AM), http://bit.ly/YnEqmj (characterizing as "weak" the government's argument that disclosures of officials of coordinate branches cannot accomplish official acknowledgements, and observing that the cases cited by the government "do not stand for the proposition" for which the government cites them).

To be clear, Plaintiffs' argument is not that disclosures of legislators and former agency officials are *always* sufficient to constitute official acknowledgement. Plaintiffs' argument, rather, is that these disclosures are sufficient in the unusual circumstances of this case. Here, some of the disclosures were made by an executive official—Leon Panetta—who had assumed one Cabinet position (Secretary of Defense) after having served in another (CIA

Director), and who indisputably had first-hand knowledge of the matters he was disclosing. Others were made by the President's chief counterterrorism advisor—John Brennan—who oversaw the government's targeted-killing program before he assumed the leadership of the CIA. *See* Brennan Hearing Tr. 31:11 – 32:13 (responding to a question about drone strikes by answering: "my role as the President's counterterrorism advisor was to help orchestrate" the government's "effort to try to institutionalize and to ensure we have as rigorous a process as possible"). Still others were made by the leaders of the congressional committees tasked with oversight of the intelligence agency (the CIA) whose actions they were discussing. The government does not dispute that these disclosures were made. Nor does it contend that these disclosures were inadvertent—and any such contention would be frivolous, as the disclosures were made repeatedly over the course of months, without any subsequent disavowal or retraction. In these circumstances, it would be formalistic in the extreme for the Court to hold that the matters disclosed are still secret.

The government cites a handful of cases in which the courts found disclosures of legislators or former agency officials insufficient to constitute official acknowledgements, *see* Opp. 34–37, but the facts of those cases do not even remotely resemble those presented here. Indeed, almost all of the cases the government cites turned on the question whether the disclosures were sufficiently

specific to constitute official acknowledgments, not on the question whether the person disclosing the information was capable, given his or her position, of effecting an official acknowledgement.[1] One of the cases the government cites involved an entirely distinct question and explicitly left open the possibility that disclosures by Members of Congress could render otherwise-applicable FOIA exemptions inapplicable.[2] Others did not discuss official acknowledgments at all.[3]

---

[1] *See Moore v. CIA*, 666 F.3d 1330, 1333 n.4 (D.C. Cir. 2011) (holding that FBI agent's declaration did not constitute an official acknowledgment because it did not "identify *specific* records or dispatches *matching* [a] FOIA request" directed at the CIA (emphases added)); *Wilson v. CIA*, 586 F.3d 171, 195–96 (2d Cir. 2009) (determining that "bureaucratic transmittal" of a letter acknowledging plaintiff's CIA employment did not constitute official acknowledgment because additional "disclosure of the information presently censored by the CIA would . . . facilitate the identification of particular sources and methods"); *Fitzgibbon,* 911 F.2d at 765–66 (holding that a congressional committee's revelation of the existence of a CIA station on a certain date did not defeat exemption claim as to existence of the station prior to that date); *Afshar v. Dep't of State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983) (rejecting argument that revelations in books by former CIA officers constituted official acknowledgments because "none of the[] books *specifically reveal*[*ed*]" the information sought through the FOIA (emphasis added)); *Military Audit Project v. Casey*, 656 F.2d 724, 745 (D.C. Cir. 1981) (concluding that Senate committee report did not defeat exemption claim because "either . . . the CIA still has something to hide or . . . it wishes to hide from our adversaries the fact that it has nothing to hide").

[2] *See Murphy v. Dep't of Army*, 613 F.2d 1151, 1158 (D.C. Cir. 1979). The *Murphy* court held that—in part because of the FOIA's carve-out for the dissemination of information to Congress—a single Member's *receipt* of an Executive Branch memorandum did not waive the Exemption 5 privilege where the Member did not *reveal* the document to any third party. *See id.* at 1158.

[3] *See Phillippi v. CIA*, 655 F.2d 1325, 1331–32 (D.C. Cir. 1981); *Earth Pledge Found. v. CIA*, 988 F. Supp. 623, 625 n.1 (S.D.N.Y. 1996).

While the identity of the source of a disclosure is certainly relevant to the question whether the disclosure constitutes an official acknowledgment, and while it is generally true that statements made by legislators and former agency officials are insufficient to effect official acknowledgement, *see, e.g.*, *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999),[4] the categorical rule suggested by the government is not the law. The D.C. Circuit's recent decision in *Ameziane v. Obama*, 699 F.3d 488 (D.C. Cir. 2012), is instructive. In that case, counsel for a Guantánamo detainee sought permission to disclose that the government had approved the transfer of his client from Guantánamo—information contained in a sealed district-court order. *Id.* at 493. The district court granted the request, but the D.C. Circuit reversed. In considering the detainee's argument that the government's appeal was moot due to the alleged knowledge of the detainee's status by third parties, the circuit court observed that the detainee's attorney was "an officer of the court, subject to the serious ethical obligations inherent in that position," and consequently that representations made by him "would be tantamount to, and a

---

[4] In *Frugone*, the court held that a letter from the Office of Personnel Management ("OPM") acknowledging a prior relationship between the CIA and former CIA employee did not defeat an exemption claim by the CIA because compelled disclosure of the requested records through the FOIA "could cause greater diplomatic tension" than "the informal, and possibly erroneous, statements already made by the OPM." *See* 169 F.3d at 775. *Frugone* concerned an isolated disclosure made by administrative personnel from an agency that had only second-hand knowledge of the relevant facts.

sufficient substitute for, official acknowledgment by the U.S. government." *Id.*; *see id.* ("Although foreign governments would be unlikely to rely on a claim by a third party—or even by [the detainee] himself—that [the detainee] has been cleared for transfer, the same is not true with respect to a similar representation made by counsel.").

The court rejected the detainee's mootness argument, concluding that because the government had a legitimate interest in withholding official acknowledgement of the transfer approval, it had an interest in preventing the detainee's attorney from disclosing the transfer approval himself. *Id.*; *see id.* at 492 (explaining that "the district court order" itself would "*clearly* constitute an official acknowledgment of [the detainee's] cleared status" (emphasis added)); *see also Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362, 1370 (4th Cir. 1975) (assessing whether information had been officially acknowledged by asking whether speaker had been "in a position to know of it officially").

*Ameziane* makes clear that the question whether a disclosure is an "official acknowledgement" requires a more nuanced inquiry than the government urges here. And the D.C. Circuit's reasoning in *Ameziane* was sound. The official-acknowledgement doctrine reflects the recognition that official confirmation of a fact can sometimes cause harms distinct from those caused by "mere public speculation, no matter how widespread." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir.

—10—

2007); *accord Am. Civil Liberties Union v. Dep't of Def.*, 628 F.3d 612, 621 – 622 (D.C. Cir. 2011); *Fitzgibbon*, 911 F.2d at 765. "It is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so." *Alfred A. Knopf*, 509 F.2d at 1370; *accord Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982); *Alfred A. Knopf,* 509 F.2d at 1370 ("The reading public is accustomed to treating reports from uncertain sources as being of uncertain reliability, but it would not be inclined to discredit reports of sensitive information revealed by an official of the United States in a position to know of what he spoke."); *United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir. 1972) ("Rumor and speculation are not the equivalent of prior disclosure, however, and the presence of that kind of surmise should be no reason for avoidance of restraints upon confirmation from one in a position to know officially."); *see Military Audit Project v. Casey*, 656 F.2d 724, 745 (D.C. Cir. 1981) (rejecting official acknowledgment effect of a congressional report where the "CIA still has something to hide" or could credibly "hide from our adversaries the fact that it has nothing to hide").

The relevant issue, then, is whether the disclosure in question leaves "some increment of doubt," *Wilson v. CIA*, 586 F.3d 171, 195 (2d Cir. 2009), or whether, by contrast, it will be understood as reliable, credible, and official. Whether the

person who disclosed the information was an official of the relevant agency at the time is surely relevant to the inquiry—even highly relevant—but it is not determinative.[5]

There can be no serious question that the disclosures made by the leaders of the congressional intelligence committees have been understood as official by the general public. Senator Feinstein and Representative Rogers are the chairpersons of the congressional committees that oversee the CIA, *see* 50 U.S.C. § 413b, and they have made clear that they have first-hand information about the CIA's involvement in targeted killings. *See* ACLU Br. 15–17 (detailing the committee chairpersons' disclosures concerning their oversight of targeted killings by the CIA). It would be fatuous to suggest that their disclosures about the CIA's role in the targeted-killing program would be understood as anything other than official. Notably, the government does not contend that Senator Feinstein and Representative Rogers lack credibility with the public, or that they are uninformed, or that they are perceived by the public to be uninformed. Nor does it contend that the public is likely to disregard their statements until and unless those statements are confirmed by Executive Branch officials. The government's argument is

---

[5] Indeed, courts have held that even *private* actors may make official acknowledgments of "state secrets" if they have been afforded privileged access to the information at issue. *See Terkel v. AT & T Corp.*, 441 F. Supp. 2d 899, 913 (N.D. Ill. 2006) (citing *Hepting v. AT & T Corp.*, 439 F. Supp. 2d 974, 987–89, 991–94 (N.D. Cal. 2006)).

insupportably formalistic. It is an argument that divorces the rule entirely from its rationale.

The government's effort to dismiss the relevance of certain Executive Branch disclosures, Opp. 36–37, depends on the same rigidity. In essence, the government argues that Mr. Panetta's explicit and unambiguous statements about the CIA's role in targeted killings must be disregarded simply because, at the time he made them, Mr. Panetta had begun to occupy a different chair during Cabinet meetings. This argument defies both common sense and case law. If a private attorney can effect an official acknowledgement, as in *Ameziane*, 699 F.3d at 492–93, surely a Cabinet official can effect one, too. Moreover, not even the government maintains that Mr. Panetta's statements about the CIA's role in the targeted-killing program have been understood by the general public to be uninformed or speculative. Instead, the government's argument is (once again) entirely formalistic. The same is true of the government's attempt to disqualify Mr. Brennan's statements as the President's chief counterterrorism advisor. The government does not contend that Mr. Brennan was speaking on the basis of second-hand knowledge, that he was speculating about facts unknown to him, or that his statements were (or should have been) understood by the general public as anything other than official. The government's argument is simply that the Court

should transform a general rule into a categorical one without troubling to consider the rule's rationale.

Accepting the government's argument would create a perverse situation in which details about the targeted-killing program could be discussed and debated openly in Congress by members of the congressional committees tasked with overseeing the program—as they have been[6]—but still be considered secrets in the nation's courts. It would mean that some of the Executive Branch officials with most knowledge of controversial programs could promote and defend those programs to the public, and selectively disclose information about them, without ever triggering disclosure obligations under the FOIA. And it would mean that the courts would routinely declare to be "secret" information that the entire world already regards as plainly true and officially confirmed. Precedent does not require this absurd result, and this Court should not abide it. To borrow the words of the D.C. Circuit, the Court should not give its "imprimatur to a fiction of deniability that no reasonable person would regard as plausible," *Drones FOIA*, 710 F.3d at 431.

The government's argument that it cannot provide a *Vaughn* declaration without disclosing still-secret information is based on the unsustainable fiction that

---

[6] *See* Brennan Hearing Tr. at 5–7, 23, 28–29, 31–32, 38, 43–45, 53–59, 58, 109–114, 122–129, 139–143.

the public does not yet know for certain "whether lethal targeting operations are being conducted by . . . agencies of the United States Government [other than DOJ] and, if so, which agencies," Opp. 44. As Plaintiffs have explained, however, the government has already officially acknowledged—repeatedly, and through multiple agents—that lethal targeting operations are being conducted by the CIA and the Department of Defense ("DOD"). *See* ACLU Br. 13–23 (citing statements by Mr. Panetta, Mr. Brennan, DOD General Counsel Jeh Johnson, Senator Feinstein, and Representative Rogers, among other government officials), 38–39 (collecting CIA and DOD acknowledgments).[7] The Court should order the government to finally provide the *Vaughn* declaration that the FOIA required it to provide nearly two years ago.

---

[7] Additionally, the "nature, depth, and breadth" of DOJ's withholdings are no longer secrets. *Compare* JA193–94 ("[W]ere DOJ to acknowledge that it located a *large volume* of classified records responsive to the ACLU request, that would tend to indicate that an entity of the U.S. Government was involved in the lethal targeting activities that are the subject of the request, since if a U.S. Government entity had been granted the authority to carry out lethal operations against U.S. citizens it would be logical that the legal issues related to such operations would be extensively documented." (emphasis added)), *with* Opp. 47 ("Given recent acknowledgements . . . that the United States carried out the targeted strike that killed Anwar al-Awlaki, . . . DOJ can now disclose that there are a *significant number* of responsive classified records, consisting of legal advice and analysis (including about al-Awlaki)," among other responsive documents. (emphasis added))

To the extent the government's argument is that a *Vaughn* declaration will disclose more information than has already been officially acknowledged, the government misunderstands its burden. It will always be true that releasing more information will release more information. But what would be the purpose of the FOIA if the only information requesters could obtain under the statute was information the government had already released? *See* ACLU Br. 48–49 (arguing that through "no number no list" responses, the "CIA could effectively do unilaterally what Congress explicitly rejected thirty years ago, and exempt itself from the FOIA altogether"). The government's burden with respect to its "no number no list" responses is not to show that providing a *Vaughn* declaration will release additional information, but to show that it cannot identify or describe *any* of the withheld records without compromising an interest protected by one of the FOIA's exemptions. This is a burden the government plainly has not carried. The government has now officially acknowledged enough information that it is clear that it could supply a *Vaughn* declaration without compromising any legitimate interest.

As to the government's plea that it should not be penalized for having released some information to the public, Plaintiffs have two responses: First, Plaintiffs have no desire to penalize the government for releasing information, but the FOIA makes certain disclosures obligatory, not simply discretionary, and the

question of which disclosures are obligatory sometimes turns, at least in part, on

which disclosures the government has already made. *See* ACLU Br. 44–49. There

is nothing novel about this.  Second, one of the FOIA's purposes was to end the

practice of *selective* disclosure—the practice of disclosing information that paints

government policy in the most favorable possible light, while denying the public

access to additional information required to assess the validity of the government's

claims. *See, e.g.*, Republican Policy Committee Statement on Freedom of

Information Legislation, S. 1160, 112 Cong. Rec. 13020 (1966) ("In this period of

selective disclosures, managed news, half-truths, and admitted distortions, the need

for this legislation is abundantly clear."), *reprinted in* Subcomm. on Admin.

Practice, S. Comm. on the Judiciary, 93d Cong., Freedom of Information Act

Source Book: Legislative Materials, Cases, Articles, at 59 (1974). That the

government has made selective disclosures about the targeted-killing program is

not a reason to relax the FOIA's requirements. It is a reason to enforce them.

## II.    The Agencies' Withholding of the OLC–DOD Memo, the Unclassified Memos, and Any Other Responsive OLC Memoranda is Unlawful

For years, the Government has sought to reassure the public and Congress

that its targeted-killing program is lawful and constitutional. As part of that public-

relations campaign, various Executive Branch officials—including Attorney

General Holder and Mr. Brennan—have openly discussed the content of the OLC

memoranda setting out the government's legal basis for targeted killings of U.S.

citizens. The government released the White Paper, which Mr. Holder informed the Senate was based on OLC memoranda. In addition, Mr. Brennan stated in testimony before Congress that OLC memoranda set forth the legal limits within which the government's targeted-killing program operates. The government has consequently waived any privilege that might otherwise apply to the memoranda under Exemption 5 to the FOIA, under both the doctrines of adoption or incorporation and "working law." In addition, the government's attempts to shield the memoranda from disclosure under Exemptions 1 and 3 are unavailing. Legal analysis cannot itself be classified, and the government has not shown that the legal analysis cannot be segregated from other information that is properly withheld.

Exemption 5 protects documents that would be shielded in litigation by traditional common-law privileges, including the attorney–client and deliberative-process privileges. *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005). However, the FOIA requires disclosure of "all opinions and interpretations" which constitute an agency's "effective law and policy," even if such documents were initially created as predecisional advice and would otherwise be privileged. *NLRB v. Sears, Roebuck, & Co.*, 421 U.S. 132, 153, 161 (1975). The government also waives its common-law privileges when it adopts or expressly incorporates a document into a non-exempt communication. *Brennan Center for*

*Justice at N.Y. Univ. Sch. of Law v. Dep't of Justice*, 697 F.3d 184, 201– 202 (2d Cir. 2012).

As Plaintiffs made clear in their opening brief, the government has adopted the legal analysis concerning targeted killing contained in the OLC–DOD Memo, the Unclassified Memos, and other responsive legal memoranda. *See* ACLU Br. 52–54. The government's position is that the Executive Branch's public statements adopting the reasoning in the withheld memoranda have not been "express." Opp. 52. But the government's statements are exactly the kinds of "considered public reference[s] demonstrating reliance on both the conclusion and the reasoning of the document as the basis for agency policy" that the government concedes are sufficient to meet the adoption standard, Opp. 52. The law interpreting Exemption 5 simply does not permit the government to reassure the public and Congress that its targeted-killing program is carried out in accordance with legal limits set forth by the OLC but at the same time claim in court that the memoranda setting out those limits are merely predecisional legal advice. *See* ACLU Br. 54 (describing the government's unlawful attempt to "invoke" and "shield" its "effective law and policy" (citing *Brennan Center*, 697 F.3d at 208)).

As the government acknowledges, this Court does not employ a bright-line test for adoption. Opp. 53 (citing *La Raza*, 411. F.3d at 357 & n.5). The government cites *Brennan Center* to argue that "adoption through public

statements requires some 'explicit reference' to a specific document." Opp. 52 (citing *Brennan Center*, 697 F.3d at 204). But in that case, this Court used the quoted term but once—when it concluded that an "explicit reference" was sufficient, but by no means necessary, to agency adoption. *See Brennan Center*, 697 F.3d at 204. In addition, the government inaccurately cites *La Raza* for the proposition that "adoption must still be 'express' and 'explicit,'" Opp. 53. Rather, in *La Raza* this Court explicitly *rejected* the government's position that adoption should require "specific, explicit language of adoption or incorporation," for the reason that "courts must examine *all* the relevant facts and circumstances in determining whether express adoption or incorporation by reference has occurred." *La Raza*, 411 F.3d at 357, n.5.

Like the district court did, the government asks the wrong question: "The relevant question is not . . . whether the government's public statements evidence the 'specific[]' adoption of a withheld *document*; rather, it is whether those statements demonstrate that the government has adopted the *legal reasoning* in that document as 'effective law and policy.'" ACLU Br. 54 (alteration in original) (quoting *Brennan Center*, 697 F.3d at 195); *see Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency

in its dealings with the public."). The government warns that Plaintiffs' "proposed" rule would have the "perverse effect of deterring agencies from describing the legal basis for their conduct publicly out of concern that such explanations would risk removing the protection of the deliberative process and attorney–client privileges for any arguably related predecisional advice." Opp. 54. But that argument turns the law of adoption on its head: The doctrine's purpose is to *prevent* the withholding of law adopted in public, not to *protect* the withholding of law adopted in private.

The district court's construction of the "adoption" doctrine was indefensibly narrow. The district court concluded that it did not need to examine the OLC–DOD Memo *in camera* because even if the OLC–DOD Memo "contains language *identical* to that uttered by the Attorney General and others . . . , that would still not necessarily constitute proof that the Government had adopted *this document in particular*." SPA 61 (quoted at Opp. 54). But while the adoption doctrine requires plaintiffs to show that the government has adopted a document's legal reasoning, an otherwise valid adoption argument is not defeated simply because the government has set out its legal analysis in multiple documents rather than just one. The important point is that the government has told the public, multiple times, that its targeted-killing program is governed by legal analysis set out in specific documents authored by the OLC. The adoption doctrine requires no more.

And there is no question that the Executive Branch *has* explicitly adopted the legal reasoning and conclusion of the withheld memoranda. *See* ALCU Br. 24–25. At a Senate hearing, the Attorney General discussed the relationship between the White Paper and OLC opinions concerning targeted killing. *Oversight of the U.S. Department of Justice Before the S. Comm. on the Judiciary* at 1:51:36–1:52:24, 113th Cong. (Mar. 6, 2013), http://1.usa.gov/14pKfSc. Mr. Holder explained that the White Paper's discussion of imminence would be "more clear" if it were read together with the "underlying OLC advice." *Id.*[8] White House Press Secretary Jay Carney made a similar reference linking the documents. *See* White House, Press Gaggle by Press Secretary Jay Carney (Feb. 7, 2013), http://1.usa.gov/TQ3MLw. And Mr. Brennan cited OLC advice as defining the limits of the Executive Branch's targeted-killing authority against U.S. citizens. *See* Brennan Hearing Tr. at 57:14–15.

Nor are the OLC memoranda at issue in this case predecisional legal advice. *See Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010) ("To the extent the documents at issue in this case neither make recommendations for policy change nor reflect internal deliberations on the advisability of any particular course of action, they are not predecisional and

---

[8] The government is mistaken to represent that "no Executive Branch official has made any . . . statement" acknowledging that the White Paper was "'drawn from one or more of the OLC memoranda.'" Opp. 54 n.16 (quoting ACLU Br. 24).

deliberative despite having been produced by an agency that generally has an advisory role."). As the OLC itself has recognized, when the OLC is asked to opine on matters that may not be resolved by courts, "OLC's advice may effectively be the final word on the controlling law." Memorandum from David Barron, Acting Assistant Attorney Gen., Office of Legal Counsel, U.S. Dep't of Justice, for Attorneys of the Office (July 16, 2010), http://1.usa.gov/ZWlpuo; *see* Br. of *Amici Curiae* Elec. Privacy Info. Ctr. at 5–10. The government's targeted-killing program presents the quintessential example of this scenario, as there is no opportunity for judicial review before the government carries out a targeted killing. *See Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010). As Mr. Brennan candidly stated during his confirmation hearing, the OLC "advice establishes the legal boundaries within which [the government] can operate." Brennan Hearing Tr. at 57:14–15. The OLC memoranda are not merely legal advice, but establish the operative law and policy for the government's targeted-killing program. The public knows this to be true, because the government continues to say it.

The government also argues that the withheld legal memoranda, including the OLC–DOD Memo and the Unclassified Memos, are not "working law" because they do not constitute "rules used by agencies to determine the rights and obligations of the public." Opp. 56. This contention misunderstands the law. Courts have repeatedly held that documents "reflecting [an agency's] formal or

informal policy on how it carries out its responsibilities fit comfortably within the working law framework." *Pub. Citizen*, 598 F.3d at 875; *accord Coastal States*, 617 F.2d at 869 ("[I]n fact, these opinions were routinely used by agency staff as guidance . . . and were retained and referred to as precedent. If this occurs, the agency has promulgated a body of secret law which it is actually applying in its dealings with the public but which it is attempting to protect behind a label. This we will not permit the agency to do.").

But the facts here satisfy even the government's proposed rule. As the President and the Attorney General have recognized, the right not to be deprived of life without due process of law is a fundamental right recognized in the Fifth Amendment to the U.S. Constitution. *See* Obama NDU Speech; Holder Letter at 2; JA085 (Mr. Holder's speech at Northwestern University School of Law). U.S. citizens have a critical interest in knowing when the Executive Branch claims the right to kill them without judicial process. Far from "not opin[ing] on the legal rights of the public," Opp. 57, the withheld memoranda speak to the most fundamental right of all: the right to life. The government's claim that the OLC's legal advice had "no legal effect on private parties," Opp. 55, is difficult to understand. The OLC's legal advice supplied the framework under which four U.S. citizens were deprived of their lives.

The government claims that the legal memoranda are not "working law" because the ultimate decision whether to kill a particular person is not made by the lawyers at the OLC. Opp. 59. But the government's insistence that "working law" requires that legal advice leave the Executive Branch "'with no decision to make,'" Opp. 59 (quoting *Brennan Center*, 697 F.3d at 203), omits the first half of the relevant sentence from the opinion it quotes. In *Brennan Center*, this Court indicated that *alternatively* (as Plaintiffs have argued), legal advice constitutes "working law" when it is "effectively binding on the agency." *Brennan Center*, 697 F.3d at 203. The government has made clear—indeed, it has promoted the fact—that the legal advice in the withheld memoranda cabins Executive Branch authority with respect to targeted killings. Moreover, the fact that Executive Branch officials retain latitude in deciding whether to authorize a targeted killing does not mean that the OLC memoranda are not binding. The memoranda are binding because they set out limitations on Executive Branch officials' authority.

Furthermore, because legal analysis cannot itself be classified, the OLC–DOD Memo, the Unclassified Memos, and other responsive legal memoranda are not protected by Exemptions 1 and 3—and certainly not in their entireties. *See* ACLU Br. 55 (explaining that "no court has ever held" that legal analysis may itself be classified). With respect to Exemption 1, Plaintiffs have already rebutted the government's argument that the legal principles governing the targeted-killing

program may be classified because they would "pertain to" an intelligence source and method, Opp. 31. *See* ACLU Br. 56–58 (explaining that the government's reading of Executive Order 13,526 would permit the CIA an effective exemption from the FOIA and create a body of "secret law"). Rather, the government may classify information only to the extent it falls within one of the categories enumerated in the Executive Order, and, even then, it can classify that information only if its disclosure would jeopardize national security in some identifiable way. *See* ACLU Br. 55–58.

The government's Exemption 3 argument fares no better. Killing does not "logically fall[] within," *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009) (quotation marks omitted), the bounds of the statutory term "intelligence sources and methods." *See* ACLU Br. 59. And targeted killing is not a "function" under the Central Intelligence Agency Act, 50 U.S.C. § 403g. Indeed, if that term (which covers the agency's "internal structure") were read that broadly, the Act would effectively "accord the Agency a complete exemption from the FOIA," *Phillippi v. CIA*, 546 F.2d 1009, 1015 n. 14 (D.C. Cir. 1976).

Plaintiffs recognize that legal memoranda may sometimes include discrete material that is properly classified or protected by the CIA's relevant withholding statutes. If that is the case, however, the FOIA obligates the defendant agencies to provide Plaintiffs with "[a]ny reasonably segregable portion" of the documents.

5 U.S.C. §552(b). Therefore, any classified or statutorily protected portions of the documents should be redacted so that the non-protected portions can be disclosed. Of course, in some circumstances legal analysis might be "inextricably intertwined" with properly classifiable information, and therefore properly withheld. *See, e.g.*, *N.Y. Times Co. v. U.S. Dep't of Justice*, 872 F. Supp. 2d 309, 318 (S.D.N.Y. 2012). But that is plainly not the case here. Mr. Holder's speech, as well as the White Paper, detailed almost every aspect of the relevant law. *See* ACLU Br. 53. As to the question whether the withheld memoranda contain reasonably segregable legal analysis that can be produced in this litigation, the government's own recitations of the law binding the Executive Branch in this area should be conclusive.[9]

---

[9] Perhaps the government could have argued at one time that the legal memoranda were protected because disclosing them would reveal the very existence of the targeted-killing program, or the fact that that program has killed U.S. citizens. But that information—and a great deal more—has already been disclosed to the public by the President, senior Executive Branch officials, and Congress.

And as explained *supra* § I, the government's argument that releasing the memoranda risks revealing the identity or identities of the agency or agencies operationally involved in targeted killing is also unpersuasive. If it were persuasive, moreover, it would be easily remediable: The Court could simply order that memoranda addressed to the CIA or DOD be redacted so that the name of the recipient agency was removed.

### III.    OIP Did Not Conduct an Adequate Search for Records

The government cites to *Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999), for the uncontroversial proposition that its search need not be perfect, but only "reasonable." Opp. 60 (quotation marks omitted). The government, however, misconstrues Plaintiffs' argument, which does not depend on "purely speculative claims about the existence and discoverability of other documents," *Grand Central Partnership*, 166 F.3d at 489 (quotation marks omitted). Rather, Plaintiffs contend that the search carried out by the DOJ's Office of Information Policy ("OIP") was not reasonable given the information that the DOJ *itself* possessed at the time the search was carried out. *See Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998) (holding that the reasonableness of an agency's search must be judged by what the agency knew at its conclusion). The DOJ cites to agency regulations requiring that FOIA requests be submitted to particular agency components, but it conspicuously does not make the factual claim that the OIP was *unaware* of the results of the OLC's search. Opp. 60. Nor would such a claim be credible, given that both components of the DOJ are represented in this litigation by the very same counsel. At the conclusion of the OIP's search, the agency (and its lawyers) *knew* that the OIP's search had been less comprehensive than the OLC's search because it had failed to locate at least thirty responsive e-mail chains involving the OLC. In this context, it is unreasonable for

the DOJ to refuse to conduct an additional search for responsive records and, on remand, the OIP should be ordered to do so.

Finally, the government's casual dismissal of Plaintiffs' argument that the White Paper, or drafts of it, should have been found through DOJ's various searches, *see* Opp. 61, places form over substance. That the White Paper is stamped "draft" has little bearing on whether it is, in fact, a draft document excluded by the terms of the Plaintiffs' Request. Indeed, if the White Paper was (as has been reported) delivered to Congress as a substitute for the legal memoranda that the Executive Branch refused to provide to legislators, the argument that the White Paper was merely a draft is simply not credible. *See* Daniel Klaidman, *Obama's Drone Debacle*, Daily Beast, Mar. 10, 2013, http://thebea.st/Zys6Af. The government must do more than contest Plaintiffs' argument with one sentence in its brief, and this Court should require it to more fully account for the White Paper's total absence from any government response to Plaintiffs' Request in this case.

## CONCLUSION

For the reasons stated above, the Court should reverse the decision below and remand with instructions that the district court require the defendant agencies to (1) identify all records responsive to the Request by date, author, recipient, title, length, and description; (2) release the identified records or provide a *Vaughn* declaration explaining, on a record-by-record basis, why release would compromise an interest protected by one of the FOIA's enumerated exemptions; (3) after *in camera* review to determine whether redactions are necessary to protect intelligence sources and methods that have not already been disclosed, release the OLC–DOD Memo; (4) release the Unclassified Memos; (5) after *in camera* review to determine whether redactions are necessary to protect intelligence sources and methods that have not already been disclosed, release the OLC memos that Mr. Holder referenced in his testimony before the Senate; and (6) require the OIP to conduct a new search for responsive documents.

Dated:  June 28, 2013                    DORSEY & WHITNEY LLP

                                          By:  /s/ Colin Wicker

                                          Eric A.O. Ruzicka
                                          Colin Wicker

                                          50 South Sixth Street
                                          Minneapolis, MN 55402-1498
                                          612-340-2959

                                          Joshua Colangelo-Bryan
                                          51 West 52nd Street
                                          New York, NY 10019-6119
                                          212-415-9200

                                          AMERICAN CIVIL LIBERTIES
                                          UNION FOUNDATION

                                          Jameel Jaffer
                                          Hina Shamsi
                                          Brett Max Kaufman

                                          125 Broad Street, 18th Floor
                                          New York, NY 10004
                                          212-549-2500

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
APPELLATE PROCEDURE 32(A)**

I hereby certify that this brief complies with Rule 32(a)(7)(B) because it contains 6,792 words, excluding the portions of the brief exempted by Rule 32(a)(7)(B)(iii), and that it complies with typeface and type style requirements of Rule 32(a)(5)-(6) because it is printed in a proportionally spaced 14-point font, Times New Roman.


 /s/ Colin Wicker

Colin Wicker
Attorney for the American Civil Liberties Union and
The American Civil Liberties Union Foundation